# PD-5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Tuesday, November 17, 2020 |
|  | ) | 1:30 p.m. Docket |
| Debtor. | ) |  |
|  | ) | PATRICK DAUGHERTY'S MOTION |
|  | ) | FOR TEMPORARY ALLOWANCE OF |
|  | ) | CLAIM FOR VOTING PURPOSES |
|  | ) | [1281] |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            John A. Morris
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For Patrick Daugherty:     Jason Patrick Kathman
                           PRONSKE & KATHMAN, P.C.
                           2701 Dallas Parkway, Suite 590
                           Plano, TX  75093
                           (214) 658-6500

For Patrick Daugherty:     Thomas A. Uebler
                           Joseph L. Christensen
                           MCCOLLOM D'EMILIO SMITH UEBLER,
                             LLC
                           Little Falls Centre Two
                           2751 Centerville Road, Suite 401
                           Wilmington, Delaware 19808
                           (302) 468-5960

1

2   For the Official Committee   Matthew A. Clemente
    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
3                                One South Dearborn
                                 Chicago, IL  60603
4                                (312) 853-7539

5   Recorded by:                 Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
6                                1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
7                                (214) 753-2062

8   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
9                                Shady Shores, TX  76208
                                 (972) 786-3063

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.

1          <u>DALLAS, TEXAS - NOVEMBER 17, 2020 - 1:38 P.M.</u>

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good afternoon.  Please be seated.  We

6   have a setting we'll start now in Highland, Case No. 19-34054.

7   We have a motion of Patrick Daugherty to have his claim

8   allowed for voting purposes under Bankruptcy Rule 3018.  For

9   Mr. Daugherty, who do we have appearing?  Do we have Mr.

10  Kathman and crew?

11         MR. KATHMAN:  Good afternoon, Your Honor.  Jason

12  Kathman on behalf of Mr. Daugherty.  I'm also joined today by

13  my co-counsel in Delaware, Tom Uebler and Joe Christensen with

14  the firm McCollum D'Emilio Smith & Uebler, LLC.  They've been

15  admitted *pro hac vice* in this case and they're going to be

16  handling the case this morning for our side, Your Honor.  We

17  also have on the phone and in the WebEx today Mr. Daugherty as

18  well.

19         THE COURT:  All right.  Very good.  I see Mr. Morris

20  up there.  Are you going to be taking the lead for the Debtor

21  this afternoon?

22         THE CLERK:  He's on mute.

23         THE COURT:  You're on mute, sir.

24         MR. MORRIS:  Thank you very much.  Yes, I -- yes, I

25  will, Your Honor.  It's John Morris from Pachulski Stang Ziehl

1    & Jones for the Debtor.

2        With the agreement of all of the parties, before we begin

3    my partner Mr. Pomerantz would like to just briefly update the

4    Court on certain plan issues, and then we'd like to proceed to

5    the matter on the schedule.

6        THE COURT:  All right.  That is fine.  So, we'll --

7    first off, I'm just going to note we have a lot of other

8    participants showing on the video screen.  I'm not going to

9    take other appearances.  I assume they're just interested

10   observers today.  The only pleadings on the contested matter

11   were filed by Daugherty and the Debtor.  But certainly if

12   someone at some point has something to say regarding the case

13   generally, I'm happy to hear anything people want to report.

14       So, with that, Mr. Pomerantz, what would you like to say?

15       MR. POMERANTZ:  So, thank you, Your Honor.  As Mr.

16   Morris mentioned, I thought I would give Your Honor a brief

17   update.  We haven't been here in a couple of weeks, which has

18   seemed like a lifetime, but I wanted to apprise the Court last

19   Friday night the Debtor filed an amended plan and disclosure

20   statement, pursuant to the Court's prior scheduling order.  We

21   also filed the infamous plan supplement, which was discussed

22   in a lot of detail at the last hearing, which contained

23   drafts, advance drafts of the principal plan implementation

24   documents likely to be of interest to the creditors, including

25   the Claimant Trust Agreement, the Liquidating Trust Agreement,

1    other corporate organizational documents, and a list of

2    retained causes of action under the plan.

3        And I'm pleased to report that over the last couple of

4    weeks the Debtor and the Committee have made substantial

5    progress in addressing the disputed issues that were forefront

6    at the hearing on October 27th.

7        Such progress included a resolution of the structure and

8    consideration relating to the releases to be provided under

9    the plan; the identity of the independent board members and

10   the Liquidating Trustee, or Litigation Trustee, excuse me;

11   substantial agreement on the form of the Claimant Trust

12   Agreement and the Litigation Trust agreement; and the

13   inclusion of a protocol to address how disputed claims will be

14   resolved.

15       While there are a few issues left to be resolved and

16   ironed out between the Debtor and the Committee, (audio gap)

17   can be resolved by Monday.  We believe that as it relates to

18   the Committee's issues next week, the hearing will largely be

19   consensual, and we extend the opportunity to other parties who

20   objected, including UBS, who has already reached out to us

21   with a couple of comments they have, as well as we suggest

22   that Mr. Daugherty and HarbourVest also reach out to us in

23   advance of that hearing so that we can work through as many

24   issues.

25       So, we took Your Honor's comments last week to heart, and

1    I think the parties have worked cooperatively to streamline to

2    what I think will be a narrow set of issues, if any, that will

3    be up for hearing on Monday, Your Honor.

4         THE COURT:  Okay.  That's very good to hear.  I'll

5    just check:  Is Committee counsel on the line and do you wish

6    to respond to that?

7         MR. CLEMENTE:  Your Honor, it's Matt Clemente at

8    Sidley.  Can you hear me?

9         THE COURT:  I can.

10        MR. CLEMENTE:  Oh, hi, yeah, good afternoon, Your

11   Honor.  As Mr. Pomerantz I think has accurately captured of

12   the current state of play, so we took the time that Your Honor

13   wisely gave us and I think we worked very, very hard and I

14   think we have come to conclusion on, you know, a variety of

15   the issues that we had.  Mr. Pomerantz is correct, there's a

16   hearing full of things that still need to discuss, Your

17   Honor.  But I would expect that either we come to a resolution

18   on those or those are things that, you know, ultimately can be

19   dealt with in connection with plan confirmation itself.  But I

20   agree with Mr. Pomerantz's comments.

21        THE COURT:  Okay.  Very good.  Well, I hope all of

22   you will keep working at it.  You've got almost a week until

23   we're here next Monday.  So, UBS and the others, I really hope

24   you will accept the invitation of Mr. Pomerantz you heard just

25   now to talk to him and see if you can get your issues worked

1    out.

2        All right.  Well, we did note that you had filed the

3    documents Friday night, and I think I know what my weekend

4    activity is going to be besides, you know, watching my

5    Longhorns:  Reading the Highland disclosure statement and plan

6    supplement.  So, anyway, I look forward to doing that, and I

7    will hope for a somewhat smooth hearing Monday, if not an

8    entirely smooth hearing.

9        All right.  Thank you for that report, Mr. Pomerantz.

10            MR. POMERANTZ:  You're very welcome, Your Honor.

11            THE COURT:  Okay.  Thank you.  All right.  Well,

12    let's turn to the matter at hand, the motion.  You all have

13    blessed me with lots of papers to read and exhibits for today.

14    We have a two-hour time estimate, so I hope you will do your

15    best to stick with that.

16        As far as your presentations today, let me tell you that I

17    really don't need you to spend much time, if any, arguing the

18    law, Bankruptcy Rule 3018(a), the case law construing it.  I'm

19    pretty familiar.  It says such things as the Rule contemplates

20    a summary estimation proceeding, not a full trial on the

21    merits.  The Court has a lot of discretion.  So please don't

22    argue the 20 or 30 cases that are out there that interpret

23    Rule 3018.  I'd really like to focus on the numbers more than

24    anything else.

25        And so as far as opening statements, I'm going to turn to

 1   -- I don't know if it will be Mr. Uebler or Mr. Christensen --

 2   and ask you right off the bat:  Why is the Debtors' suggested

 3   compromise of $9,134,019 not a fair resolution, when we all

 4   know that you can argue entitlement to every penny in that $40

 5   million plus proof of claim ultimately in the adversary

 6   proceeding, in the trial on the proof of claim, but for now,

 7   it looks like the Debtor has put out a pretty reasonable olive

 8   branch?  So let me just put you on the spot and ask you to

 9   start there in your opening statement.

10         MR. UEBLER:   Thank you, Your Honor.  This is Tom

11   Uebler on behalf of Patrick Daugherty.

12       While it is a generous offer, it leaves disputed $31 --

13   approximately $31 million with respect to Mr. Daugherty's

14   claims.  The Debtor has agreed to the amount of Mr.

15   Daugherty's 2012 Texas court judgment, plus interest, and the

16   Debtor has also agreed to the unjust enrichment and promissory

17   estoppel damages from the Delaware case in the amount of

18   approximately $5 million.  But what the Debtor refuses to

19   agree to or acknowledge any potential liability for are the

20   three other subparts of Mr. Daugherty's claim.

21       The first of those subparts is what we're calling the

22   Reimbursement Claims, and that includes Mr. Daugherty's claims

23   for contractual indemnification under Highland's partnership

24   agreement.  And it includes fees on fees -- at least that's

25   how we refer to it in Delaware -- which are fees expended by

1    Mr. Daugherty in seeking to establish his indemnification

2    rights in Delaware.  And finally, fee shifting, for what we

3    have laid out as a decade pattern of litigation misconduct by

4    Highland against Mr. Daugherty.

5        The Debtor also disputes Mr. Daugherty's claim for the

6    remaining 80.9 percent of the value of HERA, Highland Employee

7    Retention Assets.  That claim is valued at approximately $21.2

8    million.

9        And finally, --

10        THE COURT:  Let me stop you.  Let me stop you there,

11    because that's obviously a big, big, big chunk of the

12    disparity.  Remind me.  Either you lost on that in Delaware,

13    or I'm trying to remember, you abandoned it, you somehow had

14    an adverse ruling in Delaware.  Remind me real quick what that

15    was.

16        MR. UEBLER:  We did.  We had an adverse ruling.  We

17    brought claims in Delaware as part of Mr. Daugherty's original

18    pleading in 2017.  And those were claims for breach of

19    fiduciary duty, aiding and abetting breach of fiduciary duty.

20    Ultimately, Mr. Daugherty was seeking to put back into HERA

21    the millions of dollars that Highland had taken from HERA in

22    2013 and then to dissolve HERA.  And it's Mr. Daugherty's

23    position that he is the 100 percent owner of HERA at this

24    point in time.

25        The Delaware Court of Chancery dismissed that portion of

1    Mr. Daugherty's pleading on *laches* grounds, finding that --

2              THE COURT:  Yes.

3              MR. UEBLER:  -- Mr. Daugherty should have filed that

4    claim sooner.  We argued that he was excused from the

5    limitations period because there was an open question in the

6    Texas courts about whether Mr. Daugherty remained a unit

7    holder of HERA up through 2016.  And that's an argument we

8    plan to pursue on appeal.

9         To fully respond to your question, I want to note I read a

10   footnote in the Debtors' opposition that said something like

11   we've had a year to seek leave to file an appeal of that

12   dismissal in Delaware.  But we don't yet have a final

13   appealable judgment in Delaware to appeal.  That dismissal

14   remains an interlocutory order.  As Your Honor probably knows,

15   we were in day three of trial on the claims that did survive

16   the Debtors' motion to dismiss when this proceeding was filed.

17   So we have not had an opportunity to appeal the dismissal of

18   what we're calling the HERA 80 Percent Claim, but Mr.

19   Daugherty intends to exercise those appellate rights in

20   wherever the appropriate venue may be as this proceeds.

21             THE COURT:  All right.  Well, you know, courts always

22   want to be pragmatic, as you know, in situations like this,

23   3018 estimation proceedings.  And my pragmatic view of things

24   is, while, again, we may have a multi-day trial one day where

25   you convince me on this $21 million plus claim, that

1  notwithstanding the Delaware court's dismissal of it for

2  *laches*, at the end of the day you ought to get this, it seems

3  like a pragmatic place to draw the line here today for

4  purposes of an estimation hearing.  I'm not sure how you could

5  convince me in two hours that this absolutely is likely enough

6  to prevail that you ought to get to vote the claim.

7       Another area, as long as I'm talking about pragmatic ways

8  to resolve this issue today, is the post-petition interest.  I

9  have a feeling that's only a couple of hundred thousand

10 dollars or so.  But nevertheless, it's argued here somewhat

11 extensively that Daugherty ought to get to keep accruing post-

12 judgment interest on the HERA judgment post-petition because,

13 you know, it's not really a judgment against the Debtor, it's

14 a judgment against HERA, and the general 502(b)(2) you can't

15 accrue post-petition interest, unmatured interest, if you're

16 an unsecured creditor, ought not to apply.  I'm just telling

17 you right now, that would be a nonstarter here for me today.

18 Again, I have a feeling that's only a couple of hundred

19 thousand dollars, right?  Maybe it's more than that. It can't

20 be.  Right?

21            MR. UEBLER:  That's --

22            THE COURT:  Okay.

23            MR. UEBLER:  That's correct, Your Honor.

24            THE COURT:  So, --

25            MR. UEBLER:  So I won't, I won't address that any

1    further.

2            THE COURT:  Okay.  So we can take that one off the

3    table.

4        And then the other kind of pragmatic way I view things

5    today is the attorney fee shifting.  Now, you might be able to

6    piece this together for me and show me that, contractually,

7    under the indemnification provision, that there is some

8    component of attorneys' fees that ought to be allowable, but,

9    you know, to just generally kind of give a common law bad

10   faith argument here, that I should depart from the *American*

11   Rule -- you know, if there's no contractual entitlement, if

12   there's no statutory entitlement -- that's a heavy lift.

13   Again, you might prevail one day, but for purposes of a

14   summary voting estimation claim context, I just don't see how

15   you get there.

