# **EXHIBIT 2**

**EXHIBIT G**

```
                    CAUSE NO. DC-22-00304
SCOTT BYRON ELLINGTON      )    IN THE DISTRICT COURT
                           )
      Plaintiff,           )
                           )
VS.                        )    101ST JUDICIAL DISTRICT
                           )
PATRICK DAUGHERTY,         )
                           )
      Defendant.           )    DALLAS COUNTY, TEXAS
```

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICK DAUGHERTY

AUGUST 28, 2025

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK DAUGHERTY, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of August, 2025, from 1:01 p.m. to 5:27 p.m., before Kristi Klund, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas, 75201, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 1

```
 1                      A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
          MS. JULIE PETTIT
 4        THE PETTIT LAW FIRM
          1900 N. Pearl Street, Suite 1740
 5        Dallas, Texas   75201
          jpettit@pettitfirm.com
 6
      FOR THE PLAINTIFF:
 7        MR. MICHAEL K. HURST
          LYNN PINKER HURST & SCHWEGMANN, LLP
 8        2100 Ross Avenue, Suite 2700
          Dallas, Texas   75201
 9        mhurst@lynnllp.com
10    FOR THE DEFENDANT:
          MR. DREW YORK
11        GRAY REED
          1601 Elm Street, Suite 4600
12        Dallas, Texas   75201
          dyork@grayreed.com
13
      ALSO PRESENT:   Mr. Joe Willis (Videographer)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
                            INDEX
                                                        PAGE

   Appearances.....................................   2
   Stipulations...................................
   PATRICK DAUGHERTY
         Examination by Ms. Pettit...............   7

   Signature and Changes.......................... 223
   Reporter's Certificate......................... 225
                   PREVIOUSLY MARKED EXHIBITS
   NO.            DESCRIPTION                           PAGE
   Exhibit 6      Text messages
                  (DEF000236-DEF0000247)                 38
   Exhibit 23     Transcript of Proceedings (2/2/21)    173
   Exhibit 30     e-mail                                 92
   Exhibit 36     e-mail from Patrick Daugherty
                  (Part 4)(JPS/ELL-011979-011983)       196
   Exhibit 40     e-mail from Patrick Daugherty
                  (DEF014516-14517)                     193
   Exhibit 44     e-mail from Patrick Daugherty (Part 3)
                  (DEF010757-010759)                    195
   Exhibit 90     Phone image log                       212
   Exhibit 328    Text messages
                  (DEF000236-000239)                    181
   Exhibit 377    e-mail from Patrick Daugherty (Part 2)
                  (DEF00729-00730)                      194
   Exhibit 394    e-mail from Patrick Daugherty
                  (DEF016322-DEF016324)                 191
   Exhibit 982    Text message chain produced by
                  Mr. Seery                             197
   Exhibit 1069   Declaration of John A. Morris         150

                       MARKED EXHIBITS
   NO.            DESCRIPTION                           PAGE
   Exhibit 1200   Plaintiff's First Requests for
                  Production to Patrick Daugherty        75
   Exhibit 1201   Defendant's Responses to Plaintiff's
                  First Requests for Production          78
   Exhibit 1202   Dallas Business Journal article        95
   Exhibit 1203   Series of e-mails
                  (DEF026146-DEF026147)                  98
   Exhibit 1204   Final Judgment                        124
   Exhibit 1205   Verified Complaint (NexBank 2017)     132
   Exhibit 1206   Stipulation of Dismissal              134
```

Page 3

|   | CONTINUED MARKED EXHIBITS | |
|---|---|---|
| NO. | DESCRIPTION | PAGE |
| Exhibit 1207 | Verified Complaint (2019) | 135 |
| Exhibit 1208 | Order Granting Motion to Dismiss | 137 |
| Exhibit 1209 | Proof of Claim | 145 |
| Exhibit 1210 | Schedules | 167 |
| Exhibit 1211 | Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty and Authorizing Actions Consistent Therewith | 176 |
| Exhibit 1212 | Notes made by Julie Pettit | 186 |

```
 1              THE VIDEOGRAPHER:  Good afternoon.  We're
 2   going on the record at 1:01 p.m. on August the 28th,
 3   2025.  Please note the microphones are sensitive and they
 4   may pick up whispering and private conversations.  Please
 5   mute your phones at this time.  This is the video
 6   recorded deposition of Patrick Daugherty, taken by
 7   counsel in the matter of Scott Byron Ellington versus
 8   Patrick Daugherty, filed in the District Court of Dallas
 9   County, Texas.  The Case Docket Number is 22-00304.  The
10   location of the deposition is a 1601 Elm Street, Dallas,
11   Texas.
12        My name is Joe Willis representing Veritext.  I am
13   the videographer.  The court reporter is Kristi Klund
14   from the firm Veritext.  I'm not related to any party in
15   this action, nor am I financially interested in the
16   outcome.  If there are objections to proceeding, please
17   state them at the time of your appearance.  Will counsel
18   and all present, including -- well, nobody is remote.
19   Please state your appearance and affiliation for the
20   record.
21              MS. PETTIT:  Julie Pettit for the
22   Plaintiff.
23              MR. HURST:  Michael Hurst for the
24   Plaintiff, Scott Ellington.
25              MR. YORK:  Drew York for Patrick
```

