# <u>EXHIBIT 3</u>

FILED
10/28/2025 10:48 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Al Clerk DEPUTY

CAUSE NO. DC-22-00304

| | | |
|---|---|---|
| **SCOTT BYRON ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **101st JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFF'S SIXTH MOTION TO COMPEL

Plaintiff Scott Byron Ellington ("Plaintiff" or "Ellington") files this Sixth Motion to Compel against Defendant Patrick Daugherty ("Defendant" or "Daugherty") pursuant to Texas Rule of Civil Procedure 215.1. Plaintiff respectfully shows the Court as follows:

### I.   SUMMARY

Ellington once again seeks the Court's assistance to obtain discovery responses from Daugherty, who continues to play games with the production of documents and information. On August 28, 2025, Daugherty produced for the first time a 26-minute audio recording (the "Recording") of a May 4, 2022 conversation between himself and Jim Seery, in which Plaintiff Scott Ellington and other Ellington Parties are discussed in detail. The Recording is plainly responsive to multiple outstanding discovery requests that have already been the subject of a Court Order compelling compliance. Defendant's delayed production of this highly relevant Recording demonstrates that Defendant has either (1) withheld responsive recordings in violation of Court orders, or (2) failed to conduct an adequate search for such recordings.

---

This Motion seeks to compel production of all additional responsive recordings in Defendant's possession, custody, or control, and information sufficient to verify whether additional recordings exist.

## II.    PROCEDURAL BACKGROUND

1.    Plaintiff has served multiple sets of Requests for Production seeking, among other things, all recordings, documents, and communications related to the surveillance, observation, or investigation of the Ellington Parties and Ellington Locations.

2.    On June 14, 2022, Defendant served responses to several of these Requests, including:

- *RFP No. 2*: All documents and communications containing or referencing any Ellington Recording sent to or received from any person or entity.

- *RFP No. 3*: All documents and communications with any person or entity regarding the Ellington Recordings and/or the surveillance, observation, recordation, or investigation of any Ellington Party or Location.

- *RFP No. 4*: All electronic or handwritten notes, memoranda, or other documents related to or evidencing such surveillance, observation, recordation, or investigation.

- *RFP No. 8*: All documents and communications sufficient to show any individual or entity, other than Defendant, who was aware of or involved in those efforts. *See* **Exhibit A**, Defendant's June 14, 2022 Responses.

3.    On October 10, 2022, Defendant provided further responses, including to:

- *RFP No. 15*: All documents and communications referencing any Ellington Party, Location, or Recording sent to or received from Jim Seery.

- *RFP No. 26*: All documents and communications referencing any Ellington Party, Location, or Recording sent to or received from any person or entity.

- *RFP No. 29*: All documents and communications from third parties relating to any notes, memoranda, commentary, or other documents evidencing or discussing Defendant's surveillance, observation, recordation, or investigation of Ellington Parties or Locations. *See* **Exhibit B**, Defendant's October 10, 2022 Responses.

4.     On July 7, 2023 Plaintiff filed its Third Motion to Compel, requesting Defendant completely and fully produce documents in Defendant's possession, custody, or control that are responsive to Plaintiff's Discovery Requests. *See* **Exhibit C**, Plaintiff's Third Motion to Compel.

5.     On March 19, 2025, this Court entered an Order compelling Defendant to fully respond to, among others, Requests for Production Nos. 2, 3, 8, 15, 26, and 29.[1] *See* **Exhibit D**, March 19, 2025 Order.

6.     At the time of that Order, Daugherty was in possession of the Recording taken on May 4, 2022 that is clearly responsive to at least Requests for Production Nos. 2, 3, 4, 8, 15, 26, and 29.  *See* **Exhibit F**, transcript of the Recording.

7.     The twenty-six minute and eleven second (26:11) Recording appears to be a conversation between Defendant Daugherty and Jim Seery. The recording specifically discusses Mr. Daugherty taking photographs of, among others, Mr. Ellington and his then fiancé, now wife, Stephanie Archer, at or around the 14:22 mark. There are further discussions of Mr. Ellington on the Recording.

---

[1] While Request for Production No. 4 is not included in the Order, Daugherty stated that he would produce copies of non-privileged documents responsive to this request, if any, within his possession, custody or control on a rolling basis in his June 14, 2022 Responses to Plaintiff's First Requests for Production. *See* **Exhibit A**.

8.      Despite the Court's Order, Defendant failed to produce the May 4, 2022 Recording until August 28, 2025, after multiple discovery deadlines and less than three weeks before the then-current trial setting. Mr. Daugherty was set for his supplemental deposition on August 28, 2005.  Moments before the deposition, Mr. Daugherty's counsel handed the Recording on a flash-drive to Plaintiff's counsel. Mr. Daugherty then made it clear at the deposition that he produced the recording because it exposes that Jim Seery lied about not knowing about Mr. Daugherty's "investigation" of Mr. Ellington.  *See* Exhibit G (Daugherty August 28, 2025 deposition) at 102:22 – 103:11.  That is, he produced this recording now because it's suddenly beneficial to him—not because it should have been produced long ago both in response to requests for production and this Court's March 19, 2025 Order.

9.      Trial in this matter was originally scheduled for September 5, 2023, and has since been reset several times: first to June 3, 2024, then to August 5, 2025, and again to September 16, 2025. It is now set for April 27, 2026. The May 4, 2022 Recording was not produced until after both the original and several reset trial dates, underscoring Defendant's continued noncompliance with his discovery obligations.

10.     On August 29, 2025, Plaintiff's counsel issued a letter demanding the production of all additional responsive recordings, identification of all devices used to create or store the May 4, 2022 Recording, and an explanation for the delayed production. *See* **Exhibit E**, Plaintiff's August 29, 2025 Letter.

11.     To date, Defendant has provided neither an explanation of the prior failure to produce the Recording nor any additional recordings. Accordingly, Plaintiff is forced

to file this additional Motion to Compel regarding the same subject matter as the Court's
March 19, 2025 Order.


### III.   ARGUMENTS & AUTHORITIES

#### A.   Standard.

The Texas Rules of Civil Procedure emphasize full transparency in discovery. The
purpose of discovery is to seek the truth so that disputes may be decided by what facts
are revealed, not by what facts are concealed. *Crosstex Energy Services, L.P. v. Pro Plus,
Inc.*, 430 S.W.3d 384, 394 (Tex. 2014). When responding to written discovery, a party must
make a complete response, based on all information reasonably available to the
responding party or its attorney at the time the response is made. Tex. R. Civ. P. 193.1.

