Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
J. Reid Burley (Texas Bar No. 24109675)
Drake M. Rayshell (Texas Bar No. 24118507)
GRAY REED
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:    jbrookner@grayreed.com
          dyork@grayreed.com
          jsmeltzer@grayreed.com
          rburley@grayreed.com
          drayshell@grayreed.com

*Counsel to Patrick Daugherty*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 25-03055 |
| PATRICK HAGAMAN DAUGHERTY, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

[1]   Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## PATRICK DAUGHERTY'S RESPONSE TO HIGHLAND'S MOTION TO COMPEL

Subject to his pending Motion to Stay, Defendant/Counter-Plaintiff Patrick Daugherty files this Response to Highland's Motion to Compel [Doc. No. 60] and would show the Court as follows:

## PRELIMINARY STATEMENT

1.      Highland seeks the production of recorded conversations between Daugherty and James Seery, Highland's CEO. The Court should deny Highland's Motion for two reasons. First, the discovery Highland seeks is irrelevant to the claims and defenses of this action. This dispute centers on two topics: (a) the amount and validity of Daugherty's bankruptcy claim, and (b) Daugherty's counterclaim for the production of Highland Employee Retention Assets, LLC's ("HERA") books and records. The recordings in Daugherty's possession—described in detail below—do not bear on either of those two topics, and Daugherty did not intend to use them in this adversary proceeding.[2]

2.      Second, the recordings would only be used, if at all, for impeachment purposes, and Federal Rule of Civil Procedure 26 explicitly excludes impeachment evidence from all disclosure requirements until it is used. Federal courts also hold the recordings are not discoverable unless and until they are used to impeach Seery. Thus, Daugherty's recordings are not required to be produced at this juncture. As a result, the Court should deny Highland's Motion.

---

[2]    In preparation of this Response, counsel re-reviewed the audio recordings provided to them and determined that one of the recordings contains a limited discussion of Daugherty's requests to Seery about HERA's books and records and Seery's agreement to produce the books and records. Counsel is in the process of processing the recording for production to Highland.

4896-8999-2070

## FACTUAL BACKGROUND[3]

3.      As the Court is likely aware, the legal disputes surrounding Highland's downfall are abundant and malicious. And for over fifteen years, Daugherty has been the sole individual willing to stand up to Highland—and its former owners Jim Dondero and Mark Okada—and fight for his rights, and the rights of other creditors, in this Court and others. Through these disputes, Daugherty has exposed the fraud of others and has routinely observed adversaries and witnesses making misrepresentations, or inconsistent statements, in court.

4.      Jim Dondero and Mark Okada co-founded Highland Capital Management, LP ("Highland") in 1993. They operated Highland with an iron fist. This was evident in their treatment of Highland's employees that has been well-documented in the immense collection of lawsuits involving them since Highland's downfall. In September 2008, Highland took a dramatic turn for the worse because of Dondero and Okada's mismanagement. Highland defaulted on its credit facility, which prompted Highland's lenders to demand a forensic accounting of Highland to investigate where Highland's money—their collateral—had gone. Other investigations resulted in numerous lawsuits against Dondero, Okada, their respective trusts, and various other individuals.

5.      During his time at Highland, Daugherty rose to the rank of profits-interest partner, senior portfolio manager, and head of Private Equity. He held these roles from 1998 to 2011. In those roles, Daugherty was instrumental in Highland's success in both the collateralized loan obligation market and the distressed debt market. Despite Highland's default on its own credit facility in 2008, Daugherty remained at the firm and helped save the company from financial ruin. Ultimately, however, Daugherty resigned from Highland in the fall of 2011 because he refused to

---

[3]    All capitalized terms herein shall have the same meaning ascribed to them in Highland's Adversary Complaint against Daugherty [Doc. No. 1].

participate in conduct that would later result in awards of over a billion dollars in damages to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud, among other causes of action.

6.      Dondero, Okada, Scott Ellington, Isaac Leventon and others working with them, would later pursue legal actions on behalf of Highland against Daugherty to whitewash willful misconduct, breach of fiduciary duties and/or fraud, captioned *Highland Management, L.P. v. Daugherty*, Cause No. 12- 04005 (the "Texas Lawsuit").  Daugherty responded with counterclaims against Highland, HERA, and others, alleging breach of contract and breach of the covenant of good faith and fair dealing.

7.      At trial, Dondero made it a point to let the court and jury know that HERA retained control of "all" of its assets. Dondero testified responding to questions by counsel Michael Hurst as follows:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [HERA], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA and then to him.