16       So, does that help narrow the issues today?  I had trouble

17   thinking how I'm ever going to get to the $21 million claim in

18   a summary 3018 context, the breakaway from the *American* Rule

19   on attorneys fee shifting, and then the post-petition

20   interest.

21       So if you carve those away, I don't know how close we are

22   to the $9,134,000 that the Debtor has proposed, but I guess

23   we're still a few million away.

24           MR. UEBLER:  We're getting closer, but let me respond

25   to the pragmatic way of dealing with the HERA 80 Percent

1   Claim, which is $21 million.  We don't view that as at all a

2   nothing amount for purposes of today.  I might not convince

3   you that Mr. Daugherty should be entitled to the entire $21

4   million, and I'm not -- I'm not going to try, because I do

5   recognize that the claim was dismissed and that creates at

6   least a procedural burden for us.

7         So, one result may be to award Mr. Daugherty a portion of

8   that claim.  But let me move on --

9                 THE COURT:  Okay.

10                MR. UEBLER:  -- to address the fee issue.  These are

11   -- there are 30 different sources of Mr. Daugherty's rights to

12   fee reimbursement, only one of which is the common law

13   exception to the *American* Rule.  And my thought was to just

14   briefly outline what it is that we're asking for, break down

15   Mr. Daugherty's claim, and then ask Mr. Daugherty to testify

16   very briefly about how he calculated that amount and what out-

17   of-pocket payments he's actually made throughout the course of

18   this litigation, to give the Court an opportunity to see which

19   of the different buckets the fees may fall into and how you

20   may be able to resolve some or all of those amounts.

21                THE COURT:  All right.

22                MR. UEBLER:  So, the claim for indemnification and

23   fee shifting, as I said, it has -- it has three components.

24   The first, which we focused on in our reply, is the bad-faith

25   fee shifting.

1          Now, in Mr. Morris's presentation that I expect him to

2     show today, he'll refer to this as a new argument that wasn't

3     in our Delaware complaint and was not in the proof of claim

4     submitted by Mr. Daugherty.  That's just not the case.  This

5     was an issue that was presented to the Delaware court in

6     August 2019, before trial.  We laid out why Mr. Daugherty

7     should be entitled to fee shifting.  And that's an issue that

8     would have been addressed post-trial but for this bankruptcy.

9     And that's based on the series of events that we laid out in

10    detail -- probably too much detail for these purposes -- in

11    our papers about shifting positions in litigation; attempts to

12    put Mr. Daugherty in jail, which thankfully the Texas

13    appellate court put a stop to; preventing Mr. Daugherty from

14    collecting compensation that's rightfully his.  All of that

15    has cost Mr. Daugherty millions of dollars over the last ten

16    years, and he hasn't recovered a dime.

17         So, the three legal doctrines are the bad-faith exception

18    to the *American* Rule.

19         The second is contractual indemnification under Highland

20    Capital's partnership agreement.  This is a claim that was

21    fully briefed on cross-motions for summary judgment in

22    Delaware, and it was argued to the Delaware Vice Chancellor

23    and submitted for a decision.  The source of Mr. Daugherty's

24    indemnification claim is Section 4.1(h) of Highland's

25    partnership agreement, and that's Exhibit 39 in the papers we

1  submitted.  I'll just read briefly what that provision is.

2       It states that a partnership -- that is, Highland Capital

3  -- shall indemnify and hold harmless the general partner --

4  which is a company called Strand -- and any director, officer,

5  employee, agent, or representative of the general partner --

6  again, Strand -- against all liabilities, losses, and damages

7  incurred by any of them by reason of any act performed or

8  omitted to be performed in the name of or on behalf of the

9  partnership -- which is Highland -- or in connection with the

10  partnership's business -- which is Highland's business --

11  including, without limitation, attorney's fees and any amounts

12  expanded in the settlement of any claims or liabilities,

13  losses, or damages, to the fullest extent permitted by

14  Delaware law.

15       Now, it was undisputed through summary judgment in the

16  Delaware case and going I would say close to three years of

17  litigation that Mr. Daugherty was a covered party under that

18  provision.  In other words, he was an officer, agent,

19  representative of Strand who could be entitled to

20  indemnification.

21       Highland admitted in every version of its answer in the

22  Delaware case that Mr. Daugherty was, in fact, an officer or

23  an agent of Strand through his resignation from Highland in

24  2011.  But in this Court now, we have Highland claiming that

25  Mr. Daugherty ceased being an officer of Strand in 2009.

1        And, in fact, just a few hours ago I received a few

2    documents from Mr. Morris showing that Mr. Daugherty was not

3    listed as an officer of Strand after 2009.  I'm still

4    processing in my own mind why I'm just receiving these

5    documents now, after three years of litigation, why Highland

6    made previous judicial admissions to the contrary, and why we

7    made it through summary judgment without this issue being

8    raised.

9        But ultimately, it doesn't matter, because Mr. Daugherty

10    will prove, consistent with Highland's prior admissions in the

11    Delaware court, that he is a covered person under this

12    indemnification clause, because, at a minimum, he was an agent

13    and representative of Strand through 2011.

14        And he'll also prove that all of the Texas litigation and

15    what has happened since the Texas litigation began in 2012

16    really stems from what Mr. Daugherty did or did not do related

17    to Highland's business.  So the nexus requirement under the

18    indemnification agreement is satisfied.

19        Again, this is an issue that was fully submitted to the

20    Delaware court, but no decision was issued.

21        The third component of our reimbursement claim is fees on

22    fees and the idea that, to the extent Mr. Daugherty is

23    successful in establishing his contractual indemnification

24    rights, he is also entitled to reimbursement for the cost of

25    proving his entitlement to indemnification.

1        Now, if you put all of these three buckets together,

2   you're left with $7.8 million.  That's not an insignificant

3   amount, and it's -- it's more than the $9 million that

4   Highland has offered.  And if any line is going to be drawn

5   today, we submit that that line should be drawn to include

6   this $7.8 million for -- based on the law that we've provided

7   in our papers and based on the facts that we have demonstrated

8   and the exhibits and Mr. Daugherty's declarations and the

9   brief testimony you'll hear today about the litigation that

10  Mr. Daugherty defended and what he's had to deal with for the

11  last ten years.

12       I'm going to stop there.  Do you have any questions at

13  this time about the fee reimbursement portion of the claim,

14  which is $7.8 million?

15            THE COURT:  No questions on that.

16            MR. UEBLER:  Okay.  The one aspect of Mr. Daugherty's

17  claim that we did not have an opportunity to talk about yet is

18  what we're calling the 2008 Tax Refund Claim.  And that's --

19  that's an amount of $2.6 million in Mr. Daugherty's proof of

20  claim, and that amount should be allowed in full for voting

21  purposes.

22       Now, I'm going to let Mr. Daugherty explain the factual

23  background of this claim, but the short version is that Mr.

24  Daugherty received compensation in 2008 from Highland Capital,

25  and he received that compensation as an employee and in the

1    form of a tax refund.  The IRS is still in the process of

2    auditing Highland's tax treatment for 2008, so there's a

3    possibility that in the future the IRS will claw back Mr.

4    Daugherty's 2008 compensation that was approximately $1.4

5    million.  And with that would come interest and penalties that

6    we estimate could total $2.6 million.

7         So, yes, it's correct that as of today there is no

8    definite liability to the IRS.  This is a contingent liability

9    and we don't know what the total amount may be.

10        Now, if Highland hadn't come out and said in its adversary

11   complaint that it's basically refusing to acknowledge any

12   potential liability for this issue, we might not have a

13   current claim to put before Your Honor today.  But the fact

14   that Highland has already come out and said it has no

15   intention of either covering future tax liability or giving

16   Mr. Daugherty substitute employee compensation for 2008 in the

17   event that the IRS were to take that away, we think presents a

18   live claim that Mr. Daugherty has sought to preserve through

19   this proceeding.

20        He's not seeking a cash payment, ultimately.  All he's

21   looking for is some agreement by Highland to assume this

22   liability or to put the money in escrow in the event of a

23   clawback.  But for voting purposes, we're asking that the full

24   potential of $2.6 million for this claim be permitted.

25        And, you know, you asked earlier about why $9 million

1    isn't enough.  It's a matter of degree.  Mr. Daugherty is a

2    creditor and he is entitled to a say in the plan, and that's

3    what we're trying to establish today.  And we think it's

4    important that Mr. Daugherty have a voice, and that voice

5    carry some weight, to enable Mr. Daugherty to have a seat at

6    the table, have a voice in the plan.

7         I think the more that this Court would be willing to

8    permit at this summary stage of the proceedings, where there's

9    a presumption in favor of claims, even if they're disputed --

10   I think that will be my only reference to 3018 law today -- we

11   submit the Court should err on the side of more rather than

12   less.

13        Mr. Morris and I had discussed doing mutual openings

14   followed by Mr. Daugherty's testimony.  I think now would be a

15   good time to turn this over to Mr. Morris before we call Mr.

16   Daugherty, if that works for you.

17             THE COURT:  All right.  That works for me.  Mr.

18   Morris?

19             MR. MORRIS:  Good afternoon, Your Honor.  John

20   Morris; Pachulski Stand Ziehl & Jones, for the Debtor.

21        I really do appreciate Your Honor's preliminary

22   projections of where we are.  I had prepared a rather

23   extensive presentation for the Court that I'm actually going

24   to dispense with because I'd like to focus on the narrow

25   issues that Your Honor has identified.

1    I want to begin by apologizing to the Court for having to

2    engage in this process.  We have tried very hard, I think as

3    Your Honor has perceived, to fully resolve this particular

4    motion.  At the outset of the process, the Debtor readily

5    acknowledged the validity of Mr. Daugherty's judgment in the

6    amount of $2.6 million, plus interest, through $3.7 million.

7    That's not an amount in dispute today.  That won't be in

8    dispute as a matter of his claim.  We have admitted it, we

9    acknowledge it, and it will be allowed in that amount.

10    We went one step further in the hope that it would resolve

11    this motion by agreeing to allow the maximum amount that Mr.

12    Daugherty's expert was prepared to testify to on the petition

13    date for these promissory estoppel and other related claims.

14    The expert at that time testified to a range of somewhere of

15    four to about $4-1/2, $5-1/2 million, and that's how we

16    arrived at the $9.1 million.

17    Let me make it clear, Your Honor, that if the parties are

18    unable to resolve this, the Debtor will contest that.  But for

19    this purpose, we felt by giving it one hundred percent

20    validity, notwithstanding the fact that we will contest it on

21    the merits if needed, that that was a fair resolution, that

22    that was a very simple way to get this done.  Unfortunately,

23    we were not successful.

24    We're here today not because we like to litigate but

25    because we're doing our best for these estates and its

1    stakeholders, including all unsecured creditors.  Mr.

2    Daugherty is entitled to a seat at the table.  We have given

3    him a seat at the table.  He now sits with the third largest

4    general unsecured claim that is going to be allowed, and that

5    follows from the settlements with the Crusader and Redeemer

6    Funds and with Acis.  At $3.7 million, he's already got the

7    third largest allowed claim.  And we're prepared to give him a

8    vote of over $9 million for this purpose.  But what we don't

9    do and we don't think our fiduciary duty will allow us to do

10   is give him credit for claims that, in our view, clearly have

11   no merit.

12       So let me just go through them very quickly.  The first is

13   a claim for over $20 million arising from the assertion that

14   somehow he is now entitled to one hundred percent of the HERA

15   assets.  Mr. Daugherty -- I don't know Mr. Daugherty.  I have

16   no animosity against Mr. Daugherty.  One of the things that I

17   and my colleagues and the board have dealt with throughout

18   this case is that there's so much baggage here, Your Honor.

19   And it's -- this has been our burden, this has been our

20   challenge, is to cut through this and try to get to the

21   merits.  What's really fair and what's really reasonable?  And

22   it's what we try to do in our settlement negotiations and it's

23   the only reason we're here today, because we thought we made a

24   generous offer.

25       And Mr. Daugherty is well within his rights to say, Not

1   good enough.  But we think, we think we've offered enough.

2   When we think of his claim to a hundred percent of the HERA

3   assets, he will testify, I assume, that when he left he had

4   19.1 percent.  He never thought he had more than 19.1 percent.

5   Nobody ever promised him any more than 19.1 percent.  His

6   expert in Delaware was prepared to testify on damages based on

7   19.1 percent.  He actually pursued these claims, Your Honor,

8   not just in Delaware, he actually started in Texas.  He knew

9   about this in 2013, right when it happened.  It was part of

10  his Texas action, and it was rejected.  And you heard -- and

11  we heard Mr. Uebler allude to it, right?  So then he goes to

12  -- he goes to Delaware and he tries to bring them again, maybe

13  three years later, in 2017.  These are undisputed facts, Your

14  Honor.  And they get dismissed.

15      Now, the interesting thing is, if you look at our Exhibit

16  T, it's the Delaware -- I think it's V, actually.  It's the

17  Delaware court's order dismissing the claims.  It didn't give

18  a reason.  But if you go back to Highland's brief, you'll see

19  there's a multitude of reasons.

20      And when they use the phrase *laches*, Your Honor, it

21  doesn't mean that Mr. Daugherty was found to have sat on his

22  hands.  The Delaware Chancery Court is a court of equity, and

23  so they use equitable principles.  What really happened is

24  that the Delaware court found that the claim was barred by the

25  statute of limitations because the cause of action arose in

23

1    2013, Mr. Daugherty knew that, and he didn't bring his action

2    until 2017, more than, you know, more than the three-year

3    statute of limitations.

4        But you'll see in the Debtors' brief, which we've cited,

5    that Highland actually asserted a multitude of reasons why

6    this claim should be barred.  And we don't know exactly why

7    the Chancery Court did it, but he's going to have to deal not

8    just with *laches* -- which is the word, the phrase that's used

9    for statute of limitations -- he's going to have to deal with

10   promissory estoppel.  He's going to have to -- not promissory

11   estoppel; just estoppel generally.  Res judicata.  It's all in

12   there.  There is no chance he's going to succeed on this claim

13   on appeal.  And it's $21 million, and he shouldn't be given

14   the right to vote any portion of it.  That's number one.