Page 5

```
 1   Daugherty.  And Ms. Pettit, just a quick clarification
 2   question.  So the Court's Order on this deposition that
 3   we're here today was compartmentalized into two parts.
 4   One being that there were questions that were asked at
 5   Mr. Daugherty's deposition previously that he was
 6   instructed to answer that he did not answer.  And the
 7   Court has allotted three hours -- up to three hours for
 8   those questions for which he's not to be instructed not
 9   to answer again.  And then the remaining hour and 55
10   minutes from the original time available for the first
11   deposition may be used and is not limited in scope.  Are
12   you intending to segment your examination into --
13               MS. PETTIT:  Yes.
14               MR. YORK:  -- these two parts?
15               MS. PETTIT:  It will be in two parts.
16               MR. YORK:  And which part are you
17   intending to do first?
18               MS. PETTIT:  The unanswered questions.
19               MR. YORK:  Okay.  And would you let me --
20   I mean, I've got the list here but then just so that we
21   can try to keep this on task today, when we get to the
22   points those are done we can --
23               MS. PETTIT:  I will let you know.
24               MR. YORK:  Thank you.
25               MS. PETTIT:  Yep.
```

```
 1                MR. YORK:  Okay.
 2                PATRICK DAUGHERTY,
 3   after having been first duly sworn, testified as follows:
 4                       EXAMINATION
 5   BY MS. PETTIT:
 6       Q.   All right.  Good afternoon, Mr. Daugherty.  Can
 7   you please state your name for the record?
 8       A.   Patrick Hagaman Daugherty.
 9       Q.   And in your last deposition we discussed a
10   company by the name of Corinthian Capital and you were
11   instructed not to answer who the owner was of that
12   company.  Can you identify who the owner is?
13       A.   I'm not familiar with Corinthian Capital.
14       Q.   You've never heard of Corinthian Capital?
15       A.   No.  You want me to help you?  I think it's
16   Corinthian Healthcare.
17       Q.   Okay.  Corinthian Healthcare.  Who is the owner
18   of Corinthian Healthcare?
19       A.   As I understand it, Judy McNeel.
20       Q.   You said Judy --
21       A.   McNeel?
22       Q.   -- McNeel.  And how do you know Ms. McNeel?
23       A.   She is my mother-in-law.
24       Q.   Okay.  Does the owner of Corinthian have any
25   knowledge about your investigation of Mr. Ellington in
```

Page 7

```
 1              MR. YORK:  Object to form.
 2       A.    I guess somebody came down to the lobby to
 3  greet me, a baldheaded guy that was tall, and a woman and
 4  they brought me up and then I met with Seery up there,
 5  some other people one time.  I don't know.  I just --
 6       Q.    (BY MS. PETTIT)  Other than Seery, who did you
 7  meet with?
 8       A.    I mean, do you count these people that -- this
 9  one guy was an accountant and I think -- and the woman
10  was I want to say some level of administrative role.  I
11  just -- I don't recall.
12       Q.    Anyone else that you know by name?
13       A.    No.
14       Q.    What were the purposes of your meetings at the
15  Highland Capital offices?
16       A.    To discuss settlement issues.
17       Q.    Did you negotiate the agreements while you were
18  there in the office?
19              MR. YORK:  Object to form.
20       A.    I just don't -- I don't recall.  I mean, the
21  negotiations took place starting in 2020 and went all the
22  way to November 2021.  So various things got determined
23  at various times.
24       Q.    (BY MS. PETTIT)  Did you ever sign any
25  agreements while you were there?
```

Page 100

```
 1       A.   No.  I don't think so.  If you have something
 2  that can refresh my memory, but I don't recall signing
 3  anything.
 4       Q.   Did you provide any information, such as the
 5  data compilations during any of the meetings at
 6  Highland's offices?
 7       A.   No.  I think that had all been done before for
 8  the most part.  I mean, I don't know -- some of the data
 9  compilations I resent when -- what's his name -- you
10  know, there's two phases.  There's the Highland
11  bankruptcy where there was a creditor's committee and
12  then there was the emergence from bankruptcy which I want
13  to say was August 2021.  And so, parts of my deal were
14  negotiated prior to that August -- oh, confirmation and
15  emergence.  And then after August, the creditor's
16  committee went away and in came the claimant trust and
17  the claimant litigation trustee, if I'm recalling this
18  correctly, and -- so, yeah, I mean some were done before
19  and some were done after.
20       Q.   Did you ever take any of your Ellington
21  Recordings, according to my definition, to your meetings
22  at the Highland offices?
23            MR. YORK:  Object to form.
24       A.   Yeah, I don't know what an Ellington Recording
25  is.  I don't think I have any Ellington Recordings.
```