Timely supplementation of incomplete discovery is a continuing obligation under
Texas law. A party must make a full and complete response to proper discovery requests
and must timely supplement those responses as needed—no later than thirty days before
trial. *See Branham v. Brown*, 925 S.W.2d 365, 370 (Tex. App.—Houston [1st Dist.] 1996, no
writ); *Tex. R. Civ. P.* 193.5(b). While Rule 193.5 presumes that supplements made less than
thirty days before trial are untimely, courts have made clear that no opposite
presumption exists for supplements made more than thirty days before trial. *See Snider v.
Stanley*, 44 S.W.3d 713, 715 (Tex. App.—Beaumont 2001, pet. denied). Rather, a party must
supplement "reasonably promptly" after discovering the need to do so. *Tex. R. Civ. P.*
193.5(b).

Whether a response is reasonably prompt depends on the circumstances, and Dallas courts have found supplementation untimely where the responding party had the materials in their possession for an extended period, was clearly on notice of their relevance, and failed to provide any justification for the delay. *See Interest of A.R.M.*, 593 S.W.3d 358, 375 (Tex. App.—Dallas 2018, pet. denied) (holding supplementation was not reasonably prompt where materials were in party's possession for eight months and prior requests clearly covered the documents); *In re Staff Care, Inc.*, 422 S.W.3d 876, 881 (Tex. App.—Dallas 2014, no pet.) (holding supplementation untimely where requests had been pending for two years and plaintiff failed to provide the information despite answering deposition questions on the subject).

Further, when a party fails to comply with a discovery order, such as an order granting a motion to compel, Rule 215.2(b) authorizes the Court to issue "just" orders, including those compelling further compliance or requiring the disobedient party or counsel to pay reasonable expenses caused by the failure. *See* Tex, R. Civ. P. 215.2(b). Rule 215.2(b)(8) provides that the court shall require the disobedient party, the advising attorney, or both to pay such expenses, including attorneys' fees, unless the failure was substantially justified. *See* Tex. R. Civ. P. 215.2(b)(8).

Additionally, Rule 215.3 empowers the court to impose appropriate remedies if it finds a party is abusing the discovery process by resisting discovery improperly or engaging in delay tactics. *See* Tex. R. Civ. P. 215.3. While the trial court has broad authority to impose sanctions, the sanctions imposed must be just. *See TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *Shops at Legacy (Inland) Ltd. P'ship v.*

*Fine Autographs & Memorabilia Retails Stores, Inc.*, 418 S.W.3d 229, 232 (Tex. App.—Dallas 2013, no pet.). However, trial courts may impose death penalty sanctions when a party has repeatedly failed to comply with discovery orders, especially after having been warned of the consequences of continued noncompliance. *See Hizar v. Heflin,* 672 S.W.3d 774, 784–85 (Tex. App.—Dallas 2023, pet. denied) (affirming the trial court's imposition of death penalty sanctions, striking the defendant's pleadings, for failure to comply with two orders compelling discovery).

Collectively, these rules give the Court broad authority to enforce compliance with discovery obligations, protect the integrity of the discovery process, and, where appropriate, require the offending party to bear the costs incurred in seeking relief.

### B.   Defendant's Belated Production Violates the Court's Discovery Orders

Defendant's delayed production of the May 4, 2022 Recording violates both the Texas Rules of Civil Procedure and this Court's prior discovery order. As discussed above, Rule 215.1 expressly authorizes a party to move to compel discovery when another party fails to comply. Moreover, Rules 192.3 and 196.3 require parties to produce all relevant documents and tangible items within their possession, custody, or control in response to proper discovery requests.

The May 4, 2022 Recording is clearly responsive to at least Requests for Production Nos. 2, 3, 4, 8, 15, 26, and 29, each of which seeks documents or communications related to surveillance, recordings, and investigations involving Ellington and affiliated individuals. *See* **Exhibit A-B**, Defendant's Discovery Responses. This Court's March 19, 2025 Order specifically compelled Defendant to respond to those same Requests. *See*

**Exhibit D**, March 19, 2025 Order (compelling responses to Requests for Production Nos. 2-3, 7-8, 14-30, and 34-35). Yet, Defendant failed to produce the Recording until August 28, 2025, more than five months after the Court's Order and after multiple discovery deadlines had passed.

There is no credible justification for this delay. The content and timing of the Recording make clear that it was responsive and within Defendant's possession during earlier discovery exchanges. Defendant's failure to produce it in a timely manner not only violates the Rules of Civil Procedure, it also constitutes a direct violation of the Court's order. This disregard for the discovery process reinforces the need for judicial intervention to ensure full compliance going forward.

### C.   The Late Production Raises Reasonable Suspicion of Additional Recordings

Defendant's last-minute production of a single, highly relevant recording long after the Court ordered compliance also raises serious concerns about whether additional responsive materials remain unproduced. Daugherty indicated that he produced the Recording because it fit his personal agenda of proving that Mr. Seery had lied in his deposition in March 2024. *See* Exhibit G at 102:22 – 103:11.  Mr. Daugherty produced the Recording on August 28, 2025, was deposed on same day, and testified about the Recording at the deposition.   It is plain that but-for the setting of Daugherty's supplemental deposition (as a result of another Court order) and Daugherty's desire to

use the Recording to get back at Mr. Seery, the Recording never would have seen the light of day.[2]

On August 29, 2025, Plaintiff issued a letter demanding that Defendant produce all other responsive recordings, identify the devices or platforms used to record or store the May 4, 2022 Recording, and explain the reason for the delayed production. *See* **Exhibit E**, Plaintiff's August 29, 2025 Letter. To date, Defendant has failed to respond to that letter.

The content of the May 4, 2022 Recording itself, which discusses Plaintiff and other Ellington Parties in detail, shows that Defendant had both the means and practice of recording conversations relevant to this case. Defendant's history of surveillance and documentation, including photography of Plaintiff and his family, email and text messages referencing investigative efforts, and prior communications with third parties, further suggests that the May 4, 2022 Recording is not an isolated instance. Defendant's investigative activity at multiple locations involving multiple individuals supports the inference that additional recordings or communications exist.