Dondero further testified:

> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

8.      After three weeks of trial, the jury found that HERA, at the direction of Dondero and others from Highland, breached the implied covenant of good faith and fair dealing by adopting a "lose-lose" clause in HERA's company agreement, and that Highland and Dondero had

4896-8999-2070

defamed Daugherty with malice.[4] The jury awarded Daugherty damages against HERA in the amount of $2.6 million, plus interest which remains unpaid.  Once the appeals were exhausted in the Texas Lawsuit, Highland (through Dondero, Ellington, Leventon and others) terminated the escrow account and transferred the funds to Highland and away from HERA, where they rightfully belonged.

9.      This forced Daugherty to initiate litigation against Highland, HERA, Dondero, Ellington and others in Delaware to try to satisfy his judgment.  On the third day of trial, in October 2019, Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Just a few months later, the Highland Creditors Committee sought a change of control over Highland, including seeking to have Seery appointed as an independent director and later as Highland's CEO and CRO.

10.      During the course of Highland's bankruptcy, Daugherty wanted to ensure that the bankruptcy estate's value was maximized for the benefit of creditors.  Given his longstanding role at Highland, Daugherty knew a substantial amount of information concerning not just the company but also but also the activities of it key figures and facilitators including Dondero, Okada, Ellington and Leventon. Over the course of a number of months, Daugherty provided extensive information to Seery, Marc Kirschner and Highland's litigation counsel relating to the same.

11.      On October 15, 2021, Highland filed a lawsuit against Dondero, Ellington and others for various claims, including breaches of fiduciary duty and fraudulent conveyances.  That lawsuit included allegations derived from many of the facts and information Daugherty had sent to Seery and Kirschner.

---

[4]    FAC ¶91.

12.     In late 2021 Daugherty and Highland reached a settlement resolving almost all of Daugherty's claims against Highland. The Settlement Agreement included cash compensation, Class 8 and Class 9 claims at certain agreed values, and a transfer of all of Highland's interests in HERA and its managing member, ERA Management, LLC, to Daugherty. [5]  Highland filed a Notice to Approve the Settlement Agreement in December 2021.

13.     Shortly after Highland filed Notice, but before any hearing before the Court, Ellington filed a baseless lawsuit against Daugherty alleging stalking.  Ellington then used that lawsuit as the basis for objecting to the Settlement Agreement. [Docket No. 3242 in 19-34054-sgj].

14.     During the hearing on the Settlement Agreement, Highland acknowledged that "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Plaintiff judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs."  Seery testified that "It actually looks like, frankly, the escrow was never really an escrow, and it was a – it was a fraud from the beginning."

15.     It could not be clearer that Ellington's lawsuit against Daugherty was nothing more than a gambit to try to thwart the Settlement Agreement. After Highland and Seery advocated

---

[5]     HERA is currently engaged in litigation with Dondero, Ellington and others in the case styled *Highland Employee Retention Assets LLC v. James Donero, et al.*, Civil Action No. 3:24-cv-00498-K, pending in the United States District Court for the Northern District of Texas. That litigation centers on Dondero et al.'s misconduct and fraud among other things in the treatment of the monetary contributions and assets that numerous Highland employees made into retirement vehicle known as HERA. But because of Dondero's and others' underhanded efforts to fraudulently transfer assets to benefit themselves and others, those assets were funneled out of HERA and into various entities and accounts controlled by Dondero, Okada, Ellington and their affiliates. That litigation remains pending since February 29, 2024.

against Ellington's interference, the Court rejected Ellington's gambit and approved the Settlement Agreement in March 2022.[6]

16.    The Settlement Agreement also contained one additional pertinent provision: that Daugherty's Reserved Claim would not be litigated by either side until the IRS made a "final determination" concerning the 2008 Audit. In connection therewith, Highland sought multiple agreements from Daugherty that would toll Highland's deadline to object to the Reserved Claim. These were given in exchange for no additional consideration or demands by Daugherty. Despite Highland's promise not to litigate the Reserved Claim until after the 2008 Audit, Highland surreptitiously filed this adversary proceeding while at the same time admitting that the 2008 Audit was not final.

17.    Through the litigation that has ensued since Highland's collapse—as well as the litigation involved in Highland's main bankruptcy case—Daugherty has been one of very few individuals willing to stand up to Highland, Dondero, Okada, Ellington, and their enablers. Daugherty endeavored to bring truth into the courts, which necessarily meant that he had to engage in litigation with Highland and its founders. This made him a target of Highland, Dondero, Okada, Ellington, Leventon and their professionals.