15       Number two, with respect to the tax claim, what's really

16   interesting here, Your Honor, is that there is no claim that

17   Highland has breached any duty today.  There's no claim that

18   he's breached a contract -- that Highland has breached a

19   contract.  There's no claim that Highland has committed any

20   tort.

21       What happened was, back in 2008, Mr. Daugherty, according

22   to him, was promised $1.475 million as compensation.  There

23   was an agreement.  That compensation was delivered to him not

24   in cash but in the form of an allocation of losses from the

25   Highland partnership.  Mr. Daugherty was a limited partner.

24

1    He got over $4 million in losses.  Those losses were recorded

2    on a K-1 that's going to be admitted into evidence.  And Mr.

3    Daugherty took those losses and shielded his income and his

4    gains in other places in his life, I don't know.  But the

5    benefit of that was $1.475 million.

6        Mr. Daugherty never says that Highland breached its

7    agreement.  He never says that Highland failed to perform.  He

8    never says that Highland did anything wrong.  All that's

9    happened here, Your Honor, is that the IRS is conducting an

10   audit of Highland's 2008 taxes, including these losses.  Okay?

11   So, as we sit here today, Highland owes zero.  There is no

12   basis to give him any claim for voting purposes.  There's

13   just, there's no reason.  It may be -- later that he should be

14   getting.  And what I would find to be very reasonable is that

15   we are here on the merits and he asked the Court to establish

16   a reserve.  I think it's almost what Mr. Uebler asked for,

17   that you establish some type of reserve for a contingent

18   claim.  You know, that would make sense.  But that's not why

19   we're here today.  We're here to say whether or not he's

20   allowed to vote this claim, a claim where Highland today

21   admittedly owes nothing.

22       So, you know, I think that that dispenses with the tax

23   issue.

24       The last one is this claim for attorneys' fees.  I will

25   tell you, Your Honor, I didn't have a good weekend myself this

1    past weekend because I had to flip through 2,600 pages of Mr.

2    Daugherty's appendix.  I don't have the experience here on

3    (garbled), but I waded all through that stuff.  And Mr. Uebler

4    and I have a very cordial relationship, which I'm grateful

5    for, and we were talking on Friday, and he said, Why do you

6    guys say that he resigned from Strand in 2009?  And I said, I

7    don't know where I picked it up, but that's what I put in

8    here.  And he said, But that's not right.  And I asked him, I

9    said, If you have a letter of resignation, you have something,

10   give it to me.  And he didn't give me anything.

11       But last night -- and this is why it came up at the last

12   minute.  This is why it came up at the last minute.  Last

13   night, they filed a declaration from someone named Mr. Covlin

14   or Colvin, who I hadn't heard of but who apparently was the

15   Highland general counsel back when Mr. Daugherty was at

16   Highland.  And you'll see in Paragraph 5 of his declaration he

17   says, I don't have a memory of Mr. Daugherty resigning from

18   the Strand board before he left in 2011.  And I said to

19   myself, I don't -- I don't understand why people can't --

20   there's got to be a letter of resignation, there's got to be

21   something to prove the fact.

22       And so I called Highland this morning and I said, When did

23   he resign?  Do we have anything?  I said, I want anything you

24   can find.  And we're going to put into evidence, Your Honor,

25   two different exhibits, one of which, ironically, is a

1    Secretary's Certificate that was signed by Mr. Colvin.  And it

2    was signed in early 2009, where he certifies to the Strand

3    board resolutions, which set forth the officers of the

4    company, and Mr. Daugherty is not on it.

5        The second document, Your Honor, is even more significant.

6    It is a periodic statement of the officers of Strand that are

7    listed by individual with their title and each person signs

8    it.  And what the evidence is going to show is that Mr.

9    Daugherty signed his statement as either Secretary or

10   Assistant Secretary every single time from 2006 until about

11   March of 2009.  And then in the mid-2009 document, consistent

12   with Mr. Colvin's certificate, Secretary's Certificate, he's

13   no longer there, but Mr. Colvin was still signing all of his

14   papers without Mr. Daugherty.

15       So I don't really know the record of Delaware.  I'm doing

16   the best I can, Your Honor.  But I don't think that there's

17   going to be any dispute at the end of all of this that Mr.

18   Daugherty ceased to be a director or an officer of Strand

19   sometime between March and May 2009.

20       Why is that significant?  Because that is what he hangs

21   his hat on in order to establish his claim for

22   indemnification.  We don't think there is any claim because he

23   was no longer an officer of Strand after early 2009.

24       Even if he was, Your Honor, everything that he's seeking

25   indemnification for now arose after he left in 2011.  He's

1   trying to use the indemnification provision in order to

2   recover his attorneys' fees, attorneys' fees that were

3   recovered [sic] after 2011, that were incurred solely for his

4   own personal benefit.

5       It's not as if he brought a claim derivatively on behalf

6   of Highland.  Instead, he pursued litigation where he would

7   recover damages, where he was the plaintiff.  In fact,

8   Highland was a defendant, is a defendant in a lot of this

9   litigation.  I don't understand how anyone can fairly read an

10  indemnification agreement that requires the indemnitee to act

11  on behalf of the indemnitor, and that somehow suing an

12  indemnitor is consistent with the concept of indemnification.

13  It just, it doesn't make sense.  He wasn't there.  The fees

14  accrued after the fact.  There's just, there's no basis for

15  it.

16      And fees on fees, that other concept that they're building

17  upon, is fees on top of fees to pursue indemnity.  So if the

18  indemnity doesn't work, fees on fees don't work either, Your

19  Honor.

20      And I'll just very briefly, the fee shifting thing, I

21  heard Your Honor's point.  But, again, I bear no ill will

22  toward Mr. Daugherty, but a fair reading of the record says

23  that nobody comes to this, none of those parties come here

24  with unclean hands.  Mr. Daugherty was found to have breached

25  his fiduciary duty.  The only judgments that have been

28

1    rendered by any court so far have him paying Highland 2.8 and

2    Highland paying him 2.6.  He complains that so many of

3    Highland's causes of actions were dismissed.  We could do a

4    scorecard if you think it's necessary showing that Daugherty's

5    claims and causes of action were dismissed.

6        I heard Mr. Uebler talk about, you know, the appellate

7    court reversing the criminal issue.  But you know what, Your

8    Honor?  The trial court actually agreed with Highland there.

9        So, again, fee shifting is an extreme remedy, the absolute

10   extreme remedy in the United States.  And, again, not to cast

11   aspersions against Mr. Daugherty, but nobody comes here with

12   unclean hands.  There's no basis to do it in this particular

13   case.

14       So we think $9.1 million was very fair, Your Honor.  We

15   think the undisputed facts are going to show that the balance

16   of these claims are without merit at the merit hearing, but

17   certainly for this purpose, Your Honor.  He doesn't -- he

18   doesn't come close to the -- even the low bar that's needed

19   for voting purposes.

20       Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.  Mr. Uebler, you

22   can call your witness.

23           MR. UEBLER:  Thank you, Your Honor.  Mr. Daugherty,

24   are you available?

25           MR. DAUGHERTY:  Yes.  I am here.

Daugherty - Direct                        29

1            THE COURT:  All right.  Mr. Daugherty, I'm going to

2    swear you in.

3    PATRICK DAUGHERTY, CREDITOR PATRICK DAUGHERTY'S WITNESS, SWORN

4            THE COURT:  Thank you.  You may proceed.

5        (Note:  Witness muffled throughout testimony.)

6                        DIRECT EXAMINATION

7    BY MR. UEBLER:

8    Q    Good afternoon, Mr. Daugherty.

9    A    Good afternoon.

10   Q    I'd like to begin by asking you a few questions about what

11   we call the fee reimbursement portion of your claim.  Would

12   you explain to the Court what out-of-pocket payments are

13   included as components of that claim?

14   A    As far as category or number?

15   Q    What's -- however you'd like to address it.  Maybe

16   categories and then number.

17   A    Sure.  There's (inaudible) I'm pursuing for the costs

18   incurred pursuant to executing my release under Strand.  And

19   just to be clear, Strand reimburses not just for officers and

20   executives, but also for representatives in any case, which is

21   consistent with what Highland said in Delaware on multiple

22   occasions.

23        Then there are fees on fees, which is, under Delaware law

24   as I understand it, I'm entitled to the fees that I had to

25   incur in order to gain -- in order to get Highland to make

Daugherty - Direct                                30

1  good on its promise in that original partnership agreement

2  with Strand and Highland.

3       And then, let's see, indemnification, fees on fees.  And

4  then there's my claim for the fee-shifting.  And I certainly

5  understand the concept of the *American* Rule and the judge's

6  point, and (inaudible), but what you have to remember here is

7  there was a crime fraud finding in Delaware which caused

8  Highland to lose its attorney-client privilege where we

9  discovered that its in-house counsel -- Scott Ellington, Isaac

10 Leventon, Thomas Surgent -- working with outside counsel,

11 basically provided prima facie evidence of a fraud.  So this

12 moves far beyond just, you know, two parties going at it.

13 This has been, again, that Highland sued based on, frankly,

14 lying to that very same judge in Dallas County Court that Mr.

15 Morris referred to.  And not only the judge, the jury, where

16 we have (inaudible) law from the various outside firms

17 summarizing what these people -- you know, again, I generally

18 refer to them as the cabal.  But this just goes far beyond two

19 parties having a good-faith battle with one another.  This

20 turns into, frankly, fraud.  And I've had -- and by the way,

21 Judge (inaudible) in Delaware Chancery Court, once he made

22 this ruling, said that he sees evidence of fraud going all the

23 way back to December of 2013, when Highland allegedly set up

24 an escrow account on my behalf, and it never happened.  And

25 not only did it not happen, but again, they told Judge Hoffman

Daugherty - Direct                              31

1    down in Texas and they told the jury that it did happen.  And

2    (inaudible) and everyone else on multiple occasions that

3    (inaudible), only to find out in December of 2016, after all

4    appeals -- the appeal process was exhausted, that most of that

5    money was never put into escrow.  Again, they never

6    (inaudible) Dondero (inaudible).  And (inaudible), his

7    counsel.  But that what any of those assets were there would

8    have been shifting -- and when I say they, I mean Scott

9    Ellington and Isaac Leventon -- while they (inaudible) my

10   house in Dallas, while they were claiming that I had

11   (inaudible) and were seeking turnover in Dallas, while they

12   were terrorizing my family and sending the cops on the house,

13   they had all those assets shifted to themselves, kept quiet

14   about it, and then proceeded to order me to make a $3.1

15   million (inaudible) for their attorneys' fees.

16       I don't think a fraud can get more absolute than that.

17   And so that is, you know, that's my quick summary on the

18   nature of those fees.  And, again, I know this (inaudible),

19   but this is just a little bit different than your, you know,

20   run-of-the-mill situation.

21   Q   Mr. Daugherty, you mentioned indemnification in your

22   answer.  Did Highland or its affiliates assert claims against

23   you in Texas state court based on your conduct as a Highland

24   employee?

25   A   They did.  I mean, I was accused of having (inaudible), of

Daugherty - Direct                            32

1    committing securities fraud violations, of not executing my

2    duties to investors, when in fact I was doing just the

3    opposite and (inaudible) protecting them from being defrauded.

4    And some of those investors are on the Creditors' Committee

5    today, as the Crusader and Redeemer Committee, is Eric Felton,

6    (inaudible) Montgomery.  Those were the people I was trying to

7    protect from -- and by the way, at the end of the day, I felt

8    like I protected Highland, too, to keep them from doing

9    something stupid that could end us in this -- all of us in the

10   situation where we are today.

11        So I was executing my duties as a portfolio manager.  I

12   was -- and by the way, that carried all the way through to

13   January or February of 2012, after I left, because what Mr.

14   Morris didn't tell you is in Mr. Colvin's affidavit I was

15   enlisted by Highland to come to an exit interview after I had

16   resigned, where they wanted to hear two categories of topics.

17   One, the performance of the individual (inaudible) in the

18   Crusader Fund, because Highland had lied to them (inaudible).

19   They wanted to hear from me what I thought its true value was.

20   One of those investments was Cornerstone, which we're all

21   familiar with.

22        And then the other category of topics that they wanted to

23   discuss with me was (inaudible) leaving Highland.  And that

24   included the timing, (inaudible) efforts.  Money was being

25   thrown at me, or offered to me, I should say, directly from

Daugherty - Direct                          33

1    Dondero, from Cornerstone, to pay me a (inaudible) in order to

2    seek releases for Highland.

3         So, you add all these things up together, and I was

4    performing my duties as their portfolio manager and as a

5    fiduciary that basically superseded any duty that I had to

6    Highland itself when it came to those clients, which was my

7    fund, Crusader, that I managed and that ultimately the

8    beneficiaries, the investors, led by, as I said, one of their

9    UCC members, Eric Felton, (inaudible) at the time, who now

10   leads the Crusader entity.

11   Q   Mr. Daugherty, with that background about the different

12   bases for your theory (inaudible) claim, could you quantify it

13   for us, how you reached $7.8 million?

14   A   Well, the total fund, for the total 7.8, the answer is

15   yes, I could break it down into individual components if it

16   would be helpful to the judge because I believe the -- I

17   believe the indemnification part of that, which the judge

18   seemed to have issues with, was around 1.5, if I remember

19   correctly.  The rest of it was fees on fees, and defending

20   myself against false accusations from the Debtor, and

21   executing (inaudible) to defend those investors from --

22   (inaudible) that they were getting ripped off by Highland, by

23   Dondero.

24   Q   Are there any other components to your -- the amount

25   that's represented in your fee claim?

Daugherty - Direct                          34

1    A    It's fees on fees.  I think we touched on that.  So that's

2    related to the (inaudible).