Page 101

```
 1        Q.   (BY MS. PETTIT)  Okay.  So I'll represent to
 2   you that we consider your photos that you produced in
 3   this case Ellington Recordings, according to our
 4   definition in Request For Production?
 5        A.   That's a weird definition.  I don't agree with
 6   it.
 7        Q.   Okay.  I understand you don't agree with it,
 8   but I'm asking you using that definition did you provide
 9   or bring any Ellington Recordings with you to the
10   deposition -- excuse me -- to the meeting at Highland's
11   offices?
12             MR. YORK:  Hold on.  Object to form,
13   compound.
14        A.   Yeah, look, I'm going to try and just cut
15   through it.  Because I don't like the question.  It
16   doesn't make much sense, but I didn't bring any pictures
17   of Ellington.
18        Q.   (BY MS. PETTIT)  Well, what about the other
19   photos that you produced in this case?  Did you take any
20   of those pictures with you?
21        A.   What photos are you talking about?
22        Q.   Any photo that you've produced in this case.
23        A.   I don't -- no.  I didn't bring any photos to
24   their offices, no.
25        Q.   Okay.
```

Page 102

1  A.  On those occasions.
2  Q.  All right.
3  A.  And by the way, I never sent them any photos.
4  The only photo that was sent was of Ellington standing in
5  the front yard when he'd gone AWOL.
6  Q.  That's the only photo you sent to Jim Seery?
7  A.  Of -- of Ellington?  Of Ellington?
8  Q.  Of any photo that was produced in this case.
9  A.  Oh, no.  I mean, I sent the Highland employee
10 that was -- what was her name -- Sarah Beth Goldsmith or
11 she was Sara Bell back then.  Yeah, she was a Highland
12 employee.  Ellington had been fired for over a month and
13 I'm like, oh, by the way, your employee's over here at
14 Ellington's place.  And she's like, she's no longer an
15 employee, blah, blah, blah.  And that was like two days
16 before; and I think he even mentioned in his deposition
17 it was kind of suspicious why -- why she was over there.
18 I did send him those pictures.
19 Q.  Okay.
20 A.  And -- and, look, if you have others, just
21 remind me.  Stop trying to trick me.
22 Q.  Okay.  I have not had a chance yet to listen to
23 the exhibit or the document recording that you-all
24 produced labeled DEF53104, but can you just tell me
25 generally what that is?

Page 103

```
 1        A.    Seery's lying.
 2        Q.    And what is he lying about?
 3        A.    Not knowing about my investigation, not knowing
 4   about multiple things.
 5        Q.    And when was this recording made?
 6        A.    I want to say May 2022.
 7        Q.    So was it before or after his deposition?
 8        A.    Who's deposition?
 9        Q.    Mr. Seery?
10        A.    Before.
11        Q.    So you have a recording of Mr. Seery prior to
12   his deposition which is now inconsistent, you're saying,
13   with his deposition?
14        A.    Correct.
15        Q.    Okay.  And why did you make that recording at
16   the time?
17        A.    Oh, because people lie, deny and die.
18        Q.    What does that mean?
19        A.    What do you think it means?  It means what it
20   says.  People lie, you know, like Mr. Hurst to a jury or
21   Mr. Seery in this case; and people deny, like Ellington,
22   et cetera and lie and some people die -- some witnesses
23   die over time.  And so I made that recording to do -- to
24   just trust but verify, you know.  I didn't want there to
25   be a situation where somebody turned on me and said, hey,
```

Page 104

```
 1   I had no idea and that's kind of what happened in that
 2   deposition.  And we gave him every opportunity to set the
 3   record straight and he chose not to.
 4       Q.   What do you mean by you gave him every
 5   opportunity?
 6       A.   We asked him to clarify.
 7       Q.   During the deposition?
 8       A.   I think so --
 9       Q.   Okay.
10       A.   -- yeah, and he dug in -- foolishly so, in my
11   opinion.
12       Q.   Are there any other recordings that you have
13   between you and Mr. Seery?
14       A.   Yes.
15              MR. YORK:  Object to form.
16       A.   I'm sorry, yes.
17       Q.   (BY MS. PETTIT)  Do any of them involve
18   Mr. Ellington?
19              MR. YORK:  Objection to form.
20       A.   No.
21       Q.   (BY MS. PETTIT)  Is there any other -- was this
22   recording made at an in-person meeting or over the phone?
23       A.   Phone.  He was in New York.  I was in Dallas.
24       Q.   Do you know if New York is a one or two-party
25   state?
```

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.