In light of these circumstances, Plaintiff has a reasonable basis to believe that other responsive recordings have either been improperly withheld or overlooked. Without an order compelling compliance, including the identification of devices used and locations where recordings are stored, Plaintiff cannot verify that Defendant has fulfilled his discovery obligations. Plaintiff therefore respectfully requests that the Court issue a secondary order compelling full and transparent compliance. Plaintiff further requests

---

[2] Mr. Daugherty did testify that he had other recordings of Mr. Seery, but that none of them mention Mr. Ellington. Given the circumstances regarding the production of the Recording and the apparent lack of prior review by counsel, Mr. Daugherty's self-serving assertion should be given no weight by the Court.

language in the Order warning Defendant of the potential consequences of any further

non-compliance in this case.[3]

## IV.    CONCLUSION & PRAYER

For the foregoing reasons, the Court should enter an order compelling Defendant

to do the following within seven (7) days:

a.    Produce all other recordings by Mr. Daugherty regarding any Ellington
Party, Location, or Recording, as those terms are defined in the Requests for
Production.

b.    Produce all other recordings responsive to the Requests for Production
compelled by the Court's March 19, 2025 Order, including but not limited
to Requests for Production Nos. 2, 3, 8, 15, 26, and 29.

c.    Produce any other responsive documents that have been overlooked by
Defendant.

d.    Provide information sufficient to identify what mechanism(s) or device(s)
Defendant used to make and/or store the Recording in order to permit
verification of the presence or absence of any additional responsive
recordings.

Plaintiff prays for all such other relief to which he may be justly entitled.

## V.    APPENDIX

| Exhibit A | Defendant's June 14, 2022 Responses to RFPs |
| --- | --- |
| Exhibit B | Defendant's October 10, 2022 Responses to RFPs |
| Exhibit C | Plaintiff's Third Motion to Compel |
| Exhibit D | March 19, 2025 Order |
| Exhibit E | Plaintiff's August 29, 2025 Letter |

---

[3] Texas courts recognize that an order compelling discovery, when paired with an express warning of consequences for future noncompliance, constitutes an appropriate lesser sanction under Rule 215. See *Hizar v. Heflin*, 672 S.W.3d 774, 785 (Tex. App.—Dallas 2023, pet. denied).

| Exhibit F | Recording taken on May 4, 2022 |
| Exhibit G | Daugherty August 28, 2025 deposition |

Respectfully Submitted,


THE PETTIT LAW FIRM

By: */s/ Julie Pettit* _____
Julie Pettit
State Bar No. 24065971
**jpettit@pettitfirm.com**
**THE PETTIT LAW FIRM**
1900 N. Pearl Street, Suite 1740
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
LYNN PINKER HURST & SCHWEGMANN LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

*ATTORNEYS FOR PLAINTIFF*


<u>**CERTIFICATE OF CONFERENCE**</u>

On August 29, 2025, Counsel for Plaintiff contacted Counsel for Defendant regarding his failure to comply with the Court's March 19, 2025 Order. As of the date of this filing, Counsel for Plaintiff has not received any response.

*/s/Julie Pettit* _____
Julie Pettit

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record via *electronic service* on October 28, 2025.

/s/Julie Pettit
Julie Pettit



1

1          CAUSE NO. DC-22-00304
  SCOTT BYRON ELLINGTON,    )

2                )
                )

3    Plaintiff,      )  IN THE DISTRICT COURT
                )

4                )  101ST JUDICIAL DISTRICT
  V.             )

5                )  DALLAS COUNTY, TEXAS
                )

6  PATRICK DAUGHERTY      )
                )

7                )
    Defendant.      )

8
   ************************************************************

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1                APPEARANCES

2

3 MALE SPEAKER 1

4 MALE SPEAKER 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              3

1                I N D E X

2

3

4  E X H I B I T S

5
   NO.              DESCRIPTION            PAGE
6
   NONE MARKED
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


4


1        MALE SPEAKER 1:  Correct.  And -- and so they're --

2  they're going to be fine to withdraw their claims.  CalPERS

3  can't find it.  I've got to -- I got to call those guys

4  again.  Like, they literally don't know who -- who is

5  responsible for filing it.  It was somebody in legal in San

6  Francisco.  So I -- I got to try to hound that.  If we can

7  get ---

8        MALE SPEAKER 2:  I -- I thought they were -- I

9  thought -- as I recall, I thought CalPERS filed a claim

10  really just so that Dondero (phonetic) would have to go

11  through on buying their shares at whatever it was, 68 or $72

12  a share.

13        I -- I thought they said, "Look, we don't care what

14  is going on with this bankruptcy.  That was the deal that was

15  struck.  We need to get paid."  I thought that was their

16  claim.  And I thought that had been paid during the estate.

17  Yeah.

18        MALE SPEAKER 1:  But -- but what they didn't know

19  was they were selling them at 6850 and he was selling them at

20  7250 or 6750 and 7250.  He was giving them five bucks.

21        MALE SPEAKER 2:  Okay.  Well, he was skimming them

22  a lot more than that because it sold for 146.  But yeah.

23      MALE SPEAKER 1:  You think?

24      MALE SPEAKER 2:  While he was on the board, I mean,

25  that's why he was trying to give you that -- force you to use

5

1  his insider information because he knew that, you know,

2  Amazon was there for 146.  I mean, that's what I've read in

3  the press.

4      MALE SPEAKER 1:  Yeah.  It was all in the press

5  anyway, but whatever.

6      MALE SPEAKER 2:  Yeah.

7      MALE SPEAKER 1:  I think the -- my point is if I

8  can get those withdrawn and then we can figure out the other

9  tax guys if that -- and I'll talk to Demo (phonetic) about

10  that other than you and Todd, then as we -- I don't think we

11  want to -- let -- we'll try to figure out where this tax --

12  you know, the status of the tax litigation.

13      MALE SPEAKER 2:  Yeah.

14      MALE SPEAKER 1:  But then it's easier to make a

15  distribution and reserve.

16      MALE SPEAKER 2:  Yeah.  That's all.  And -- and

17  that was what I was calling about.  I'm obviously going to

18  stick to the terms of our deal, but just want to make sure

19  the estate doesn't get liquidated and we get, you know ---

20      MALE SPEAKER 1:  No -- no.  Of course not.

21      MALE SPEAKER 2:  Okay.

22      MALE SPEAKER 1:  And also, I don't -- there's no

23  point in spending money while -- you know, we're all -- we're

24  all going to -- if ---

25      MALE SPEAKER 2:  Yeah, if you do that, we'll sit

6

1  tight.  We're not -- we're not dying to go and fight you.