18.    Because of the bitterness between various constituents, along with the incredible amount of misinformation being spread about him, Daugherty began recording conversations he

---

[6]    Highland's Motion references Ellington's lawsuit against Daugherty but fails to tell the Court that the Fifth Court of Appeals found no evidence that Daugherty engaged in civil stalking. *Daugherty v. Ellington*, No. 05-22-00991-CV, 2024 WL 177482, at \*5-6 (Tex. App.—Dallas Jan. 17, 2024, pet. denied).  Highland also fails to disclose to the Court that in May 2022 Seery did not "doubt that for a second" that Ellington's allegations against Daugherty were "clearly fabricated," that Seery does not trust Ellington, and he considers Ellington a "complete lying, cheating piece of shit."  *See* Highland's Motion at Exhibit 3, Exhibit F thereto [Docket No. 61-3] at 16:18-18:19.  Conveniently, in March 2024 Seery changed his tune and called the lawsuit "disturbing" even though he had not looked at any of the evidence (either testimony or documents) in the case. *See generally* Burley Decl. at Ex. 1 (228:19-229:23).

had with various individuals, including Seery. Daugherty did this because he had legitimate

concerns that certain individuals would tell him one thing on the phone and then take the opposite

position during litigation. He needed to be able to refute the false claims that he anticipated being

made. These recordings have been sparse and limited to conversations about Highland, HERA,

Dondero, Okada, Ellington, Leventon and other ancillary litigation, and miscellaneous other issues

unrelated to this case. To be clear, the recorded conversations in Daugherty's possession do not

involve (a) Highland's treatment of Daugherty's bankruptcy claim, (b) the IRS' treatment of

Daugherty's 2008 Refund and the 2008 Audit of Highland, or (c) details of Daugherty's

counterclaim for HERA's books and records. As such, the recordings have no relevance to this

action (other than as potential impeachment evidence if any witnesses or parties speak untruthfully

about past events).

## ARGUMENT AND AUTHORITIES

19.    The discovery that Highland seeks is not relevant. Though broad, the scope of

discovery is not unlimited. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)

("[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries."). Federal

Rule of Civil Procedure 26(b) only permits discovery of "non-privileged matter[s] that [are]

relevant to any party's claims or defenses and proportional to the needs of the case[.]" Fed. R. Civ.

P. 26(b)(1).

20.    Furthermore, "Rule 26(b) 'has never been a license to engage in an unwieldy,

burdensome, and speculative fishing expedition.'" *Curtis v. Metro. Life Ins. Co*., No. 3:15-CV-

2328-B, 2016 WL 687164, at *4 (N.D. Tex. Feb. 19, 2016) (quoting *Crosby v. La. Health Serv. &

Indem. Co*., 647 F.3d 258, 264 (5th Cir. 2011)). Under Rule 26(b)(1), discoverable matters must

be both relevant and proportional to the needs of the case. *See Samsung Elecs. Am., Inc. v. Chung*,

321 F.R.D. 250, 279 (N.D. Tex. 2017). And the "district court must limit otherwise permissible discovery if it determines that 'the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.'" *Crosby*, 647 F.3d at 264 (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)). The guiding principle for discoverability is relevance: what a party seeks ***must be relevant*** to the claims or defenses. That is not the case with what Highland seeks through its motion.

21.     Here, Highland seeks the production of various recordings of conversations between Daugherty and Seery that Daugherty has in his possession. Highland speculatively contends that the recordings "***likely*** concern information that goes to the heart of the issues in this Adversary Proceeding." Motion at ¶ 2 (emphasis added). In support of the relevance argument, Highland's argument is two-fold. First, Highland contends that the information is directly relevant because it (wrongly) believes the conversations are about the 2008 Audit or the HERA books and records. *See generally* Motion at ¶¶ 22-24. Second, Highland contends that alternatively, the recordings are relevant because they "concern the litigants and implicate Daugherty's credibility." Motion at ¶ 23. Neither of these arguments are meritorious.

22.     **As to relevance**: Highland's adversary claims against Daugherty are predominantly statutory in nature. They address the singular question of: "How should the Court treat Daugherty's claim in the Highland bankruptcy?" That question hinges on whether the IRS has made a "final determination" as to the 2008 Audit of Highland as well as the accompanying analysis of Daugherty's 2008 Refund (which is directly tied to Highland's 2008 tax return and related financials). Even a cursory review of Highland's adversary complaint against Daugherty confirms that the complaint is confined to those issues. The claims themselves do not hinge on

recordings. Moreover, it does not legally matter if the Court finds Daugherty's decision to record conversations to be justified, paranoid, or inappropriate. Instead, all that matters is that the recordings do not contain discussions of the issues of this lawsuit, including Daugherty's counterclaim for HERA's books and records. There is no basis for the Court to find that the recordings in Daugherty's possessions are relevant to the claims and defenses of this lawsuit.