3    Q    You're -- you're saying that the claim included a

4    reference to IRA penalties and --

5    A    Oh, yeah.  So, you know, when you have to proceed like

6    this, and I know I've been presented as this rich greedy

7    person, but there's a reason why Highland was wanting to get

8    garnishment and wanting to seize my assets with the constable,

9    because I got (inaudible) fighting this.  And Judge Jernigan,

10   I was in your case on another matter and you asked why there's

11   not counsel, it's because I didn't have the money.  And so one

12   of the things I had to do was cash in my IRA, my wife's IRA.

13   Q    What's --

14   A    I had to take a mortgage on my house.  I had -- with

15   interest on that.  And with penalties on the IRA.  I did not

16   (inaudible) -- I did not -- I hate this.  I hate talking about

17   this.  Is that enough?

18   Q    I want to talk briefly about this tax refund claim for

19   2008 and the basis for it.  What -- what is this tax refund

20   that you received in 2008?

21   A    (inaudible).  In 2008, and I put it in a page in my

22   declaration, Highland was in trouble (inaudible) of the

23   crisis, you know, the various -- and we had talked about our

24   credit facility with our banks, led by Bank of America

25   (inaudible), but they were unsecured.  So what that's -- the

Daugherty - Direct                            35

1    way it's drafted, and they wanted to get secured.  In the

2    process, I was having negotiations, which (inaudible) into

3    2009.  They were concerned that money was being siphoned out

4    of Highland while we were in breach of our credit facility.

5    Initially -- initially, they thought all the partners were

6    taking money out, and after getting their -- after getting

7    their forensic accountants in there from FTI, they discovered

8    that the only people taking money out was Dondero and Okada,

9    under a guise of quote/unquote repaying a loan to themselves.

10        So, in the heat of all that, there were two things that

11   came from that.  One, they shut down all the money going out

12   of Highland and they closed (inaudible).  We had to reduce our

13   headcount by 20 percent.  We also had to reduce our costs, you

14   know, our outgoing costs, as you would expect when you're in

15   this type of situation.

16        Well, the problem was there wasn't enough money to pay the

17   cash element of bonuses that were coming due in February of

18   2009 for the work that we (inaudible), you know, operate for

19   the year 2008.  The way it worked at Highland, and still does

20   apparently, the employees work the full year, and then in

21   February of the following year they get a compensation

22   benefits letter that says, Here's what your bonus is.  Here's

23   what your tax bonus is going to be.  It's going to be paid out

24   in installments, call it February or August, February and

25   August of the subsequent years.  And then there would be some

1    type of deferred compensation and then some type of listing of

2    the value of the (inaudible).  So we got lunch generally every

3    day, we had healthcare costs paid for, we had life insurance.

4    And so we (inaudible) out all these things (inaudible).

5        And I think what you're asking in your question is, Where

6    did the tax refund come in this?  Well, historically, we would

7    -- we would have got a cash bonus in that particular, you

8    know, document that I mentioned.  But (inaudible) pay cash

9    bonuses beyond a *de minimis* amount.  Dondero and, I believe,

10   Mark Patrick in the tax groups and Rick Swadley, and there's

11   another one, Jennifer Blumer, I think, and Michael Collins,

12   they called all of us into the conference room and they said,

13   We're going to pay your cash bonuses, but we're going to have

14   to do it by making this election with the IRS.

15       And, frankly, none of us really understood what it was.

16   It was very convoluted.  But when we got our February 2009

17   award letter, and I think that's an exhibit in here somewhere,

18   it says very clearly -- in my case, anyway -- (inaudible) tax

19   refund, $1.475 million.  And then it says, You're going to get

20   this -- and I'm paraphrasing -- but, You're going to get this

21   amount, but to the extent that you don't get this amount, we

22   will provide you, you know, Highland will provide you

23   substitute compensation.

24       So it was very important that -- to take the place of what

25   had (inaudible) cash bonus, but it was compensation through

Daugherty - Direct                        37

1   and through.  And when you hear Mr. -- Mr. Morris, I'm sorry,

2   go on about me getting $4 million in the loss, well, I did get

3   (inaudible) that had a $4 million loss.  As the IRS

4   interpreted it, they only netted, I guess, accepted it, the --

5   they had the number equivalent at roughly 1.1.

6       But the point in all this is that was the method that

7   Dondero and the tax team had concocted to generate the funds

8   for Highland, its separate obligation, this is a compensation

9   of benefits letter that I got.

10      And we understood the situation that Highland was in and

11  we were willing to live with that.  Where I think things went

12  bad -- and by the way, this has been dragged out forever, Your

13  Honor.  I've talked to Mr. Stewart about it.  I informed the

14  IRS, tried to settle it.  And I know (inaudible) probably

15  never (inaudible), I'm more than willing to work with the

16  Debtor to get it settled.  But what I want, and I don't know

17  how this works in bankruptcy, Your Honor, I -- I've got a

18  claim, so I filed the claim, because if you don't file the

19  claim, you lose it.  Right?  And then what happens is I'm

20  (inaudible) the Debtor.  The Debtor (inaudible) as an

21  adversary, said, We're going to equitably subordinate this

22  because this is equity in nature.  And at one time, the method

23  of payment that was concocted by the Debtor (inaudible) was,

24  the compensation agreement is separate and apart from that,

25  and that stands.  And neither I nor any of the other guys that

Daugherty - Direct                                    38

1    got this are looking for a windfall.  And I don't know how you

2    vote it.  I mean, if the Debtor had said, We're just going to

3    assume this like a lease contract, I wouldn't be in here

4    asking you to put a number on it.  But what I got was an

5    adversary saying, We're not going to pay this.  We're going to

6    go equitably subordinate this, even if you're trying to, you

7    know, get it reimbursed through the partnership.  So that

8    forced me to bring it to you, Your Honor, and try to put a

9    number on it.

10   Q    Mr. Daugherty, during your time with Highland Capital, did

11   you receive cash distributions from Highland in your capacity

12   as a limited partner of Highland?

13   A    That's a very important point.  These K-1's that -- there

14   were two kinds of partners at Highland.  There were the real

15   partners, Jim Dondero and Mark Okada, who referred to

16   themselves as founding partners, and then there were the

17   subclass of partners, really, we kind of -- we called

18   ourselves profit centers partners because we had a place in

19   the partnership but we weren't allowed to get any

20   distributions.

21        So whenever you see a K-1, we didn't get any of that

22   money.  All right?  That money stayed in the partnership or

23   went to Mark and Jim.  What we had was what's called a

24   (inaudible) and a buy-sell agreement that were attached to the

25   partnership which -- that basically we didn't get any

Daugherty - Direct                      39

1   (inaudible) distributions or income from this, but what we got

2   was at the end of that time we could go and terminate it and

3   say, Pay me out now, and at that point it would be valued.

4   And so in my case, when I left, the value that they offered me

5   was $199,000.  For all, for all those years of service.  And

6   so to answer your question, no, I didn't get any money from

7   it.

8   Q    Thank you.  I want to ask you just a few questions about

9   the HERA 80 or 81 Percent Claim that they were referring to.

10  At a high level, what is HERA?

11  A    Well, this goes back to the same situation I was talking

12  about before as it related to this 2008 tax refund.  As I

13  mentioned, we were losing employees.  People were leaving.  I

14  mean, we started the year in 2008 with 22 partners and we were

15  down to I think 11 or 12 at the start of 2009.  The banks were

16  just, the banks were furious and they were talking about

17  liquidating us and getting a trustee put in place because they

18  were furious to find out that Dondero and Okada had taken out

19  money.  It was around $20 or $30 million.

20      Once we got through that hurdle, I said, Listen -- because

21  I became, by the way, Your Honor, I became Highland's kind of

22  advisor, restructuring person.  I did that for Highland as

23  (inaudible) usually us on the same side of the table as the

24  banks on, you know, I was head of distressed and private

25  equity at Highland, so I -- distressed debt and go and

Daugherty - Direct                          40

1  negotiate at the Debtors' beck and call.

2       In this position, I moved over to the other side of the

3  table and I was negotiating on behalf of Highland with a lot

4  of my colleagues who were in the distressed community, which I

5  generally refer to as knuckle raps.  But they knew me, and I

6  knew them, and we sort of -- and we had trust between each

7  other, especially given what had just happened.  And they

8  agreed to set aside HERA, which is an acronym for Highland

9  Employee Retention Assets, and it was a fund where they set

10  aside, I don't know, around $20 to $25 million of assets that

11  would then be used to incent employees to stay.  And it had a

12  three-year cliff vesting.  And what happened is they didn't

13  have any money left.  Well, the employees that remained got

14  reallocated their shares.  So, contrary again to what Mr.

15  Morris said, there was an agreement that the ownership

16  interest would go up as we stayed through and helped right-

17  size the ship.

18  Q    Mr. Daugherty, why is it that you contend now that you're

19  the one hundred percent owner of HERA?

20  A    Well, this goes back to bad faith.  And I sympathize with

21  the judge, I did give you a ton of information, but this has

22  just been nine years of terrorizing, you know, that I've had

23  to contend with.  And if you look back to December of 2012,

24  January of 2013, a gentleman named (inaudible) had sent

25  Dondero an email saying, Here's how you can pay everybody

Daugherty - Direct                              41

1   except for one.  And (inaudible) board member on HERA.  And on

2   HERA's board, there's affiliates of this guy.  Ellington and

3   John (inaudible).  It's basically Jim's buddies, Jim Dondero's

4   buddies, not (inaudible).  So he sent me this email saying,

5   Here's how you can pay everybody but one.  So we get into

6   January 2013, and Highland purports to make an offer to buy

7   out everybody at HERA except me.  Well, guess what.  In the

8   middle of January, all of the board resigns, without having

9   anyone change the shareholder unit to the LLC and without

10  taking board action that would allow Highland Capital to be an

11  assignee of these units.

12      There is a reason for this.  We go back to why HERA was

13  created.  The banks were furious about Mark and Jim taking

14  money and the banks wanted to take a secured interest in all

15  things Highland.  So what we agreed is we would put it in a

16  (inaudible), in an entity referred to as HERA, and Mark and

17  Jim and Highland would not be able to participate in it.  So

18  they are not recipients of the preferred units, and the only

19  way it can ever become (inaudible) preferred units is for

20  there to be action taken, specific action take to amend the

21  documents, or by the board, if they remain.  And in my Texas

22  trial, this issue did come up, and Thomas Surgent said that no

23  such action was taken.  Thomas Surgent is Highland's chief

24  compliance officer.  (inaudible).  I'm getting a little --

25  Q   I'm just going to ask two questions briefly before we turn

Daugherty - Direct                                    42

1   this over to Mr. Morris.  How did you calculate the value of

2   $21 million for this HERA 80 Percent Claim?

3   A    I took what -- Highland took my own expert report and made

4   it attorneys' eyes only in Delaware.  So my lawyers could

5   never sit down with me and explain it to me.  So all I could

6   go off of was what I saw at the trial.  And it was only the

7   last two or three days where Mr. Morris, he did file the

8   entire expert opinion of my expert where I could see all the

9   components.

10       So, at the time, I took what my expert was saying was the

11  value of my expert assets, I think as of December 2016.  And

12  since I knew that that was based on 19.1 percent, I divided

13  that number by 19.1 percent, came up with a total, and then

14  re-multiplied by 80 -- 80.1 percent, to find out what that

15  delta was.

16  Q    Given that these claims were dismissed on procedural

17  grounds in Delaware, and having heard Judge Jernigan's

18  comments earlier about this claim and its value for voting

19  purpose, what do you as the Claimant believe a fair allocation

20  of this claim is for voting purposes?

21              MR. MORRIS:  Objection to the form of the question.

22              THE WITNESS:  Listen.  I've --

23              THE COURT:  Overruled.

24              THE WITNESS:  -- been around Judge Jernigan --

25              THE COURT:  Overruled.  You can answer.

Daugherty - Direct                          43

1          THE WITNESS:  I've been around Judge Jernigan long

2     enough to know that she means what she says and she says what

3     she means.  And I understand her reservations on this, too.

4     But I will say there are some mitigating factors here that

5     Highland, in Texas and all the way through the Texas Court of

6     Appeals, they were saying (inaudible), this is a double

7     counting, this is a double counting.  That (inaudible) up for

8     reconsideration in a court -- Texas Court of Appeals

9     (inaudible), and the Court refused to see it that way.  Then

10    when we went to Delaware, they(inaudible), they said, Oh, no,

11    we have cures.  There's *laches*, statute of limitation is

12    operating against them.

13         And so my reaction to that was, How am I supposed to be in

14    an action based on my share ownership when you're saying I

15    don't even own my share ownership and it's not determined

16    until December 2016?

17         It is true that Judge (inaudible) said you should have

18    basically filed a placeholder.  As I've learned a little bit

19    about Delaware law, I don't think that is consistent with

20    Delaware law, but it is what it is.  And if Judge Jernigan

21    (inaudible) position.  So if she's right to say that I could

22    bring these claims over (inaudible) you know, contains, you

23    know, a different item.  And so you're asking me whether

24    (inaudible) advice to the judge?  I would say that I'm more --

25    I'm more than agreeable to whatever she decides.  I just want

Daugherty - Cross                              44

1    to know -- her to know why I'm here and what this is about,

2    that this is not frivolous, but if it doesn't end with plan

3    voting as she sees it, then I can live with that.

4    Q    Thank you, Mr. Daugherty.

5            THE COURT:  All right.  Thank you.  Pass the witness.

6    Mr. Morris?

7            MR. MORRIS:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. MORRIS:

10   Q    Good afternoon, Mr. Daugherty.

11   A    Hello.

12   Q    My name is John Morris with Pachulski Stang and I'm here

13   on behalf of the Debtor.  We've never spoken before, have we?