2      MALE SPEAKER 1:  Yeah, we'll just -- because

3  hopefully it'll -- it'll go away.  I mean, at some point --

4  it's 10 years old, it's -- there's -- there's got to be a

5  resolution.

6      MALE SPEAKER 2:  You would think.  But, I mean, I

7  -- like you said, I think you hit the nail on the head.  I

8  think they're after Dondero and Occada (phonetic) for the big

9  money and, you know, until they get some resolution on that,

10  you know, who knows?

11      I mean, you guys brought up a host of other tax

12  fraud issues when it came to all these transactions between

13  all these entities, right?  The moving of the shared services

14  and the employment reimbursement contracts back and forth and

15  all that.  I can't imagine that the ---

16      MALE SPEAKER 1:  They said once that they were tax

17  fraud.  Deveaux Lucarini (phonetic) brought that up.

18      MALE SPEAKER 2:  That's what I mean, you brought up

19  the transactions and Deveaux brought up the tax fraud.  No,

20  Morris made a point to -- to let the Judge know that you-all

21  -- you guys say -- you're assuming they're completely

22 legitimate.  If they're not, that's between, you know,

23 Dondero and the IRS, but yeah.

24       Anyway -- well, the reason why it -- it's on my

25 mind is because, you know, rumor mill, Dondero is running

7

1 around town telling everybody he is going to get back

2 Highland.  He is going to get back the name, the brand, you

3 know, the legacy, whatever else goes along with it, he is

4 claiming he is going to get it back.

5       So, you know, my thought is if he has got any

6 grounds for saying that, which I always doubt first that

7 anything he says is true, but to the extent it is true, I

8 just want to make sure my unresolved things are getting

9 resolved.  Unless he is going to do what he says he is going

10 to do, which is buy out this estate.

11       MALE SPEAKER 1:  Yeah.  Like, he is fucking insane.

12       MALE SPEAKER 2:  Okay.  Well, I figured, like I

13 said ---

14       MALE SPEAKER 1:  You know, he -- he can definitely

15 buy out the estate and -- and, you know, if it's -- if

16 there's $600 million, like he said, you know, sold to him at

17 a 20 percent discount.

18       MALE SPEAKER 2:  Yeah.  He said you're sitting on

19 200 million in cash and the value of everything is 600.  I

20 don't know.  You -- like, you and I already talked about

21 that.  You just said he is making it up, so --

22      MALE SPEAKER 1:  He is making it up.

23      MALE SPEAKER 2:  Yeah.  Not the first time.  Okay.

24 Those were -- that was -- those were those two items -- oh --

25 oh, on Ellington.  You had mentioned to me in many

8

1 conversations ago that he told you that he had a special

2 relationship with Hoffman.  He was bragging about it.  I -- I

3 can't remember what it was, but that -- and then the same

4 conversation, I think you mentioned to me that he also said

5 that I was stalking Hoffman at Disneyland, and I followed him

6 all around Disneyland.

7      MALE SPEAKER 1:  Yeah.

8      MALE SPEAKER 2:  You mind -- I mean, we may have to

9 call you as a witness on that.  I -- I'm not sure that we

10 will, but on the one hand it's defamation because I never

11 stalked Hoffman at all at Disneyland or anywhere else.

12      But on the other hand, just want to -- we may need

13 to show at some point down the line, Hey, this Ellington guy,

14 he has -- he has used the stalking card before, and I don't

15 know if you know this or not, but they're desperately trying

16 to get back in front of Hoffman.

17      We have Judge Williams or Williamson, and they're

18 trying to claim that all this stalking stuff relates back to

19 the case way back in 2012.  In fact, the papers that -- that

20 Michael Hurst filed with the Court didn't even acknowledge

21 the settlement where everything in the Texas action against

22 me was vacated.

23       They're still operating and trying to tell the

24 Court that Hoffman should have jurisdiction over this because

25 of all the things that the jury found against me back in

9

1 2014.  If you can believe it, that's actually what they're

2 doing.  That's what Michael Hurst is doing.

3       MALE SPEAKER 1:  I mean, but all you got to do is

4 put in front this other person, like -- yeah, the jury

5 journal has struck -- maybe whatever they found was based on

6 a whole thing of lies.

7       MALE SPEAKER 2:  Yeah.  Well, fortunately you did a

8 really good job.  I didn't even expect it.  And were it not

9 for Ellington objecting to my claim, it never would have gone

10 on record.  But in the transcript, you said there's fraud

11 here, which was one of the most disturbing things that you

12 discovered.  And that there never was an escrow account.  So,

13 you know, it couldn't have been better.

14       MALE SPEAKER 1:  I mean, I got -- I keep -- you --

15 you can't say this about Highland anymore because, like, how

16 could I still be shocked, but I'm still shocked about stuff

17 that I learned.

18       MALE SPEAKER 2:  Yeah.

19       MALE SPEAKER 1:  I -- I'm just blown away.  Like,

20  I'm -- I mean, these guys literally fucking put on a case

21  of -- but now I've seen them do it again.  You know, they put

22  it on in front of judges a fucking fraudulent case about

23  there being an escrow and about there being plenty of money

24  to pay you if you prevail.  And then they -- they don't pay

25  you fucking, like, 2.6 million.  Who the fuck does that?

10

1       MALE SPEAKER 2:  I know -- I know.  And -- I mean,

2  it's just unbelievable.

3       MALE SPEAKER 1:  You paid him, like, it's fucking

4  insane.

5       MALE SPEAKER 2:  You -- I don't even know if you

6  know the whole of it.  They sent the constable over to my

7  house to seize my assets, claiming that I hadn't paid

8  anything.  So I had to wire them 3.1 million because of

9  interest.  All the while, they had taken all the assets out

10  of the escrow.

11       And Ellington has filed an affidavit saying that on

12  personal knowledge, I didn't have the assets to make due on

13  their claim against me.  It was just unbelievable.  But

14  anyway, I -- I don't want to go through all that.  It's --

15  it's not your problem anymore.

16       MALE SPEAKER 1:  No -- no.  That was a horrible

17  thing.  I think you told me that you were away and your wife

18  called you.