23.    **As to impeachment/credibility**: The recordings are not discoverable as credibility or impeachment evidence against Daugherty. The best that Highland can come up with is that the recordings go to Daugherty's credibility because he recorded Seery without his knowledge or consent. This argument is flawed. Daugherty did not need Seery's consent nor did he have to inform him that he was recording the conversations. Both federal and Texas law require only one party's consent to recording a call. *Taylor v. State*, 555 S.W.3d 765, 776 (Tex. App.—Amarillo 2018, pet. ref'd.). Daugherty was in Texas at the time of the calls in question, and Highland has presented no evidence that a two-party consent was required. And notably, Highland itself secretly recorded a portion of an off-record conversation between Daugherty and Dondero during a break in a hearing in the main bankruptcy case without advising either of the recording when no one from Highland participated in that specific conversation. It is Seery's credibility that may be at issue, not Daugherty's.

24.    Moreover, any interest Highland has in attempting to use tapes in Daugherty's possession to attack Daugherty's credibility is outweighed by the potential use of those tapes to impeach Seery for any inconsistent statements he makes in this adversary proceeding.  In *Ramos v. Capitan Corporation*, the lone case cited by Highland in its Motion on this topic, the court did not focus on instances of recorded conversations and their discoverability, but rather on whether criminal and litigation history were *admissible* under Federal Rule of Evidence 509. *Ramos v.*

-10-

*Capitan Corp.*, 2017 WL 1278737, at \*3 (W.D. Tex. Feb. 2, 2017). The court discussed the limited

scope of Rule 509 and how it applies only to evidence that would demonstrate "inconsistent

statements, criminal convictions, proof of bias, or similar material." *Id.* (citing Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure § 2015* (3d ed. 2016)). Importantly,

the court went on to state that "'courts that have 'protected impeachment evidence from disclosure

have done so because the only practical way to preserve the prophylactic effect of impeachment

evidence is to keep its existence as well as its contents unknown.'" *Id.* (quoting *Chiasson v. Zapata

Gulf Marine Corp.*, 988 F.2d 513, 516 (5th Cir. 1993)). This line of reasoning tracks with the

explicit exclusions of Rule 26. In both 26(a)(1)(ii) and (3)—the rules for initial and pretrial

disclosures, respectively—impeachment evidence is excluded from disclosure requirements.

"Neither rule [referring to Rule 26 and Northern District of Texas Local Rules] requires disclosure

or witnesses or documents that will be used only for impeachment." *Eagle Railcar Services-

Roscoe, Inc. v. NGL Crude Logistics, LLC*, 2018 WL 2317696, at \*19 (N.D. Tex. May 22, 2018).

      25.     What Highland seeks is production of the tapes so that they can prepare Seery for

his testimony and deposition in this case so that he does not trip up. That is like letting the fox

guard the hen house. Indeed, courts have dealt with discoverability of impeachment evidence by

requiring the party to be impeached to commit to his position through deposition before the

impeachment evidence must be produced. *Martin v. Long Island R.R. Co.*, 63 F.R.D. 53 (E.D.N.Y.

1974); *Blyther v. Northern Lines, Inc.*, 61 F.R.D. 610 (E.D. Pa. 1973). And that is how this Court

should treat the issue: allow Daugherty to take Seery's deposition, and if there are any inconsistent

statements made during the deposition, Daugherty must produce any such recordings to Highland

in order to be able to use those prior inconsistent statements at trial.

4896-8999-2070

WHEREFORE, Patrick Daugherty respectfully requests that the Court (a) enter an order denying Highland's Motion to Compel, and (b) grant such other and further relief as may be just and proper.

Dated: January 5, 2026.

Respectfully submitted,

GRAY REED

By:  */s/ Andrew K. York*
       Jason S. Brookner
       Texas Bar No. 24033684
       Andrew K. York
       Texas Bar No. 24051554
       Joshua D. Smeltzer
       Texas Bar No. 24113859
       J. Reid Burley
       Texas Bar No. 24109675
       Drake M. Rayshell
       Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:       jbrookner@grayreed.com
        dyork@grayreed.com
        jsmeltzer@grayreed.com
        rburley@grayreed.com
        drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 5th day of January 2026, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
ANDREW K. YORK

-12-