14   A    Yeah, we have.

15   Q    Yeah?  I don't --

16   A    Yes.

17   Q    I don't recall.  But it's --

18   A    You were in in-person court in Judge Jernigan's court in

19   January and February and I think we spoke.

20   Q    Okay.  Well, forgive me for not recalling that particular

21   detail.  I just wanted -- just a few questions, sir.  On the

22   tax issue, according to your testimony you were promised

23   $1.475 million approximately in connection with your 2008

24   compensation; do I have that right?

25   A    That's correct.

1   Q    And I understand your testimony that it was Highland's

2   idea, but you agreed to the method of compensation in the form

3   of an allocation of Highland's partnership losses, right?

4   A    I would not say that.  There was no -- it was dictation,

5   not an offer and acceptance.

6   Q    Well, you did accept -- you did accept the benefit of the

7   allocation of the Highland losses on your 2008 tax returns,

8   right?

9   A    I -- I don't know if accept is the right answer.  I sent

10  my K-1 in with my tax return, and as I clearly admit, there's

11  approximately $4 million of losses that are allocated to me

12  via the K-1 that they could use in the computation of my

13  taxes.

14  Q    Okay.  So it's fair to say, then, that the manner in

15  which, or I think the word that was used in your papers, the

16  method by which you were compensated was through the

17  allocation of a portion of Highland's losses; is that right?

18  A    That is wrong.  I was compensated that said you're going

19  to get 1.475.  If you don't get 1.475, we will provide

20  substitute compensation.  What you're confusing is the manner

21  in which Highland decided to try and fund the obligation, and

22  I just don't think it's right to conflate the two.

23  Q    Well, Highland did fund the obligation through the

24  allocation of losses to you; isn't that right?

25  A    It is not.  As I said, I got the $4 million pass-through

Daugherty - Cross                                    46

1   that the IRS determined was approximately $1.1 million, as I

2   recall.

3       Again, I'm not here to try to capture that missing 3.75.

4   All I want is Highland to basically stay in the shoes if -- or

5   stand by the promise that they made, that they made, sorry,

6   that they made to me, which is if the IRS changes their mind

7   or if Highland (inaudible) and wanted to start to use this

8   (inaudible) argument, that I get sufficient compensation to

9   make me whole.

10       I mean, at this point, if that -- if we aren't successful,

11  right, on this tax refund issue, then I'm going to get -- not

12  just me.  There's about seven or eight other employees who

13  have all also filed claims in this case.  We're going to get

14  hammered with penalties and interest that far exceed that

15  amount, and that's not fair.

16  Q   Okay.  As of today, Highland doesn't owe you -- that audit

17  is not complete; is that right?

18  A   Well, it's -- the audit took place for two years, and

19  you're probably familiar more than me, I got a letter from

20  Byron Collins in December of 2019, after the Debtor filed for

21  bankruptcy, saying, We've exhausted effectively our

22  negotiations with the IRS.  We've now turned this over to some

23  appeals unit in the IRS, and they determined that you don't

24  get -- I'm paraphrasing -- that you don't get to keep this

25  amount.

Daugherty - Cross                           47

1        Now, that basically put me on notice, right, that this is

2    coming to somewhat of a conclusion.  (inaudible), I listed it

3    as a claim, I listed it as unliquidated, because I really

4    don't know how to treat it.  I guess, I mean, hopefully, the

5    judge makes a decision, and the same kind of category, I don't

6    know how you classify this thing.  But when you guys filed an

7    adversary against me and said, You know what, by the way,

8    (inaudible) to me about any of my clients.  So when you

9    present to the Court that you engage me and (inaudible) with

10   this guy, you guys didn't talk to me once from the time you

11   filed until October about my claims.  You did it just

12   recently, after you filed an adversary.  I would have been

13   happy to work with you on this.

14        MR. MORRIS:  Your Honor?  Your Honor, I apologize for

15   interrupting.  Can I have the question read back?  Because I

16   really move to strike.  I'll be here all day if we get these

17   answers that really have nothing to do with my question.

18        THE COURT:  Okay.

19        MR. MORRIS:  It's not proper.

20        THE COURT:  Well, I'm going to sustain and strike the

21   narrative answer.  I'm going to ask you to just repeat your

22   question at this point.

23        MR. MORRIS:  Okay.

24   BY MR. MORRIS:

25   Q    The audit is not completed; isn't that correct?

Daugherty - Cross                              48

1    A    I don't know.  I've been told by you that it's not.

2    Q    Okay.  And nobody has told you and you have no information

3    to contradict my assertion that the audit is incomplete today?

4    A    That's correct.

5    Q    And as you sit here today, you don't know how much, if

6    anything, you might owe on account of the tax issue.  Is that

7    right?

8    A    That is right.

9    Q    Okay.  You first learned about the audit in 2010; isn't

10   that correct?

11   A    I don't know when I first learned about the audit.

12   Q    You learned about the audit before you left Highland;

13   isn't that correct?

14   A    I know that when we filed this, you know, when we filed

15   the returns, we had to file a cover letter that basically

16   notified the IRS, hey, and I'm paraphrasing, we made these

17   elections, you may not agree with these elections, but we're

18   drawing your attention to it right now to put you on notice

19   that we're making these elections.  So that's what I know.

20   Q    When is your first recollection of when you learned about

21   the audit?

22   A    I don't recall.

23   Q    Okay.  Let's talk about the HERA assets for a moment.

24   When you left in 2011, you owned approximately 19.1 percent of

25   the HERA preferred units; is that right?

1  A    That is right.

2  Q    Okay.  And you learned in 2013 of the events that you

3  described earlier with respect to the amendment of the HERA

4  partnership agreement -- limited liability -- limited

5  liability company agreement, the assignment agreement, the

6  expense allocation?  All of that occurred in 2013, and you

7  knew it at that time, right?

8  A    Well, if I could clarify that.  I believe I was informed

9  that the amendment -- you had a lot of questions in there, so

10  I'll try and break it down.  The amendment -- you're talking

11  about 1241, right?  I believe I was informed, informed of that

12  either late February or early March 2014.

13      On the other stuff, we had -- we had sought discovery,

14  and, you know, people have experiences that you don't always

15  get discovery on an expedited basis all the time.  We started

16  to take discovery in dribs and drabs in -- early in July, and

17  then a lot more in October and then a lot more in December of

18  2013.  So the (inaudible) that you asked me a question about,

19  we got a lot of it in that time period, and then some of it

20  rolled into 2014.

21  Q    Okay.  So, you knew about Highland's purchase of the other

22  holders of the HERA preferred units in 2013, right?

23  A    Yeah, I knew about the purported purchase probably in

24  February 2013.

25  Q    And the purchases were by people who hold -- who held

Daugherty - Cross                        50

1   vested interests in their preferred units in HERA; isn't that

2   right?

3   A    You said it was by them.  I think it was from them.  But I

4   think (inaudible).

5   Q    If I did, I misspoke, but thank you for the correction.

6   But you'll agree, right, that -- that you knew in 2013 that

7   Highland purchased from the vested holders of the preferred

8   units their interests in -- in the HERA --

9   A    You know, I knew that ultimately that happened.  I don't

10  remember if I knew definitively it happened until probably

11  October of 2013.

12  Q    Okay.  And you don't bring these claims relating to all of

13  this -- all of these things that happened in 2013 until the

14  summer of 2017 in Delaware; is that right?

15  A    That -- that's generally about right.

16  Q    Okay.  And that's more than three years after you learned

17  of them.  Is that fair?

18  A    I brought my claims after the Texas Court of Appeals said

19  that I had that shares that your clients said I didn't.

20  Q    Okay.

21          MR. MORRIS:  I'd move to strike.

22  BY MR. MORRIS:

23  Q    And I ask you to just listen carefully to --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

Daugherty - Cross                        51

1    Q    -- my question.  Okay.  Listen carefully to my question.

2    You brought the claims relating to the HERA events of 2013 for

3    the very first time in Delaware in July 2017, right?

4    A    Yes.

5    Q    And it's more than three years after you learned of them;

6    is that fair?

7    A    I'm sorry.  More than three years--?

8    Q    More than three years after you learned of those events.

9    You just said that you learned about them in 2013.

10   A    I think that's right, yeah.

11   Q    Okay.  And you brought four different claims?  I think

12   claim -- Counts 2, 3, 4, and 5 in the original Delaware action

13   were all based on the events of early 2013; is that right?

14   A    I don't know.  I don't -- I don't -- frankly, I don't

15   recall my claims (inaudible) that you described.

16   Q    Okay.

17          MR. MORRIS:  Can we please call up Exhibit A to Mr.

18   Daugherty's proof of claim, which I believe has been marked as

19   Exhibit 40?

20          THE COURT:  Okay.  Are you going to share the screen

21   or do you want the Court to pull it up?

22          MR. MORRIS:  Yes.

23          THE COURT:  Okay.

24          MR. MORRIS:  I think we'll be able to share the

25   screen.  Thank you.  And if we could just scroll to the end.

Daugherty - Cross                              52

1  And I apologize, I don't have the page number, but it should

2  be --

3          THE WITNESS:  Could you go back up to the top, just

4  so I know what I'm dealing with here?

5  BY MR. MORRIS:

6  Q   Yeah.  It's Paragraph 82.

7  A   No, I'm looking at the date this was filed.  Can you do it

8  to the top?  All right.  So this is --

9  Q   This is your amended pleading.

10 A   Oh, this -- okay.  You mentioned 2017, so I got a little

11 bit thrown off.  Okay.

12 Q   So this is the -- this is the document that was attached

13 to your proof of claim.  That's why I'm using it.  Okay?

14 A   Okay.  We've amended our proof of claim.  You're talking

15 about the first one?

16 Q   This is the -- this is the one that was attached to your

17 proof of claim, right?

18 A   Well, as I said, we've amended the proof of claim.  So are

19 we talking about the one that's amended or the first one?

20 Q   All right.  Just take a look,

21         MR. MORRIS:  If you can scroll down to Paragraph --

22 keep -- no, keep going.  Keep going.  La Asia, can we scroll

23 down, please?  Okay.  So go to Paragraph 84 and 85.  Okay.

24 BY MR. MORRIS:

25 Q   Can you read Paragraph 85 into the record, please?

1    A    (inaudible) unit holder of Highland Employee Retention

2    Assets.  The purported purchases of units by Highland Capital

3    on January 30th, 2013 using the funds of Highland Employee

4    Retention Assets were -- were invalid transfers.

5    Q    Okay.  And that's exactly what you're asking the Court

6    here to find; isn't that right?  That you're the sole

7    remaining holder and that the purported purchases by Highland

8    in 2013 were invalid transfers, right?

9    A    Correct.

10   Q    Okay.

11   A    Well, we're not asking her to find that, but we're asking

12   her to find for voting purposes.

13   Q    Okay.

14        MR. MORRIS:  Can you go to Paragraph 89, please?

15   BY MR. MORRIS:

16   Q    In 89, the relief that you requested is the return to HERA

17   of the funds transferred it and distributed to you as the sole

18   remaining shareholder, right?

19   A    That's correct.

20   Q    And that's specifically one of the claims that the Court

21   dismissed; isn't that right?

22   A    I thought it dismissed the claims for me making ownership

23   of the, you know, the (inaudible) because of the *laches* issue

24   that you described.

25   Q    Sir, sir, this claim was dismissed by the Chancery Court,

Daugherty - Cross                          54

1   right?

2   A    It was dismissed by Judge (inaudible) who's the Chancery

3   Court on *laches* grounds.

4   Q    Okay.  How do you know it was on *laches* grounds?

5   A    Because he said so.

6   Q    Okay.  Can we just look quickly at Cause of Action No. 3?

7   This was a claim arising out of the exact same conduct against

8   HERA Management and Mr. Dondero; isn't that right?

9   A    I'm not sure I understand your question.

10  Q    Count III was against HERA Management and Mr. Dondero

11  arising out of the same facts, only this claim was for breach

12  of fiduciary duty, right?

13  A    I guess it was breach of fiduciary duty.  I don't see -- I

14  guess Mr. Dondero down there in No. 2, but I can't read the

15  whole paragraph.

16          MR. MORRIS:  Can you scroll down a little bit,

17  please?

18  BY MR. MORRIS:

19  Q    Okay.  Right there, Paragraph 93?

20  A    Correct.

21  Q    The adoption of the third amended and restated agreement

22  you allege to be self-dealing and constituting a breach of

23  fiduciary duty, right?

24  A    Correct.

25  Q    And in Paragraph 94, if we can scroll down, you allege

Daugherty - Cross                        55

1    that the execution of the allocation, the expense allocation

2    whereby your interest was reduced to zero was also self-

3    dealing and a breach of duty, right?

4    A    Can you go back there?  I can't read it.

5    Q    But you recall making that claim generally?

6    A    (inaudible)  You know, give -- ask me the question again

7    about generally what I recall.

8    Q    Do you recall generally making an allegation in the

9    Delaware Chancery Court that there is a breach of fiduciary

10   duty by executing the expense allocation agreement, right?

11   A    Yeah.  On behalf of Highland ERA Management.

12   Q    Okay.

13         MR. MORRIS:  Can we go to Paragraph 95, please?

14   BY MR. MORRIS:

15   Q    You also challenge the assignment agreement, is that

16   right, as an act of self-dealing and breach of fiduciary duty?

17   A    Yeah.  I obviously can't read the redacted parts.

18   Q    But this claim was also dismissed, right?

19   A    As I said, these claims were reduced on a *laches* basis,

20   but obviously I plan to appeal.  I just (inaudible).

21   Q    Right.  And *laches* you understood meant that it was time-

22   barred, right?  It was brought beyond the statute of

23   limitations?

24   A    Yeah, as I understood it, yes.

25   Q    Okay.

1          MR. MORRIS:  Can we go to the next cause of action?

2    This will be the last one, Your Honor.

3    BY MR. MORRIS:

4    Q    This is against the Debtor, Highland Capital.  Aiding and

5    abetting breach of fiduciary duty.  If you look at Paragraphs

6    101 and 102 and 103, it's charging Highland with liability for

7    the same conduct, for the execution of the third amended and

8    restated agreement, the receipt of the HERA assets, right, as

9    --

10   A    Correct.

11   Q    -- part of -- and this too was dismissed on statute of

12   limitations grounds, right?