19       MALE SPEAKER 2:  I was in New York and my wife was

20 in a complete panic with the kids, and I had my in-laws

21 trying to get them out here, and we thought they might come

22 in and take the dogs.  So it was just ridiculous.  But it is

23 what it is.  And I -- again, I'm not trying to drag you into

24 that.

25      MALE SPEAKER 1:  Yeah.  I would say -- look, I

11

1 don't know if I could say he said he had a special

2 relationship.  I don't ---

3      MALE SPEAKER 2:  Well, that's what I'm getting at.

4 What did he tell you as far as -- you said he boasted

5 something about Hoffman, and I don't want to paraphrase you.

6 I want to know what did he say.

7      MALE SPEAKER 1:  It -- it's hard to -- I'm trying

8 to be as both accurate in -- in memory.  It was more in

9 passing that he had a good relationship with Judge Hoffman.

10 I think he said he had lunch with him.  Now I may conflate

11 some stuff because I think you or someone else has told me

12 that, you know, he and -- and Levington (phonetic) and

13 Savilla (phonetic) and Dondero -- not -- not that anything is

14 illegal about it, but they all just happened to contribute to

15 ---

16      MALE SPEAKER 2:  Not Dondero, but yes, it was -- it

17 was -- that I did tell you.  I don't know if you heard from

18 others, but it was -- it was Ellington, Levington, Savilla

19  and Diorio (phonetic) contributed $20,000 to Judge Hoffman's

20  runoff campaign as Judge Hoffman was hearing a contempt of

21  Court case from them against me.  But anyway, I could prove

22  that because I've got the records from the Attorney General's

23  office.

24      MALE SPEAKER 1:  Right.

25      MALE SPEAKER 2:  I just couldn't remember exactly

12

1  what it was that he boasted to you.

2      MALE SPEAKER 1:  It was some -- it was hard to -- I

3  can't say it was Hoffman.  There was definitely some

4  implication that he knew the Dallas Judges and he could have

5  lunch with them ---

6      MALE SPEAKER 2:  Oh, so it wasn't even -- it wasn't

7  even specific to Hoffman?

8      MALE SPEAKER 1:  It -- I don't -- I don't recall.

9  He is the only judge that -- that I've heard a name because

10  that went to the Disneyland thing.

11      MALE SPEAKER 2:  Well, he -- yeah, that was pretty

12  clear.  He did -- he -- you know, there's only one.  That was

13  Hoffman that he was referring to there, so ---

14      MALE SPEAKER 1:  Yeah.  And -- and ---

15      MALE SPEAKER 2:  And didn't he tell you I --

16  because you asked me.  No, don't you remember early on you

17  asked me -- you were like, "Hey, man, you don't have to tell

18  him if you don't want to, but did you" ---

19      MALE SPEAKER 1:  No.  He said -- he -- he said that

20  you stalked the guy.

21      MALE SPEAKER 2:  Yeah.

22      MALE SPEAKER 1:  Right?  And so -- and told me all

23  about it, how Hoffman came back, you know, really disturbed.

24  And that's why he, like, put a -- some kind of order against

25  you or something.


13


1      MALE SPEAKER 2:  Well, okay.  As usual, he was

2  lying.  I mean, I -- I did talk to Hoffman and he did say it

3  was an improper ex parte communication, even though I was

4  talking to him about a case I wasn't even involved in.  But

5  anyway, be that as it may, that's kind of my point is ---

6      MALE SPEAKER 1:  Apparently, you didn't just fly

7  and follow the dude to Disneyland.  You go there with your

8  family.

9      MALE SPEAKER 2:  Yeah.  Every year.  And when I saw

10  him, I was with my wife and daughter because I didn't even

11  see him initially.  My wife did.  And she is like, you ought

12  to introduce Judge Hoffman to your family and blah, blah,

13  blah, blah.  So, you know, I'm not -- I got my wife and

14  daughter if necessary for witnesses on that front.

15      But I think we may have to show the Court, you

16  know, that, A, this guy lies all the time, you know, not just

17  about all the business stuff, but he has used the stalking

18  thing before.  Because I'm still having to deal with

19      MALE SPEAKER 1:  I'll tell you one thing this guy

20  has done is he has run from this case.

21      MALE SPEAKER 2:  In what sense?

22      MALE SPEAKER 1:  Their defense on the -- on the,

23  you know, whatever this Rukavina thing he made up that they

24  -- we were -- had to renegotiate this contract with Frank

25  Waterhouse at the beginning of the case, told the ---

14

1      MALE SPEAKER 2:  Oh, yeah.  Well, he said he told

2  Ellington.

3      MALE SPEAKER 1:  Frank Caruso ---

4      MALE SPEAKER 2:  Yeah.

5      MALE SPEAKER 1:  --- just happens to be retired.

6  So they -- they pick on Fred and then -- and Ellington and

7  Levington -- well, Ellington and Levington are your guys.

8  They -- you -- if 100 percent of their income come from

9  Dondero, why weren't they testifying?

10      MALE SPEAKER 2:  Oh, I see what you're saying.

11  It's not like they dodged a subpoena from you, they just ---

12      MALE SPEAKER 1:  No -- no.  Oh, they did.  When --

13  when we said, oh, we're going to actually -- we subpoenaed

14  them for the -- the CPMC claims, they just agreed to take

15  zero.

16      MALE SPEAKER 2:  Got you.

17      MALE SPEAKER 1:  (Indiscernible).

18       MALE SPEAKER 2:  Well, because you had already

19 taken both of their depositions -- I want to say January 56

20 -- 15th and 16th of 2021.  Because that's when I found out

21 about ---

22       MALE SPEAKER 1:  I thought that was Klubock

23 (phonetic).

24       MALE SPEAKER 2:  Oh, was January 15th -- was that

25 Klubock in January 15 and 16th?

15

1       MALE SPEAKER 1:  I think Klubock took that.

2       MALE SPEAKER 2:  Because that was the whole where

3 Ellington said he -- he didn't know anything about Nimitz and

4 Patton.

5       MALE SPEAKER 1:  Yeah, well, we -- we know those

6 true -- we know those unequivocally to be false.

7       MALE SPEAKER 2:  Right.  Remember I went and found

8 Cayman Islands registrar and I gave this to Paige Montgomery

9 at the time, and I found that Diorio was the board member of

10 Sentinel.

11       MALE SPEAKER 1:  Yeah.  And -- and, you know,

12 during -- during the case, Sentinel provided an indemnity,

13 unbeknownst to me or anybody else, when I started getting a

14 little bit close, maybe in the beginning of the summer when

15 they were fraudulently hiding the whole settlement -- the

16 whole payments to UBS.