13   A    I believe so.

14   Q    Okay.  Thank you.

15   A    You know, I know that Highland is liable for the transfer

16   of promissory stock and the unjust enrichment.  I don't know

17   if (inaudible).

18   Q    Okay.  Well, we'll leave that alone.  Okay?  I think that

19   -- that's what we've actually offered to allow your claim for,

20   for all of those claims.  Let's --

21          THE COURT:  Mr. Morris, I want to make sure --

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  -- the record is clear about what Mr.

24   Daugherty was testifying about the last five minutes.

25          MR. MORRIS:  Sure.

1          THE COURT:  This is, of course, an attachment to

2     Daugherty's original proof of claim, but it is in the record

3     at Docket Entry #1388, which was collectively all of

4     Daugherty's exhibits for today, and it was at --

5          MR. MORRIS:  Right.

6          THE COURT:  -- Subpart 40, or Exhibit 40 therein,

7     Subpart A of that.

8        All right.  Did you want to offer that or does anyone want

9     to offer that into evidence so that the record will make

10    sense?

11         MR. MORRIS:  Sure.  I'll take it upon myself for this

12    specific exhibit, Your Honor.

13         THE COURT:  Okay.

14         MR. MORRIS:  I offer -- I offer PHD Exhibit 40 unto

15    evidence.

16         THE COURT:  Okay.  And I assume there's no objection

17    since that was Daugherty's exhibit.  It's admitted.

18         MR. UEBLER:  No objection.

19         THE COURT:  Okay.

20       (Patrick Daugherty's Exhibit 40 is received into

21    evidence.)

22    BY MR. MORRIS:

23    Q   Mr. Daugherty, let's just talk for a moment as to the

24    timing of your departure from Strand.  You were an officer of

25    Strand at one point; isn't that right?

1  A    Yes.

2  Q    Do you have any letter of resignation or any other

3  documentation that shows the date on which you were no longer

4  an officer of Strand?

5  A    I don't recall.

6  Q    Okay.

7         MR. MORRIS:  Can we please call up Exhibit X2?  Your

8  Honor, this is one of the two exhibits that I shared with

9  counsel earlier today that are the corporate records that show

10  the officers of Strand at various points in time.

11        THE COURT:  All right.  Are they on the docket?

12        MR. MORRIS:  This goes to -- this goes to -- they're

13  not.  This goes to the indemnification claim.

14        THE COURT:  Okay.

15        MR. MORRIS:  All right.  So if we can get X2 up,

16  please.

17     (Pause.)

18        MS. CANTY:  I'm sorry, John.  One second.  The

19  computer's acting a little crazy.

20        MR. MORRIS:  Okay.

21     (Pause.)

22     You know, Your Honor, instead of taking the Court's time

23  with this, I don't need to cross-examine Mr. Daugherty with

24  this.  What I'd like to do is, because I've shared the

25  documents with Mr. Daugherty's counsel -- oh, here it is.

Daugherty - Cross                          59

1   Okay.

2              THE COURT:  Okay.

3              MR. MORRIS:  So let's just --

4              THE WITNESS:  I see it.

5              MR. MORRIS:  Thank you.  Let's just get through this

6   quickly.

7   BY MR. MORRIS:

8   Q    Do you recall that, when you were an officer of Strand,

9   that from time to time you signed a document that identified

10  all of the officers of that entity?

11  A    No.

12  Q    Okay.

13             MR. MORRIS:  Can you scroll down a little bit here?

14  BY MR. MORRIS:

15  Q    Do you see that this is --

16             MR. MORRIS:  I'm sorry, just a -- not quite so much.

17  I want to see the first paragraph.

18  BY MR. MORRIS:

19  Q    It says that "I am the president of Strand Advisors" and

20  that Mr. Dondero was certifying that the people below were

21  duly appointed and qualified to serve as officers of Strand.

22  I'm paraphrasing a bit there.  Do you see that?

23  A    I can read it.

24  Q    Okay.  And do you see the third line down is you?

25  A    Correct.

Daugherty - Cross                              60

1   Q    And that's your signature?

2   A    It appears to be.

3   Q    And did you serve in the capacity as Secretary of Strand?

4   A    I mean, I served in various capacities.  So I was agent, I

5   was representative, I was an officer.  I never was limited to

6   just being Secretary.

7   Q    Okay.  But that's what you signed this document as, right?

8   A    That's what my signature is next to.

9   Q    Okay.

10        MR. MORRIS:  And if you scroll down a little bit,

11  let's just see the date.

12  BY MR. MORRIS:

13  Q    And so that's August of 2006.

14        MR. MORRIS:  Can we go to the next page, please?

15  BY MR. MORRIS:

16  Q    You signed the next iteration of this as Secretary.  Do

17  you see that?

18  A    I do.

19        MR. MORRIS:  Can we scroll down a few lines to see

20  the date?

21  BY MR. MORRIS:

22  Q    That's February 27, 2007, okay?  And all of these folks

23  were officers at the time, do you recall?

24  A    No.

25  Q    No, you don't recall that?

Daugherty - Cross                           61

1   A    Huh-uh.  I don't remember Nicky being an officer or Jim

2   (inaudible) or Ron Williams.

3   Q    Okay.  It was 13 years ago.

4            MR. MORRIS:  Let's scroll to the next page, please.

5   BY MR. MORRIS:

6   Q    Do you see --

7            MR. MORRIS:  Scroll down a little further.

8   BY MR. MORRIS:

9   Q    You're now -- you've now been designated Assistant

10  Secretary.  Do you see that?

11  A    Yes.

12  Q    And that's your signature?

13  A    It is.

14  Q    And two lines above that, do you see there's Michael

15  Colvin?

16  A    Colvin, yes.

17  Q    Yeah.  And did you understand that he was Secretary of

18  Strand at one point?

19  A    I didn't focus on it one way or the other.

20  Q    He submitted -- Mr. Colvin submitted a declaration last

21  night on your behalf; isn't that right?

22  A    He did.

23  Q    And he said he couldn't recall when you stepped down from

24  your position as an officer of Strand, right?

25  A    Words to that effect, yes.

Daugherty - Cross                          62

1           MR. MORRIS:  Can we just show the date of this

2     document?  So, this is January 2008.  Let's go to the next

3     page.  Here, again, if we can scroll down a little further, --

4     BY MR. MORRIS:

5     Q    -- you have Mr. Colvin signing and you also signing as

6     Assistant Secretary.  Do you see that?

7     A    I do.

8     Q    And that's your signature?

9     A    Yes.

10          MR. MORRIS:  Okay.  Can we just see the date of this

11    document?  This is May 2008.  Let's go to the next page.

12    BY MR. MORRIS:

13    Q    Okay.  Again, Mr. Colvin as Secretary and you as

14    Assistant Secretary; is that right?

15    A    Yes.

16    Q    And that's your signature?

17    A    Yes.

18    Q    And it's March 1st, 2009, right?

19    A    That's what it says, yes.

20          MR. MORRIS:  Okay.  Let's go to the next page.  Stop.

21    BY MR. MORRIS:

22    Q    You see Mr. Colvin is still there, but you're not, right?

23    A    Correct.

24    Q    And this is dated May 29, 2009, right?

25    A    Correct.

Daugherty - Cross                                      63

1    Q    So Mr. Colvin, the person who submitted a declaration on

2    your behalf, signed a document where you're no longer listed

3    as an officer of Strand as of May 29, 2009, fair?

4    A    That is correct.

5    Q    Okay.

6             MR. MORRIS:  Let's just keep going.

7    BY MR. MORRIS:

8    Q    This one is dated January 2010.  Again, Mr. Colvin was on

9    and you're not, right?

10   A    Correct.

11            MR. MORRIS:  Next page.

12   BY MR. MORRIS:

13   Q    Mr. Colvin was here as Secretary and you're not listed as

14   an officer of Strand as of July 1st, 2010, right?

15   A    That's correct.

16   Q    Okay.  Does -- does -- do these documents refresh your

17   recollection that you stepped down as an officer of Strand

18   sometime between March and May of 2009?

19   A    No.

20   Q    Okay.

21            MR. MORRIS:  Can we call up the other exhibit,

22   please?

23   BY MR. MORRIS:

24   Q    This is a document entitled Secretary's Certificate.  Do

25   you see that?

1   A    I do.

2   Q    And do you see Mr. Colvin signed it as Secretary?

3   A    I do.

4   Q    And do you see that it was delivered on behalf of Strand

5   Advisors?

6   A    No.

7   Q    Up at the top line.

8   A    Oh, yes.

9   Q    Okay.  And Mr. Colvin signed this as of August 4, 2009,

10  right?

11  A    Well, it's --

12  Q    Above his signature?

13  A    Well, Highland had the practice of -- it sort of had the

14  practice where they would put an effective date prior to the

15  actual time that the document was created.

16  Q    So Mr. Colvin, the person and the attorney who submitted a

17  declaration on your behalf, signed this document as of August

18  4, 2009, right?

19  A    Well, well, it says, The undersigned has executed, so

20  yeah, I'm just going to have to say yes.  I'm just not sure --

21  I don't know, I guess, is my obvious question of when he

22  actually signed it.

23  Q    Okay.  Well, he was comfortable signing it as of August 4,

24  2009, is that fair, based on his signature?

25  A    I mean, you're showing me a document with his signature on

Daugherty - Cross                    65

1   it.  That's all I see in front of me.  I don't know what he

2   was comfortable with.

3   Q   Okay.  And in Paragraph 1, it says that, The resolutions

4   attached as Exhibit A have been duly authorized by the

5   company, by the company's sole director.  Do you see that?

6   A   I do.

7          MR. MORRIS:  Let's look at Exhibit A, please, if we

8   can scroll down.

9   BY MR. MORRIS:

10  Q   And this is the consent of the sole director as of May 29,

11  2009.  Do you see that?

12  A   Yeah.  (inaudible) as Treasurer?

13  Q   No, we'll scroll down, sir.  No problem.

14         MR. MORRIS:  Let's keep scrolling down.  Okay.  All

15  right.

16  BY MR. MORRIS:

17  Q   And there's your list of officers, and you don't appear

18  there, right?

19  A   I don't appear there, no.

20  Q   And so would you agree that Mr. Colvin, the attorney who

21  signed the declaration on your behalf last night, signed a

22  Secretary's Certificate pursuant to which he attested to the

23  accuracy of the resolution, that as of May 29, 2009 the

24  officers were as listed here and it didn't include -- did not

25  include you?

Daugherty - Cross                              66

1   A    Okay.  I just want to clarify a couple things.  One, he

2   signed it on Friday.  You know, just so you know, it didn't

3   get created last night.  And will you ask me the rest of that

4   question?

5   Q    Sure.  I apologize.  I just didn't see it until last

6   night, and that's why I'm referring to last night, because I

7   didn't see it until it was filed.

8   A    I think we included it in the exhibit list on Friday.

9   Q    Okay.  I know it was on the list.  In fact, that's where

10  --

11  A    I pulled it off the Internet from the court site, so they

12  had it.

13  Q    You're not on this list of officers?

14  A    I'm not on this list, no.

15  Q    Okay.  And just a few more questions, sir.

16        THE COURT:  I'm going to make sure the record is

17  clear once again.  Are you going to offer into evidence these

18  pages you've described as Exhibit X2, so we --

19        MR. MORRIS:  X2 and X1.

20        THE COURT:  X2 and X1?

21        MR. MORRIS:  Yes.

22        THE COURT:  All right.

23        MR. MORRIS:  And we will file -- we will file an

24  amended list for the docket, Your Honor.  But again, this just

25  came up a couple of hours before the hearing, because

1   personally I didn't see the Colvin declaration until I woke up

2   this morning.  I asked the question and I got these documents.

3   So these documents are being tendered in response to that very

4   specific declaration.

5            THE COURT:  All right.  It was filed at 6:11 p.m.

6   last night, in case -- Central Time.

7            MR. MORRIS:  Right.

8            THE COURT:  Any objection to X1 and X2?

9            MR. UEBLER:  And Your Honor, this is Tom Uebler.  For

10  purposes of this summary proceeding, I'm inclined not to

11  object to the document.  We've both put a lot of paper before

12  the Court.  But we would reserve our right to explore these

13  documents further in discovery on the merits and try to find

14  out why we didn't see them for the last three years in

15  Delaware.

16           THE COURT:  All right.  So X1 and X2 will be admitted

17  for today's hearing.  And Mr. Morris, you're going to file

18  them later on the docket.

19           MR. MORRIS:  Yes, Your Honor.

20      (Debtors' Exhibits X1 and X2 received into evidence.)

21           MR. MORRIS:  Yes, Your Honor.  Just a few more

22  questions.  I know we're almost out of time here.

23  BY MR. MORRIS:

24  Q   Mr. Daugherty, just quickly, in the Texas action you were

25  found liable for breaching your fiduciary duty to Highland;

Daugherty - Cross                              68

1    isn't that correct?

2    A    Correct.

3    Q    And you were ordered to pay Highland's legal fees of

4    approximately $2.8 million; is that right?

5    A    Correct.

6    Q    The litigation that you -- excuse me.  Withdrawn.  The

7    claims that you have been pursuing against all of the

8    Highland-related people and entities, you would be the

9    beneficiary of any judgment that you obtained, right?

10   A    I don't know what you mean by that.

11   Q    You are the sole plaintiff in all of these cases?

12   A    On the actions that I brought?

13   Q    Yes.

14   A    I believe so, yeah.

15   Q    Okay.  And so any judgment that's rendered will be

16   rendered in your own personal capacity; isn't that right?