17      And they were working with me on the strategy to

18  fight UBS, they got -- must have gotten worried.  And

19  Savilla, Levington, Ellington, Katie Irving, Stephanie

20  Patella, all got indemnities, a written indemnity that they

21  each signed from Sentinel in June of 2020.  Nobody ever

22  mentioned Sentinel.  This was during the case while they were

23  full-time employees in Highlands.

24      MALE SPEAKER 2:  Wow.

25      MALE SPEAKER 1:  And then, you know, this guy says

16

1  he doesn't remember anything about the Sentinel structure.

2      MALE SPEAKER 2:  Oh, I know.  Yeah.  He -- he said

3  he didn't know about it.  He didn't -- wasn't involved and

4  knew -- knew he had heard the word, but that was it, you

5  know, blah, blah, blah.

6      MALE SPEAKER 1:  Yeah.  He knew -- he knew how to

7  build all of his expenses through it ---

8      MALE SPEAKER 2:  Yeah.

9      MALE SPEAKER 1:  --- at the very time.

10      MALE SPEAKER 2:  Yeah.

11      MALE SPEAKER 1:  With this indemnity.  Yeah.

12      MALE SPEAKER 2:  Well, okay.  I -- I'm glad you

13  clarified on the whole judge thing.  Just because if it

14  becomes necessary, we're going to have to, you know ---

15      MALE SPEAKER 1:  Why are they ---

16      MALE SPEAKER 2:  Continuing to fight it?  Because

17 it's ---

18        MALE SPEAKER 1:  Well, I -- like, the whole thing

19 -- the whole thing with you, right, it is clearly fabricated.

20 They -- they could clearly say, "Hey, you went and took

21 pictures of people."  Okay.

22        MALE SPEAKER 2:  Actually, I didn't take pictures

23 of the people.  I took pictures of the driver's license

24 plates and the cars.  The only people I took a picture of was

25 one of Ellington, one of his secretary, and one of his --

17

1 what at the time, I didn't know who she was, but now we've

2 learned that she is a fianc , workout partner/girlfriend,

3 depending on who he is talking to.  But other than that, all

4 this shit about kids and all the others is made up.

5        MALE SPEAKER 1:  Well, I don't -- I don't doubt

6 that for a second, but -- but be that as it may, what --

7 what's the -- what are they defending -- what are you -- I

8 guess I'm trying to figure out what he is -- why is he -- why

9 is he in your -- why isn't he getting away from you too?  Why

10 -- what's -- why is he in your ---

11        MALE SPEAKER 2:  I -- I think that's why he is

12 doing this.  I think he is saying, "Hey, if you come after me

13 for your Delaware actions, and if you bring Herra (phonetic)

14 after me" -- because that's what they said.  You know, they

15 said, "Hey, Your Honor, you can't approve this settlement."

16  This is to Judge Jernigan, because Daugherty is just going to

17  take Herra and come after us through Herra.

18       He is going to harass, you know, Ellington.  And we

19  all knew it was really all of them.  And so they've concocted

20  up -- this whole stalking thing is, in their mind, I guess,

21  some kind of, "Hey, you let us off of ours and we'll let you

22  off yours."  And I'm like, "Screw you."  You know, I

23  negotiated hard for the Herra thing for a reason.

24       And as you can imagine, we are now -- we got a --

25  we got a meeting with Judge Zern tomorrow to move forward on

18

1  that.  But there's a lot of people with a lot of problems on

2  the Herra front.

3       MALE SPEAKER 1:  I mean, look, you -- your thing --

4  your pleading, which was, as I said, pretty good, the one

5  with the -- the crime fraud stuff, if only a quarter of it is

6  -- is -- it's all really bad.  If only a quarter of it is

7  like -- somebody has got -- I mean, I can't imagine people

8  don't want to get the fuck out of that.

9       MALE SPEAKER 2:  You know, look, and I'm always

10  open -- you know, you call it commercial.  I'm always open to

11  a settlement, but the lying has to stop and the defamatory

12  stuff against me has to stop.  And then I'll talk to anybody

13  who wants to be a grownup about coming up with a solution,

14  but I'm not going to go away just for the hell of it.

15       MALE SPEAKER 1:  Yeah.

16       MALE SPEAKER 2:  You know, so ---

17       MALE SPEAKER 1:  Well, I don't trust Ellington for

18 anything.  I think he is -- he is a complete lying, cheating

19 piece of shit.

20       MALE SPEAKER 2:  Yeah.  I -- you could put

21 Levington in that group too.

22       MALE SPEAKER 1:  But it seems to me like he is --

23 is he separating himself from -- I mean, the fact that he

24 wasn't in any of these things, he has got to be telling him

25 ---

19

1        MALE SPEAKER 2:  I'm telling you the reason why he

2 doesn't -- he hasn't gotten any of those things, is they

3 don't want to put him on the witness stand where he could get

4 caught perjuring and then be under the -- and then get

5 repercussions from Jernigan.  That's why.

6        MALE SPEAKER 1:  I mean, I'm -- I'm going to be --

7 I'm going to be sorely disappointed if on that litigation

8 over the fees she doesn't recommend or refer Dondero for

9 prosecution -- investigation or prosecution.  I'm -- I just

10 -- I don't ---

11       MALE SPEAKER 2:  You're talking about the

12 promissory notes, making them all up with Nancy?  Or are you

13 talking about ---

14       MALE SPEAKER 1:  No, that one is separate because

15 that one, she didn't actually hear any testimony.

16     MALE SPEAKER 2:  Correct.

17     MALE SPEAKER 1:  So she is already ---

18     MALE SPEAKER 2:  You are talking about the one

19 where he got on there and was just making up and he said he

20 was going to go after her to have her recused again.

21     MALE SPEAKER 1:  Yeah -- yeah.

22     MALE SPEAKER 2:  And he said it was financial

23 mugging and everything else?

24     MALE SPEAKER 1:  Yeah -- yeah.  But he -- he flat

25 out lied about all kinds of stuff.

20

1     MALE SPEAKER 2:  Agreed.

2     MALE SPEAKER 1:  And she -- she looked at him with

3 her mouth open, like ---

4     MALE SPEAKER 2:  Well, she looked at him over her

5 glasses.  She wasn't going to -- she wasn't going to give him

6 a single word that he can use on his appeal.