17   A    Yes.

18   Q    You didn't bring --

19   A    Well, I'm the plaintiff, I guess is what I'm saying.

20   Q    Yeah.  That's fair.

21   A    So, I mean, yeah, the payments will go to me.

22   Q    Okay.  You mentioned something about a criminal case being

23   overturned on appeal.

24   A    I didn't.  My lawyer did.

25   Q    Okay.  Can you just describe for the Court what the

Daugherty - Cross                                69

1    original charge was?

2    A    I don't believe that it's relevant, but there was an

3    injunction put in place that said that -- that prohibited me

4    from retaining Highland's account information.  And over the

5    course of, I don't know, from about 2014 to 2018, Highland

6    brought eight different, you know, variations of show cause

7    violations on that injunction against me.  Eight times I had

8    to defend.  And one of those eight was based on Josh Terry had

9    just been terminated from Highland and I saw him, I think, I

10   saw him in London May of 2016.  He got terminated in June.  I

11   sent him -- I walked up to his house and handwrote him a

12   letter extending my condolences and --

13            MR. MORRIS:  Your Honor, I'm going to --

14            THE WITNESS:  You asked me a question and I'm trying

15   to answer it.

16   BY MR. MORRIS:

17   Q    I apologize.  I apologize.  Let me ask a different

18   question because -- because that wasn't responsive to what I

19   was asking.  Were you found in contempt of court?

20   A    No.

21   Q    Okay.  What crime were you charged with?

22   A    I was charged with contempt of court violating the

23   injunction.  And a three-member panel at the Texas Court of

24   Appeals found unanimously in my favor that there was no

25   evidence that I violated the injunction.

Daugherty - Redirect                              70

1   Q    But the trial court did in fact not only find that there

2   was evidence, but the trial court is the one who imposed the

3   judgment against you; is that fair?

4   A    That is correct.  And he was ordered to vacate that

5   ruling.

6   Q    Okay.

7              MR. MORRIS:  Your Honor, I have no further questions.

8              THE COURT:  All right.  Redirect?

9              MR. UEBLER:  Thank you, Your Honor.

10                        REDIRECT EXAMINATION

11  BY MR. UEBLER:

12  Q    Mr. Daugherty, the fee award that Mr. Morris referred to

13  in Highland's favor, did you pay that?

14  A    I did.  I wired approximately $3.1 million to Highland, I

15  want to say, December 13th or 14th, 2016.

16  Q    2016?

17  A    Yeah.

18  Q    What amount have you received form Highland or any of its

19  affiliates as a result of the judgment you obtained?

20  A    Zero.

21  Q    With respect to Strand Advisors, when did you last serve

22  as an agent of Strand?

23  A    January-February 2012, when Highland enlisted me to meet

24  with the Crusader investors, and I guess one called a Stratus

25  (phonetic) investor, to the Stratus -- as I mentioned, there

Daugherty - Redirect                          71

1   was two categories.  One, my view on value of various Top 40

2   portfolio investments, and two, to discuss my reasons for

3   leaving Highland.

4   Q    When did you last serve as a representative of Strand?

5   A    In that January-February 2012 time frame.

6   Q    Were you authorized to sign documents on behalf of Strand

7   Advisors?

8   A    Yes.

9   Q    When did that authority cease?

10  A    When my employment at Highland terminated in October 2011.

11         MR. UEBLER:  Your Honor, I have no further questions.

12         THE COURT:  Any recross?

13         MR. MORRIS:  Mr. Daugherty?  Yes, Your Honor.

14         THE COURT:  Go ahead.

15                    RECROSS-EXAMINATION

16  BY MR. MORRIS:

17  Q    Mr. Daugherty, did you submit any documentation in support

18  of your contention that you served not as an officer but as an

19  agent or a representative of Strand until the time of your

20  departure in 2011?

21  A    Yes.

22  Q    All right.

23         MR. MORRIS:  No further questions, Your Honor.

24         THE COURT:  All right.  Thank you.

25      Mr. Daugherty, we appreciate your testimony.  You're

Daugherty - Redirect                          72

1    excused.

2              THE WITNESS:  Thank you, Judge.

3              THE COURT:  All right.  Mr. Uebler, do you have any

4    other evidence today?

5              MR. UEBLER:  I don't have any other evidence, Your

6    Honor, just some very brief closing remarks, if that's

7    permitted.  And I see we have four minutes left, so I'll defer

8    to the Court.

9              THE COURT:  Well, I won't cut you off cold in four

10   minutes.

11       Mr. Morris, did the Debtor have any evidence today?

12             MR. MORRIS:  Yes, Your Honor.  Does Mr. Daugherty

13   rest?

14             THE COURT:  Yes, they rested.  What I understood,

15   they rest.

16             MR. UEBLER:  I -- that's correct.  I mean, subject to

17   my comment earlier about submitting the exhibits and the

18   papers as part of our case.

19             THE COURT:  Well, let's make sure we get all of Mr.

20   Daugherty's evidence in before I shift over to Mr. Morris.  So

21   what else did you want to offer?

22             MR. UEBLER:  Only the -- the papers we've provided,

23   including Mr. Daugherty's declaration and the exhibits

24   attached to our motion and our reply.

25             THE COURT:  All right.  So those were filed as

1   separate exhibits at Docket Entry No. 1388.  I think it's all

2   there, correct?

3           MR. UEBLER:  Correct.

4           THE COURT:  All right.  So it looks like it's

5   Exhibits 1 through 42 that appear there.

6       Any objection, Mr. Morris?

7           MR. MORRIS:  Yes, Your Honor.  I object to the

8   admission into evidence of Exhibits 7 through 10, No. 14, and

9   No. 17 through 38, on grounds that they are irrelevant in

10  light of the fact that the Debtor has conceded for purposes of

11  voting the $9.1 million in claims, and on the separate ground

12  under Rule of Evidence 403 that any probative value of this

13  material is greatly outweighed by the waste of time and the

14  irrelevance of the subject matter.

15      I will point out just some examples, Your Honor.  And this

16  is why the Debtor really doesn't put this stuff in the record,

17  because it is so irrelevant to these claims.  But he's got

18  things in there, the Court of Appeals decision on his criminal

19  case.  He's got a Crusader presentation.  Actually, I -- we

20  also object to that one, which is Exhibit 5.  We've got, you

21  know, appellate decisions, the escrow correspondence.  We've

22  got a Court of Appeals mandate.  We've got correspondence

23  relating to the escrow at Exhibit 30.  We've got a transcript

24  on an argument on a motion to compel.  We've got motions for

25  the argument.

1     If you look at these documents, Your Honor, they really

2    have nothing to do with the claims that are being made here.

3    Certainly, in light of the Defendant -- in light of the

4    Debtor's concessions that we've made, we don't think that the

5    record should include any of the documents that I've

6    identified.

7          THE COURT:  All right.  Mr. Uebler, it's 2,619 pages

8    in all.  And what do you say to that objection?

9          MR. UEBLER:  I agree they are prejudicial documents,

10   Your Honor, but that doesn't make them inadmissible.  They're

11   prejudicial documents because they establish Mr. Daugherty's

12   right to fee shifting under the bad-faith exception to the

13   *American* Rule.

14     This is not, as Mr. Morris said earlier, a case where both

15   sides' hands are dirty.  This is a case where the Delaware

16   court found the crime fraud exception applied.  Based on my

17   research, that was the second time that has happened in

18   Delaware.  That's a big deal.

19     And the transcripts that we put in, the motions for re-

20   argument, the history we have presented in those 2,000 pages

21   supports Mr. Daugherty's claim.  It's directly relevant to an

22   issue that I think Mr. Morris referred to as frivolous

23   earlier, but I don't want to put words in his mouth.  It's

24   directly relevant, and that relevance by far outweighs any

25   prejudice to Highland, or at least prejudice that wasn't of

1   its own making.

2       So it should all be submitted at a minimum for the purpose

3   of considering Mr. Daugherty's request for fees.

4           THE COURT:  Okay.  I overrule the objection.  I'll

5   admit Exhibits 1 through 42.

6       (Patrick Daugherty's Exhibits 1 through 42 are received

7   into evidence.)

8           THE COURT:  All right.  So you rest at this point?

9           MR. UEBLER:  Yes.  Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Morris?

11          MR. MORRIS:  Yeah, just one clarification there, Your

12  Honor.  Is Mr. Daugherty attempting to offer into evidence Mr.

13  Colvin's declaration?

14          THE COURT:  I did not hear him offer that.

15          MR. UEBLER:  I believe that's No. 42, Your Honor, so

16  the answer is yes.  And Mr. Morris had ample opportunity to

17  question Mr. Daugherty about the substance of the declaration.

18          MR. MORRIS:  Your Honor, it's --

19          THE COURT:  Oh, okay.  I had misunderstood.

20          MR. MORRIS:  Okay.

21          THE COURT:  It is Exhibit 42, even though it was just

22  filed separately on the docket last night.  So did you have an

23  objection, Mr. Morris?

24          MR. MORRIS:  I do.  It's hearsay, Your Honor.  It's

25  being offered for the truth of the matter asserted by a

1  witness who is not available to be cross-examined.

2              THE COURT:  Okay.  I sustain --

3              MR. UEBLER:  Your Honor, --

4              THE COURT:  I sustain that objection.  42 will not be

5  admitted.  All right.

6       (Admission of exhibits revised to exclude Patrick

7  Daugherty's Exhibit 42.)

8              THE COURT:  Mr. Morris, you have evidence?

9              MR. MORRIS:  Yeah.  So the Debtor offers into

10 evidence Exhibits A through -- Exhibits A through V.  And I

11 guess Exhibits X1 and X2 have already been admitted.

12             THE COURT:  All right.  Let's be clear there.  Those

13 appear --

14             MR. KATHMAN:  Your Honor?  Your Honor, this is Jason

15 Kathman.  And I just wanted to -- on Exhibit 42, we talked

16 with Mr. Morris, and maybe I had a misunderstanding, but my

17 understanding is that we were going to present witnesses via

18 declarations in that manner.  And there had been some

19 discussion about -- and giving him the opportunity to cross-

20 examine Mr. Daugherty.  So if I misunderstood the agreement,

21 that's on me, but there was -- we had I believe it was in two

22 phone calls, and I think he's had more (inaudible), about how

23 testimony and witnesses would be presented for this hearing.

24 And if Mr. Colvin is outside of that, again, maybe I'm

25 misunderstanding, but I at least wanted to raise that issue.

1          MR. MORRIS:  Your Honor, respectfully, I have great

2     respect for Mr. Kathman, but he is misunderstanding.  I would

3     never, ever permit a declaration to come into evidence in a

4     matter like this without the ability to cross-examine.  I can

5     describe for the Court what the offer was, but it was not

6     that.

7          THE COURT:  Okay.  Well, I regret there was a

8     misunderstanding, but just pulling this up, while it's only a

9     one-and-a-half page declaration, it has 57 pages of

10    attachments, or approximately 57 pages of just all kinds of

11    things that I can presume the Debtor might want to cross-

12    examine Mr. Colvin on.  So I again sustain the objection.  42

13    will not come in.

14       All right.  Mr. Morris, your evidence.  Where do Exhibits

15    A through V appear on the docket?  I need to refresh my

16    memory.

17          MR. MORRIS:  Your Honor, just to let you know what

18    happened last night, because we were working with Mr.

19    Daugherty's counsels on redaction, and I think Mr. Anabel,

20    with your Court's permission, allowed us to email the

21    documents to you, and we had emailed them to Mr. Daugherty

22    because we weren't sure at the late moment as to where we were

23    going to be with the redactions.  We can certainly file

24    everything now.  But Your Honor has those documents.

25          THE COURT:  Okay.  I do have those.  I knew that

1   there were several emails that they were attached to.  I just

2   didn't know if they were separately on the docket.  So, again,

3   let me pull those up.  It's A through V?

4           MR. MORRIS:  Yes.

5           THE COURT:  Any objections by Daugherty's counsel?

6           MR. UEBLER:  Your Honor, as I said, for this summary

7   proceeding, we're not going to object to A through V.  But

8   with the exclusion of Daugherty 42, the Colvin declaration, it

9   seems that X1 and X2 have no relevance anymore and should be

10  excluded.  Mr. Morris stated earlier that those two documents

11  were submitted expressly in response to the Colvin

12  declaration.  With that out, Exhibits X1 and X2 should be out

13  as well.

14          THE COURT:  Okay.  Your response, Mr. Morris?

15          MR. MORRIS:  Yeah, very briefly.  Number one, I used

16  them to cross-examine his witness.  I offered them into

17  evidence.  There was no objection.  They've already been

18  admitted into court.  So I think this issue is moot.

19      But number two, when Mr. Daugherty said that he didn't --

20  I don't remember exactly what his testimony was, but suffice

21  it to say that he wouldn't agree that he had resigned sometime

22  between March 3rd and -- between March and May of 2009, I

23  certainly could have used them as impeachment documents under

24  any circumstance.

25          THE COURT:  All right.  I overrule the objection.  X1

1 | and X2 are in.

2 | (Debtors' Exhibits X1 and X2 are again received into

3 | evidence.

4 | THE COURT: Again, I think not only were they

5 | admitted without objection earlier, but they do, I guess you

6 | would say, contradict some of the testimony of Mr. Daugherty.

7 | His position, as I hear it, is he was still an agent, or he

8 | was an agent at least of Strand beyond the May 2009 time

9 | period. And these are documents that arguably impeach that

10 | testimony.

11 | All right. So A through V and X1 and X2 are admitted.

12 | (Debtors' Exhibits A through V and X1 and X2 received into

13 | evidence.)

14 | THE COURT: If I could just ask, Mr. Morris, that you

15 | all later submit on the docket these exhibits, all of them, so

16 | we don't have to go back and print out the email attachments

17 | and do it the old-fashioned way.

18 | MR. MORRIS: Sure.

19 | THE COURT: All right. Any other evidence?

20 | MR. MORRIS: No, Your Honor. The Debtor rests.