7     MALE SPEAKER 1:  And Waterhouse, I -- I ---

8     MALE SPEAKER 2:  Waterhouse just looked like a

9 Stockholm syndrome.

10     MALE SPEAKER 1:  I'll be disappointed if she

11 doesn't, like, literally, you know, refer them to the Justice

12 Department for perhaps possible perjury.  It -- there has to

13 be some -- man, I guess maybe there isn't.

14     MALE SPEAKER 2:  You know, it's funny you mentioned

15 Ellington.  We haven't seen Ellington on the stand in her

16 Court since Asis when he got nailed for lying about the

17 HarbourVest stuff, and he stopped going to the Court.  Isaac

18 Levington stopped going to the Court and they started sitting

19 JP Savilla in their place.  And I haven't seen either one of

20 them, not only on the stand, but in the courtroom ever since.

21 And that was 2019 -- 2018.

22       MALE SPEAKER 1:  Yeah.

23       MALE SPEAKER 2:  So -- all right.  Status on the

24 sales and everything, did you ever get the remaining pieces

25 of -- of Cornerstone done?

21

1       MALE SPEAKER 1:  We are still working on it.

2       MALE SPEAKER 2:  Okay.

3       MALE SPEAKER 1:  We've got a couple -- there's a

4 couple of very difficult things that we have to deal with.

5       MALE SPEAKER 2:  Okay.

6       MALE SPEAKER 1:  We have a really good second

7 piece, so we need to be very, very quiet about it.  We're

8 very optimistic for the remaining pieces.  We have an LOI and

9 we're moving towards a PSA, it -- it's -- so we don't want to

10 mention that anywhere.  We just want to keep it really low.

11       MALE SPEAKER 2:  The PSA on the -- on the second

12 parts or the first part, or all of it?

13       MALE SPEAKER 1:  Second part.

Exhibit 3 - Part 1   Page 36 of 46

14      MALE SPEAKER 2:  Okay.  I won't say anything.

15      MALE SPEAKER 1:  And -- and so we really -- I mean,

16  that one is the -- the community is too small.

17      MALE SPEAKER 2:  Okay.

18      MALE SPEAKER 1:  And then we've got a couple of one

19  particularly difficult thing that we're dealing with that

20  we're trying to expedite related to an investigation matter

21  in the company which is a gating item.

22      MALE SPEAKER 2:  Oh, you're talking about an

23  internal operational problem?

24      MALE SPEAKER 1:  Office of Inspector General.

25      MALE SPEAKER 2:  Yeah.  We've -- that's -- that

22

1  could be dealt with, the OIG.  I mean, it sounds awful, but

2  it's not uncommon.

3      MALE SPEAKER 1:  Yeah.  The issue is it's -- you

4  know, you need to -- it's not uncommon.  It's not that bad.

5  It's a key -- we think it's a Qui tam, but whatever.

6      MALE SPEAKER 2:  Yeah.

7      MALE SPEAKER 1:  And the issue is it's a little bit

8  pushing as strength.  So we've got a strategy to get there,

9  you know, that'll -- we'll go over the next couple weeks how

10  our strategy looks because we've been providing information

11  and ---

12      MALE SPEAKER 2:  Okay.

13      MALE SPEAKER 1:  --- you know, there really isn't

14 anything there, but we're not going to be able to close with

15 that hanging out there.

16  MALE SPEAKER 2:  Understood.

17  MALE SPEAKER 1:  And so that -- that's ---

18  MALE SPEAKER 2:  What about Trustway?

19  MALE SPEAKER 1:  We -- we are -- you know, again,

20 keep it to yourself, please.  We are in the market.

21  MALE SPEAKER 2:  Well, that's not a secret to

22 anybody.

23  MALE SPEAKER 1:  Well, we've actually -- we got a

24 real launch.  We were ---

25  MALE SPEAKER 2:  Okay -- okay.  I was hoping you're

23

1 going to say I'm not -- I can't tell you, but I -- I -- you

2 know, don't tell anybody, but it -- we think we can get 500

3 million for it.

4  MALE SPEAKER 1:  I wish -- I wish.

5  MALE SPEAKER 2:  One time is the backlog, man.  One

6 time is the backlog.

7  MALE SPEAKER 1:  Yeah.  The hard part for that

8 business is -- is people getting their arms around that level

9 of volatility unless they're in it.  So the strategics, you

10 know, obviously have -- have a better insight.  You know, the

11 financiability part of it is tougher.

12  MALE SPEAKER 2:  Okay.

13       MALE SPEAKER 1:  For our biz, so that's

14  that's the challenge.  But the business is way different than

15  it was in 2018.  It's -- it's just a different -- they put in

16  a whole bunch of different stuff that's made it a much, much

17  better business.  And -- and, you know, we're -- we're

18  hopeful for ---

19       MALE SPEAKER 2:  Well, remember I got to see the

20  entire business plan because of my appraisal rights hearing.

21  Carl Moore had to go through all the things that they were

22  going to do to bring all this value in.

23       MALE SPEAKER 1:  Yeah.  Well, a lot of that they've

24  changed -- like, they changed and I -- Jeff ---

25       MALE SPEAKER 2:  Oh, really?  Because that was

24

1  October 2018.

2       MALE SPEAKER 1:  Yeah.  They adapted to the market.

3  They did -- they did some of those, but they really have

4  gotten way better at their -- both their -- their payment

5  protection date provisions in their contracts as well as

6  their -- their hedging strategy.  And then in addition, they

7  -- they concentrated their buys, so they just have a better

8  relationship with their suppliers.

9       And then they strategically focus themselves on the

10  more value-add customers who are willing to pay a premium,

11  both for the, you know, design execute -- design flexibility,

12  quality, but also the execution and delivery.  And -- and

13  notwithstanding -- notwithstanding, you know, some of them

14  were difficult decisions during the -- the real spike and

15  during the COVID.  Trustway didn't miss a single contract.

16  Didn't back out with -- didn't back out of one.

17        MALE SPEAKER 2:  Yeah.

18        MALE SPEAKER 1:  And all of the competitors did.

19        MALE SPEAKER 2:  Okay.  That's impressive.

20        MALE SPEAKER 1:  And it was -- it wasn't an

21  accident.  It was like, all right, this is -- if we're going

22  to have a business that we're selling to people as, "Hey,

23  we're the high-quality guys and we deliver, we're a reliable

24  partner."  We got to actually do that.  It had -- it had a

25  short-term cost, but the numbers look really good and this

25

1  year's performance was great.  So hopefully -- hopefully

2  we'll be able to continue.