21 | THE COURT: All right. I'll hear brief closing

22 | arguments. Mr. Uebler, you first. (Pause.) Mr. Uebler,

23 | you're on mute, sir. Mr. Uebler?

24 | CLOSING ARGUMENT ON BEHALF OF CREDITOR PATRICK DAUGHERTY

25 | MR. UEBLER: Thank you. Let me try that again. I

1    want to start by responding to one of Mr. Morris's questions

2    of Mr. Daugherty, which was, Did you submit any papers in this

3    case that would establish that you were either an officer or

4    an agent of Strand through resignation in 2011?  That's

5    Exhibit 2.  It is, in fact, Highland's answer in the Delaware

6    case at Paragraph 66, where Defendants admit that Daugherty

7    served as an officer and agent of Strand from 2004 until he

8    resigned from Highland in 2011.  So I think that should answer

9    Mr. Morris's question.

10        Let me just conclude by some comments that James Seery

11    recently made in a deposition.  He said, Equally, on the other

12    side, you could say that the man's life was ripped out from

13    him, that his position was taken away, that he got an

14    arbitration award that arguably the Debtor and the Debtors'

15    management at the time stripped away all the assets and pretty

16    patently denuded it to try to leave him with no recovery.

17    Then when he sought a recovery, they sought to sue him in

18    every jurisdiction in the world and basically ruin the guy's

19    life and put him in a position where, while to some it might

20    seem a windfall, to him it might seem just.

21        Mr. Seery was talking about Josh Terry, not Mr. Daugherty.

22    But Highland's blueprint for ruining a guy's life originated

23    from its treatment of Mr. Daugherty.

24        We've given you reasons today to permit the full amount of

25    the three remaining disputed issues for voting purposes for

1   Mr. Daugherty's claim.  Allowing that full amount will protect

2   Mr. Daugherty as a creditor, give him his appropriate say in

3   any plan that's presented, and would hopefully bring these

4   parties at least one step closer to resolution.

5        Thank you for your time today.

6            THE COURT:  Thank you, Mr. Uebler.  Mr. Morris?

7              CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

8            MR. MORRIS:  Yeah.  Very briefly, I'll just borrow

9   Mr. Uebler's phraseology and say that it would not be just to

10  give to Mr. Daugherty anything on account of a $21 million

11  claim that has already been dismissed and that his testimony

12  just established will be time-barred.  We don't believe that

13  it would be just to give him anything on account of a tax

14  claim that is completely contingent, unliquidated, and where

15  the Debtor admittedly owes absolutely nothing to Mr. Daugherty

16  today.

17       I can't imagine what it's been like to go through this

18  litigation, just like I couldn't imagine from Mr. Terry's

19  perspective, from Mr. Dondero's perspective.  These people

20  have been at this for a decade.  That's not what -- that's,

21  you know, it's not anything I can get my arms around.  What

22  I'm here to do is to protect the Debtors' estate and its

23  stakeholders, including its general unsecured creditors.

24       Mr. Daugherty is going to have a very meaningful claim if

25  the Court allows his claim for voting purposes at $9 million.

1  It's going to be the third biggest claim, at least at this

2  point, of anybody.  So that's just.  It's just that he has a

3  seat at the table.  We're offering him a seat at the table.

4  But he shouldn't get anything on account of the claims that

5  really have little to no merit.

6      Thank you, Your Honor.

7          THE COURT:  All right.  Thank you.

8      Well, I thank you for your thoroughness, your professional

9  courtesy that was very visible here today.

10     As I started out with today, Bankruptcy Rule 3018(a) is

11 what guides us.  That rule is a provision that states, quote,

12 Notwithstanding an objection to a claim, the Court may

13 temporarily allow a claim for voting purposes in such amount

14 the Court deems proper, after notice and a hearing.

15     There are many cases that have attempted to kind of impose

16 a legal framework for analysis on that rule because, as you've

17 just heard, the rule doesn't give much detail.  The cases all

18 sort of sing the same tune, that the rule contemplates only a

19 summary estimation proceeding, not a full trial on the merits.

20 The Court has great discretion to employ whatever method is

21 best-suited to the circumstances of the case in determining

22 what amount should be allowed for voting purposes.  The Court

23 should consider things like whether there's a last-minute

24 objection to strategically prevent a creditor from voting who

25 might vote no and the objection might be frivolous, that sort

1   of thing.  And all decisions are reviewed for abuse of

2   discretion, should there be any appeal.

3       So that is the rule and the case law interpreting the

4   rule.  Based on that, I will note that we start out here with

5   an amended proof of claim filed by Mr. Daugherty in the amount

6   of $40,710,819.42.  And I studied hard before coming out here

7   today the addendum to that proof of claim filed by Mr.

8   Daugherty.  It had a description of the claim that was done in

9   the form of a chart.  I'm holding it up here -- I don't know

10  if it picks up on camera -- what I'm looking at.  But it

11  appears at Docket Entry 1280-2.  It was part of the appendix

12  to the motion to estimate claim.

13      So the amount is broken down into components.  If you're

14  looking at that chart -- again, which was most helpful -- I

15  note that in the claim of Daugherty for HERA units, there are

16  different line items that total approximately $26 million and

17  some change.  So that's the issue we've talked about a lot

18  today.  Is it correct, is it reasonable to assume that

19  Daugherty might be entitled to a hundred percent of the value

20  or a hundred percent of the HERA units?  So, I found that,

21  based on the evidence and the argument, to be a problematic

22  assumption.  Again, one day we will have a trial on the

23  adversary, a trial on the proof of claim.  I will hear every

24  bit of relevant evidence that the parties choose to put in on

25  that issue.  But for our purposes today, under Rule 3018, I

1  just found considerable doubt that that would be an

2  appropriate damage calculation here.

3      So, again, using my discretion, I found that, at a

4  minimum, you should reduce that $26 million-plus component of

5  the Daugherty proof of claim by the roughly 81 percent,

6  because it was 19.1 percent, I think, that Daugherty would

7  have been entitled to of the HERA units.  So that's a roughly

8  $5 million amount, or a $19 million reduction that -- excuse

9  me.  I did my math wrong.  That's a $21 million reduction that

10 I think would be reasonable for estimation purposes under

11 3018.

12     Further looking at the chart that breaks down Daugherty's

13 claim -- we discussed this today in testimony -- there is an

14 attorney fee component that aggregates to $7,854,752.31, and

15 that's the indemnification, it's the interest on

16 indemnification award, it's the fee shifting fees on fee

17 award.  And once again, looking at this through the lens of

18 3018(a), I do not think it's appropriate to assume I'm going

19 to get there, if you will, on this attorneys' fee award.

20 There have been *bona fide* issues, if you will, raised on

21 whether the indemnification provision that was cited would

22 entitle Mr. Daugherty to these fees.  Section 4.1(h) of the

23 partnership agreement would be that indemnification provision.

24     Moreover, the deviation from the *American* Rule, if that

25 indemnification provision does not apply, is a big hurdle to

1  achieve.  It's very deeply rooted in our law that if you don't

2  have a contract provision and you don't have a statute that

3  entitles you to attorneys' fees, it's quite a high hurdle to

4  get there, whether it be Rule 11, the vexatious litigation

5  statute, or some common law argument of bad faith.

6      So, again, looking through the lens I'm looking through

7  today, I just cannot get there under 3018.

8      So, doing my math, I'll go backwards.  I've just said that

9  I can't there on $7,854,750.31 of Mr. Daugherty's $40-plus

10 million claim.  I've said I can't get there on $21 million of

11 his $40.7 million proof of claim because of the HERA, the 81

12 percent interest in the HERA units.  So what else in that

13 chart gives me pause?  The tax refund, the 2008 tax refund

14 component.  We have $1,475,816 plus estimated interest on that

15 of $1.174537 [million].  It's very clear that at this point

16 this is, at best, contingent.  And again, down the road we may

17 get to a point where it's not contingent, the IRS has finished

18 doing what it's going to do, and we may get to a point where

19 we think a result is appropriate.  I don't know.  There may

20 be, even if we get there, a subordination argument.  The point

21 is, there are *bona fide* arguments today that do not allow me

22 to get to the point I feel like I need to get at an estimation

23 hearing to allow this claim, these components of the claim.

24     So when you subtract $7.854 million and $1.475 million and

25 $1.174 million and $21 million, that's about $32 million that

1   I would -- I was thinking about, before I even heard the

2   evidence, deducting out of the claim that I would estimate for

3   voting purposes.

4        That, I will tell you, is why I came out here at the very

5   beginning today and said, Jeez, the Debtors' suggested voting

6   claim of $9,134,019, which the Debtor came at a different way

7   as far as the math, that sounded darn reasonable to me.

8        So I am going to allow a voting claim for Mr. Daugherty at

9   $9,134,019.

10       Now, let me say a couple of more words why I fall back on

11  that number.  A, it's pretty close to the direction I was

12  leaning, but B, I want Mr. Daugherty, if he's still on the

13  line, to understand.  I hope it doesn't seem like I'm giving

14  Highland every benefit of the doubt here today and reducing

15  your claim by every argument they made and just going at it

16  that way.  I do feel like I am obviously giving you some

17  benefits of the doubt here.  Primarily, the benefits of the

18  doubt I'm giving you are, number one, the HERA judgment was

19  obviously a HERA judgment.  I mean, it was a judgment awarded

20  to Mr. Daugherty against HERA, not Highland per se, right?  I

21  didn't misunderstand that.  So I am assuming you have got darn

22  good arguments, Mr. Daugherty, to hold Highland liable for

23  that HERA award, plus the pre-judgment and post-judgment

24  interest, up to the bankruptcy petition date of October 16th,

25  2019.

1     So I'm giving you the benefit of the doubt there, and on

2     -- well, I do want to make one more point on the attorneys'

3     fees.  Again, that was a huge component of your proof of

4     claim.  And I certainly well understand the bad faith

5     arguments and your many ways you think you will have of

6     getting attorneys' fees at the end of the day.  But I'm

7     sitting here today looking at the fact that the Texas state

8     court actually awarded Highland attorneys' fees against you.

9     Now, I understand, or I think I understand, that was somewhat

10    of a discrete issue with regard to the breach of fiduciary

11    duty arguments in sharing information or taking files or

12    information.  And you might argue, well, that was very

13    discrete, and obviously you paid it.  But all this to say

14    there are lots of a *bona fide* disputes here, I think.  And

15    again, the rule doesn't use that term, *bona fide* disputes,

16    but, again, I have lots of discretion here, and I think, at

17    the end of the day, a roughly $9 million voting claim is very

18    reasonable.

19        I know the point I ended up making.  I've also given you

20    the benefit of the doubt, Mr. Daugherty, on the roughly $5

21    million claim I'm giving you for the 19 percent of the HERA

22    assets.  And I understand there were things about the Texas

23    state court judgment that left that a little ambiguous,

24    whether you could get that or whether that would be double-

25    counting.  But again, I just, I want you to know that I

88

1    haven't weighed every benefit of the doubt in favor of

2    Highland here.  I've weighed a couple of these doubts in your

3    favor.

4        All right.  So, $9,134,019 is the voting claim of Mr.

5    Daugherty.  Again, this is without prejudice or waiver of any

6    arguments at a later trial on the claim for distribution

7    purposes.

8        Are there any questions?

9            MR. DAUGHERTY:  Just, you asked if I was on.  I just

10    wanted to let you know I got back on.  I took my (inaudible).

11    But I heard every word and I appreciate your comments.

12            THE COURT:  All right.  Thank you, Mr. Daugherty.

13        Mr. Morris, would you be the scrivener on this order?  And

14    of course, run it by Mr. Uebler and Kathman.

15            MR. MORRIS:  Of course, Your Honor.

16            MR. KATHMAN:  Your Honor?  Your Honor, this is Jason

17    Kathman.  We have just one housekeeping issue.  We had filed,

18    when we filed our motion to -- this 3018 motion at Docket No.

19    1280, actually, we filed a motion for leave to amend our proof

20    of claim, which is the -- actually, the chart that I think

21    Your Honor was looking at was the chart that we attached to

22    our amended proof of claim.  We filed that with negative

23    notice, and that negative notice actually ran yesterday.  So

24    we'll upload a certificate of no objection.  But just, while

25    we're here on the record, I wanted to ask for the Court to

1   approve that motion for leave to file an amended proof of

2   claim.

3              THE COURT:  Okay.  So I neglected to note that

4   detail.  I was of the impression it wasn't contested, and in

5   fact, the objection deadline has run.  So I will accept your

6   order on that.  Okay?

7              MR. KATHMAN:  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you all.  We stand

9   adjourned.

10             MR. MORRIS:  Thank you, Your Honor.

11             THE CLERK:  All rise.

12       (Proceedings concluded at 3:59 p.m.)

13                          --oOo--

14

15

16

17

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
22   the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                      **11/18/2020**

24   _____    _____

25   Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

90

                              INDEX

1

  PROCEEDINGS                                            3
2

3
  WITNESSES
4
  Creditor Patrick Daugherty's Witnesses
5
  Patrick Daugherty
6  - Direct Examination by Mr. Uebler                  29
   - Cross-Examination by Mr. Morris                   44
7  - Redirect Examination by Mr. Uebler                70
   - Recross-Examination by Mr. Morris                 71
8
   EXHIBITS
9
   Patrick Daugherty's Exhibit 40            Received 57
10 Patrick Daugherty's Exhibits 1 through 42 Received 75
   Patrick Daugherty's Exhibit 42            Denied   76
11
12 Debtors' Exhibits X1 and X2               Received 67
   Debtors' Exhibits X1 and X2               Received 78
13 Debtors' Exhibits A through V, X1, and X2 Received 79

14 CLOSING ARGUMENTS

15 By Mr. Uebler                                       79
   By Mr. Morris                                       81
16
   RULINGS
17
   Daugherty's Motion for Temporary Allowance of Claim for   82
18 Voting Purposes (1281)

19 END OF PROCEEDINGS                                  89

20 INDEX                                               90

21

22

23

24

25