3        MALE SPEAKER 2:  Got you.  Hey, one other thing I

4  -- it just occurred to me, Todd Traver wanted me to ask this.

5  You know, he and I -- I don't know if any of the other former

6  partners hold it, but we have some significant ownership

7  interest in HFP, you know, the equity pilot financial

8  partners, also known as HFT, High Financial Trust.

9        MALE SPEAKER 1:  Yeah.

10        MALE SPEAKER 2:  And that entity I think took a

11  billion-dollar judgment from UBS.

12       MALE SPEAKER 1:  Correct.

13       MALE SPEAKER 2:  So I think it's pretty worthless

14  under any scenario as it relates to us as pure equity

15  holders.

16       MALE SPEAKER 1:  Yeah.

17       MALE SPEAKER 2:  The question was, we all have

18  capital accounts that we've getting on our K1s.  Are you just

19  going to write those ---

20       MALE SPEAKER 1:  Are you still getting K -- are you

21  still getting K1s on those?

22       MALE SPEAKER 2:  We did last year.  I don't know if

23  we're going to get -- you know, we ---

24       MALE SPEAKER 1:  I thought the capital account had

25  gotten zeroed out.  I'll have to look at that.

26

1        MALE SPEAKER 2:  Well, that's what I'm calling

2  about.  If you zero out ---

3        MALE SPEAKER 1:  It would be worthless ---

4        MALE SPEAKER 2:  Yeah.  If you ---

5        MALE SPEAKER 1:  --- on that already.

6        MALE SPEAKER 2:  Yeah.  I mean, for whatever reason

7  Todd accountants thought that the company should do it.  And

8  I'm like, you don't have to wait for the company to do it.

9  And I'm like, "Todd, they took a billion-dollar judgment and

10  -- and" ---

11       MALE SPEAKER 1:  They even sent out something in --

12  in '08 to tell everybody that there was no value.  Now the

13  truth was at that point there actually was all the value that

14  ended up getting siphoned up.

15        MALE SPEAKER 2:  Well, and that's just it.  Todd is

16  like, well, we had -- we had value based on all the money

17  being siphoned out.  But I'm like, okay, well, at this point

18  that was an unsecured claim from the equity and now that UBS

19  comes in with a billion dollars of non-equity based

20  unsecured, I don't think we would -- I think we would get

21  washed out.  So ---

22        MALE SPEAKER 1:  Yeah, no doubt about it.  Somebody

23  else recently asked us -- a Japanese account about this as

24  well, who hadn't taken it.  And we said, look ---

25        MALE SPEAKER 2:  Well, that's why we're asking.

27

1  Are you just going to write it down and send out the K1s that

2  -- that demonstrate that?

3        MALE SPEAKER 1:  It's -- it's got a very fucked up

4  management structure.  And so while we owned the GP, there's

5  a different board.  So Dondero sat on that board by himself

6  and controlled it.

7        MALE SPEAKER 2:  Yeah.  I remember that.

8        MALE SPEAKER 1:  Through last year.

9        MALE SPEAKER 2:  All through last year.

10        MALE SPEAKER 1:  Through last year.  And so I -- I

11 got to look at it.  It's -- I think our recommendation, I

12 don't know that we'll be able to tell you what -- tell

13 anybody what to do.  I don't think there's any dispute that

14 the equity is worthless.

15        MALE SPEAKER 2:  I agree -- I agree.  I -- I just

16 -- you know, everybody is looking for something that's coming

17 from a third party so that they could just ---

18        MALE SPEAKER 1:  Yeah.

19        MALE SPEAKER 2:  --- do it that way.  All right.

20        MALE SPEAKER 1:  Yeah.  I think -- let me -- let me

21 say -- I'll look at that for you guys because I think we had

22 -- we gave something that was ---

23        MALE SPEAKER 2:  Some type of notice that just says

24 we've looked at it and it's a write off to zero.  You know,

25 that's just what people are looking for.

28

1        MALE SPEAKER 1:  Okay.  Let see what we can -- let

2 me see what we had sent out and I think we had something

3 helpful from Japanese guys.

4        MALE SPEAKER 2:  Okay.  Thank you.

5        MALE SPEAKER 1:  Okay.  Cool.

6        MALE SPEAKER 2:  Bye.

7        MALE SPEAKER 1:  I will talk to you.  Thanks.  Bye

8 bye.

9        (Proceedings concluded at XX:XX)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1          CHANGES AND SIGNATURE

2  WITNESS NAME: --

3  DATE OF DEPOSITION: --

4

5  PAGE    LINE    CHANGE        REASON

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____


30


1    I, --, have read the foregoing deposition and hereby

2  affix my signature that same is true and correct, except as

3  noted above.

4

5        _____

6              --

7

8  THE STATE OF TEXAS)

9  COUNTY OF DALLAS)

10

11    Before me, _____, on this day

12 remotely appeared --, known to me (or proved to me under oath

13 or through identity card to be the person whose name is

14 subscribed to the foregoing instrument and acknowledged to me

15 that he/she executed the same for the purpose and

16 consideration therein expressed.

17    Given under my hand and seal of office this _____ day

18 of _____, _____.

19

20    _____
      NOTARY PUBLIC IN AND FOR
21
      THE STATE OF _____
22
      My Commission Expires: _____
23

24

25

31

1             CAUSE NO. DC-22-00304
  SCOTT BYRON ELLINGTON,      )
2                    )
                     )
3    Plaintiff,      )  IN THE DISTRICT COURT
                     )
4                    )  101ST JUDICIAL DISTRICT
  V.                 )
5                    )  DALLAS COUNTY, TEXAS
                     )
6 PATRICK DAUGHERTY         )
                     )
7                    )
    Defendant.        )
8

9

10

11

12

13

14      I, Marion Ward, the undersigned Certified Reporter in

15  and for the State of Texas, certify to the following:

16      That the transcript of the testimony herein to having

17  been present and transcribing from the audio tape provided to

18  the best of my ability.

19

20      _____
            Marion Ward, Texas CSR No. 876
21          Expiration Date:  04/30/27
         Complete Legal
22          16414 San Pedro Avenue
         Suite 900
23          San Antonio, Texas 78232
         866-806-8265
24

25