```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION

                                  )   Case No. 19-34054-sgj-11
In Re:                            )   Chapter 11
                                  )
HIGHLAND CAPITAL                  )   Dallas, Texas
MANAGEMENT, L.P.,                 )   Tuesday, November 17, 2020
                                  )   1:30 p.m. Docket
        Debtor.                   )
                                  )   PATRICK DAUGHERTY'S MOTION
                                  )   FOR TEMPORARY ALLOWANCE OF
                                  )   CLAIM FOR VOTING PURPOSES
                                  )   [1281]
                                  )
```

                       TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            John A. Morris
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For Patrick Daugherty:     Jason Patrick Kathman
                           PRONSKE & KATHMAN, P.C.
                           2701 Dallas Parkway, Suite 590
                           Plano, TX  75093
                           (214) 658-6500

For Patrick Daugherty:     Thomas A. Uebler
                           Joseph L. Christensen
                           MCCOLLOM D'EMILIO SMITH UEBLER,
                             LLC
                           Little Falls Centre Two
                           2751 Centerville Road, Suite 401
                           Wilmington, Delaware 19808
                           (302) 468-5960

DEFENDANT'S
EXHIBIT
7
25-03055

000637

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 2 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 03/12/25   Page 12 of 174   PageID 6784
Main Document   Page 12 of 90

2

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                              One South Dearborn
                              Chicago, IL  60603
                              (312) 853-7539

Recorded by:                  Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
                              (214) 753-2062

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 3 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Main Document   Filed 04/12/25   Page 12 of 90   Page 13 of 174     PageID 6785

3

DALLAS, TEXAS - NOVEMBER 17, 2020 - 1:38 P.M.

THE CLERK:  All rise.  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT:  Good afternoon.  Please be seated.  We have a setting we'll start now in Highland, Case No. 19-34054. We have a motion of Patrick Daugherty to have his claim allowed for voting purposes under Bankruptcy Rule 3018.  For Mr. Daugherty, who do we have appearing?  Do we have Mr. Kathman and crew?

MR. KATHMAN:  Good afternoon, Your Honor.  Jason Kathman on behalf of Mr. Daugherty.  I'm also joined today by my co-counsel in Delaware, Tom Uebler and Joe Christensen with the firm McCollum D'Emilio Smith & Uebler, LLC.  They've been admitted *pro hac vice* in this case and they're going to be handling the case this morning for our side, Your Honor.  We also have on the phone and in the WebEx today Mr. Daugherty as well.

THE COURT:  All right.  Very good.  I see Mr. Morris up there.  Are you going to be taking the lead for the Debtor this afternoon?

THE CLERK:  He's on mute.

THE COURT:  You're on mute, sir.

MR. MORRIS:  Thank you very much.  Yes, I -- yes, I will, Your Honor.  It's John Morris from Pachulski Stang Ziehl

000639

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 4 of 90

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2    Filed 09/12/25of 90Page 14 of 174     PageID 6786
Main Document   Page 4

4

& Jones for the Debtor.

With the agreement of all of the parties, before we begin my partner Mr. Pomerantz would like to just briefly update the Court on certain plan issues, and then we'd like to proceed to the matter on the schedule.

THE COURT:  All right.  That is fine.  So, we'll -- first off, I'm just going to note we have a lot of other participants showing on the video screen.  I'm not going to take other appearances.  I assume they're just interested observers today.  The only pleadings on the contested matter were filed by Daugherty and the Debtor.  But certainly if someone at some point has something to say regarding the case generally, I'm happy to hear anything people want to report.

So, with that, Mr. Pomerantz, what would you like to say?

MR. POMERANTZ:  So, thank you, Your Honor.  As Mr. Morris mentioned, I thought I would give Your Honor a brief update.  We haven't been here in a couple of weeks, which has seemed like a lifetime, but I wanted to apprise the Court last Friday night the Debtor filed an amended plan and disclosure statement, pursuant to the Court's prior scheduling order.  We also filed the infamous plan supplement, which was discussed in a lot of detail at the last hearing, which contained drafts, advance drafts of the principal plan implementation documents likely to be of interest to the creditors, including the Claimant Trust Agreement, the Liquidating Trust Agreement,

000640

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 5 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document D5-2meFiled 09/12/25of 90Page 15 of 174   PageID 6787

5

other corporate organizational documents, and a list of retained causes of action under the plan.

And I'm pleased to report that over the last couple of weeks the Debtor and the Committee have made substantial progress in addressing the disputed issues that were forefront at the hearing on October 27th.

Such progress included a resolution of the structure and consideration relating to the releases to be provided under the plan; the identity of the independent board members and the Liquidating Trustee, or Litigation Trustee, excuse me; substantial agreement on the form of the Claimant Trust Agreement and the Litigation Trust agreement; and the inclusion of a protocol to address how disputed claims will be resolved.

While there are a few issues left to be resolved and ironed out between the Debtor and the Committee, (audio gap) can be resolved by Monday.  We believe that as it relates to the Committee's issues next week, the hearing will largely be consensual, and we extend the opportunity to other parties who objected, including UBS, who has already reached out to us with a couple of comments they have, as well as we suggest that Mr. Daugherty and HarbourVest also reach out to us in advance of that hearing so that we can work through as many issues.

So, we took Your Honor's comments last week to heart, and

000641

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 6 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 16 of 174   PageID 6788
Main Document   Page 85 of 90

6

I think the parties have worked cooperatively to streamline to what I think will be a narrow set of issues, if any, that will be up for hearing on Monday, Your Honor.

THE COURT:  Okay.  That's very good to hear.  I'll just check:  Is Committee counsel on the line and do you wish to respond to that?

MR. CLEMENTE:  Your Honor, it's Matt Clemente at Sidley.  Can you hear me?

THE COURT:  I can.

MR. CLEMENTE:  Oh, hi, yeah, good afternoon, Your Honor.  As Mr. Pomerantz I think has accurately captured of the current state of play, so we took the time that Your Honor wisely gave us and I think we worked very, very hard and I think we have come to conclusion on, you know, a variety of the issues that we had.  Mr. Pomerantz is correct, there's a hearing full of things that we still need to discuss, Your Honor.  But I would expect that either we come to a resolution on those or those are things that, you know, ultimately can be dealt with in connection with plan confirmation itself.  But I agree with Mr. Pomerantz's comments.

THE COURT:  Okay.  Very good.  Well, I hope all of you will keep working at it.  You've got almost a week until we're here next Monday.  So, UBS and the others, I really hope you will accept the invitation of Mr. Pomerantz you heard just now to talk to him and see if you can get your issues worked

000642

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 7 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 17 of 174     PageID 6789
Main Document   Page 7 of 90

7

out.

All right.  Well, we did note that you had filed the documents Friday night, and I think I know what my weekend activity is going to be besides, you know, watching my Longhorns:  Reading the Highland disclosure statement and plan supplement.  So, anyway, I look forward to doing that, and I will hope for a somewhat smooth hearing Monday, if not an entirely smooth hearing.

All right.  Thank you for that report, Mr. Pomerantz.

MR. POMERANTZ:  You're very welcome, Your Honor.

THE COURT:  Okay.  Thank you.  All right.  Well, let's turn to the matter at hand, the motion.  You all have blessed me with lots of papers to read and exhibits for today. We have a two-hour time estimate, so I hope you will do your best to stick with that.

As far as your presentations today, let me tell you that I really don't need you to spend much time, if any, arguing the law, Bankruptcy Rule 3018(a), the case law construing it.  I'm pretty familiar.  It says such things as the Rule contemplates a summary estimation proceeding, not a full trial on the merits.  The Court has a lot of discretion.  So please don't argue the 20 or 30 cases that are out there that interpret Rule 3018.  I'd really like to focus on the numbers more than anything else.

And so as far as opening statements, I'm going to turn to

8

-- I don't know if it will be Mr. Uebler or Mr. Christensen -- and ask you right off the bat:  Why is the Debtors' suggested compromise of $9,134,019 not a fair resolution, when we all know that you can argue entitlement to every penny in that $40 million plus proof of claim ultimately in the adversary proceeding, in the trial on the proof of claim, but for now, it looks like the Debtor has put out a pretty reasonable olive branch?  So let me just put you on the spot and ask you to start there in your opening statement.

MR. UEBLER:  Thank you, Your Honor.  This is Tom Uebler on behalf of Patrick Daugherty.

While it is a generous offer, it leaves disputed $31 -- approximately $31 million with respect to Mr. Daugherty's claims.  The Debtor has agreed to the amount of Mr. Daugherty's 2012 Texas court judgment, plus interest, and the Debtor has also agreed to the unjust enrichment and promissory estoppel damages from the Delaware case in the amount of approximately $5 million.  But what the Debtor refuses to agree to or acknowledge any potential liability for are the three other subparts of Mr. Daugherty's claim.

The first of those subparts is what we're calling the Reimbursement Claims, and that includes Mr. Daugherty's claims for contractual indemnification under Highland's partnership agreement.  And it includes fees on fees -- at least that's how we refer to it in Delaware -- which are fees expended by

000644

9

Mr. Daugherty in seeking to establish his indemnification rights in Delaware. And finally, fee shifting, for what we have laid out as a decade pattern of litigation misconduct by Highland against Mr. Daugherty.

The Debtor also disputes Mr. Daugherty's claim for the remaining 80.9 percent of the value of HERA, Highland Employee Retention Assets. That claim is valued at approximately $21.2 million.

And finally, --

THE COURT: Let me stop you. Let me stop you there, because that's obviously a big, big, big chunk of the disparity. Remind me. Either you lost on that in Delaware, or I'm trying to remember, you abandoned it, you somehow had an adverse ruling in Delaware. Remind me real quick what that was.

MR. UEBLER: We did. We had an adverse ruling. We brought claims in Delaware as part of Mr. Daugherty's original pleading in 2017. And those were claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty. Ultimately, Mr. Daugherty was seeking to put back into HERA the millions of dollars that Highland had taken from HERA in 2013 and then to dissolve HERA. And it's Mr. Daugherty's position that he is the 100 percent owner of HERA at this point in time.

The Delaware Court of Chancery dismissed that portion of

000645

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 10 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25   Page 20 of 174    PageID 6792
Main Document   Page 25 of 90

10

Mr. Daugherty's pleading on *laches* grounds, finding that --

THE COURT:  Yes.

MR. UEBLER:  -- Mr. Daugherty should have filed that claim sooner.  We argued that he was excused from the limitations period because there was an open question in the Texas courts about whether Mr. Daugherty remained a unit holder of HERA up through 2016.  And that's an argument we plan to pursue on appeal.

To fully respond to your question, I want to note I read a footnote in the Debtors' opposition that said something like we've had a year to seek leave to file an appeal of that dismissal in Delaware.  But we don't yet have a final appealable judgment in Delaware to appeal.  That dismissal remains an interlocutory order.  As Your Honor probably knows, we were in day three of trial on the claims that did survive the Debtors' motion to dismiss when this proceeding was filed.  So we have not had an opportunity to appeal the dismissal of what we're calling the HERA 80 Percent Claim, but Mr. Daugherty intends to exercise those appellate rights in wherever the appropriate venue may be as this proceeds.

THE COURT:  All right.  Well, you know, courts always want to be pragmatic, as you know, in situations like this, 3018 estimation proceedings.  And my pragmatic view of things is, while, again, we may have a multi-day trial one day where you convince me on this $21 million plus claim, that

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 11 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K      Document 35-2    Filed 09/12/25   Page 21 of 174   PageID 6793

11

notwithstanding the Delaware court's dismissal of it for *laches*, at the end of the day you ought to get this, it seems like a pragmatic place to draw the line here today for purposes of an estimation hearing.  I'm not sure how you could convince me in two hours that this absolutely is likely enough to prevail that you ought to get to vote the claim.

Another area, as long as I'm talking about pragmatic ways to resolve this issue today, is the post-petition interest.  I have a feeling that's only a couple of hundred thousand dollars or so.  But nevertheless, it's argued here somewhat extensively that Daugherty ought to get to keep accruing post-judgment interest on the HERA judgment post-petition because, you know, it's not really a judgment against the Debtor, it's a judgment against HERA, and the general 502(b)(2) you can't accrue post-petition interest, unmatured interest, if you're an unsecured creditor, ought not to apply.  I'm just telling you right now, that would be a nonstarter here for me today.  Again, I have a feeling that's only a couple of hundred thousand dollars, right?  Maybe it's more than that. It can't be.  Right?

MR. UEBLER:  That's --

THE COURT:  Okay.

MR. UEBLER:  That's correct, Your Honor.

THE COURT:  So, --

MR. UEBLER:  So I won't, I won't address that any

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 12 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/12/25   Page 12/25 of 90   Page 22 of 174   PageID 6794

12

further.

THE COURT:  Okay.  So we can take that one off the table.

And then the other kind of pragmatic way I view things today is the attorney fee shifting.  Now, you might be able to piece this together for me and show me that, contractually, under the indemnification provision, that there is some component of attorneys' fees that ought to be allowable, but, you know, to just generally kind of give a common law bad faith argument here, that I should depart from the *American* Rule -- you know, if there's no contractual entitlement, if there's no statutory entitlement -- that's a heavy lift.  Again, you might prevail one day, but for purposes of a summary voting estimation claim context, I just don't see how you get there.

So, does that help narrow the issues today?  I had trouble thinking how I'm ever going to get to the $21 million claim in a summary 3018 context, the breakaway from the *American* Rule on attorneys fee shifting, and then the post-petition interest.

So if you carve those away, I don't know how close we are to the $9,134,000 that the Debtor has proposed, but I guess we're still a few million away.

MR. UEBLER:  We're getting closer, but let me respond to the pragmatic way of dealing with the HERA 80 Percent

000648

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 13 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2 Filed 99/12/25 of 90 Page 23 of 174     PageID 6795

13

Claim, which is $21 million.  We don't view that as at all a nothing amount for purposes of today.  I might not convince you that Mr. Daugherty should be entitled to the entire $21 million, and I'm not -- I'm not going to try, because I do recognize that the claim was dismissed and that creates at least a procedural burden for us.

So, one result may be to award Mr. Daugherty a portion of that claim.  But let me move on --

THE COURT:  Okay.

MR. UEBLER:  -- to address the fee issue.  These are -- there are 30 different sources of Mr. Daugherty's rights to fee reimbursement, only one of which is the common law exception to the *American* Rule.  And my thought was to just briefly outline what it is that we're asking for, break down Mr. Daugherty's claim, and then ask Mr. Daugherty to testify very briefly about how he calculated that amount and what out-of-pocket payments he's actually made throughout the course of this litigation, to give the Court an opportunity to see which of the different buckets the fees may fall into and how you may be able to resolve some or all of those amounts.

THE COURT:  All right.

MR. UEBLER:  So, the claim for indemnification and fee shifting, as I said, it has -- it has three components.  The first, which we focused on in our reply, is the bad-faith fee shifting.

000649

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 14 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25   Page 24 of 90   Page 24 of 174     PageID 6796

14

Now, in Mr. Morris's presentation that I expect him to show today, he'll refer to this as a new argument that wasn't in our Delaware complaint and was not in the proof of claim submitted by Mr. Daugherty.  That's just not the case.  This was an issue that was presented to the Delaware court in August 2019, before trial.  We laid out why Mr. Daugherty should be entitled to fee shifting.  And that's an issue that would have been addressed post-trial but for this bankruptcy. And that's based on the series of events that we laid out in detail -- probably too much detail for these purposes -- in our papers about shifting positions in litigation; attempts to put Mr. Daugherty in jail, which thankfully the Texas appellate court put a stop to; preventing Mr. Daugherty from collecting compensation that's rightfully his.  All of that has cost Mr. Daugherty millions of dollars over the last ten years, and he hasn't recovered a dime.

So, the three legal doctrines are the bad-faith exception to the *American* Rule.

The second is contractual indemnification under Highland Capital's partnership agreement.  This is a claim that was fully briefed on cross-motions for summary judgment in Delaware, and it was argued to the Delaware Vice Chancellor and submitted for a decision.  The source of Mr. Daugherty's indemnification claim is Section 4.1(h) of Highland's partnership agreement, and that's Exhibit 39 in the papers we

000650

Case 25-03055-bwo Doc 105-7 Filed 04/15/26 Entered 04/15/26 15:13:54 Desc
Exhibit PD-07 Page 15 of 90
Case 19-34054-sgj11 Doc 1426 Filed 11/18/20 Entered 11/18/20 18:56:37 Desc
Case 3:25-cv-01876-K Document 35-2 Filed 09/12/25 Page 25 of 90 Page 25 of 174 PageID 6797

15

submitted. I'll just read briefly what that provision is.

It states that a partnership -- that is, Highland Capital -- shall indemnify and hold harmless the general partner -- which is a company called Strand -- and any director, officer, employee, agent, or representative of the general partner -- again, Strand -- against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the partnership -- which is Highland -- or in connection with the partnership's business -- which is Highland's business -- including, without limitation, attorney's fees and any amounts expanded in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by Delaware law.

Now, it was undisputed through summary judgment in the Delaware case and going I would say close to three years of litigation that Mr. Daugherty was a covered party under that provision. In other words, he was an officer, agent, representative of Strand who could be entitled to indemnification.

Highland admitted in every version of its answer in the Delaware case that Mr. Daugherty was, in fact, an officer or an agent of Strand through his resignation from Highland in 2011. But in this Court now, we have Highland claiming that Mr. Daugherty ceased being an officer of Strand in 2009.

000651

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 16 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 26 of 174     PageID 6798

16

And, in fact, just a few hours ago I received a few documents from Mr. Morris showing that Mr. Daugherty was not listed as an officer of Strand after 2009.  I'm still processing in my own mind why I'm just receiving these documents now, after three years of litigation, why Highland made previous judicial admissions to the contrary, and why we made it through summary judgment without this issue being raised.

But ultimately, it doesn't matter, because Mr. Daugherty will prove, consistent with Highland's prior admissions in the Delaware court, that he is a covered person under this indemnification clause, because, at a minimum, he was an agent and representative of Strand through 2011.

And he'll also prove that all of the Texas litigation and what has happened since the Texas litigation began in 2012 really stems from what Mr. Daugherty did or did not do related to Highland's business.  So the nexus requirement under the indemnification agreement is satisfied.

Again, this is an issue that was fully submitted to the Delaware court, but no decision was issued.

The third component of our reimbursement claim is fees on fees and the idea that, to the extent Mr. Daugherty is successful in establishing his contractual indemnification rights, he is also entitled to reimbursement for the cost of proving his entitlement to indemnification.

000652

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 17 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25   Page 27 of 174     PageID 6799
Main Document   Page 23 of 90

17

Now, if you put all of these three buckets together, you're left with $7.8 million. That's not an insignificant amount, and it's -- it's more than the $9 million that Highland has offered. And if any line is going to be drawn today, we submit that that line should be drawn to include this $7.8 million for -- based on the law that we've provided in our papers and based on the facts that we have demonstrated and the exhibits and Mr. Daugherty's declarations and the brief testimony you'll hear today about the litigation that Mr. Daugherty defended and what he's had to deal with for the last ten years.

I'm going to stop there. Do you have any questions at this time about the fee reimbursement portion of the claim, which is $7.8 million?

THE COURT: No questions on that.

MR. UEBLER: Okay. The one aspect of Mr. Daugherty's claim that we did not have an opportunity to talk about yet is what we're calling the 2008 Tax Refund Claim. And that's -- that's an amount of $2.6 million in Mr. Daugherty's proof of claim, and that amount should be allowed in full for voting purposes.

Now, I'm going to let Mr. Daugherty explain the factual background of this claim, but the short version is that Mr. Daugherty received compensation in 2008 from Highland Capital, and he received that compensation as an employee and in the

000653

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 18 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2  Filed 09/12/25  Page 28 of 174    PageID 6800
Main Document   Page 25 of 90

18

form of a tax refund.  The IRS is still in the process of auditing Highland's tax treatment for 2008, so there's a possibility that in the future the IRS will claw back Mr. Daugherty's 2008 compensation that was approximately $1.4 million.  And with that would come interest and penalties that we estimate could total $2.6 million.

So, yes, it's correct that as of today there is no definite liability to the IRS.  This is a contingent liability and we don't know what the total amount may be.

Now, if Highland hadn't come out and said in its adversary complaint that it's basically refusing to acknowledge any potential liability for this issue, we might not have a current claim to put before Your Honor today.  But the fact that Highland has already come out and said it has no intention of either covering future tax liability or giving Mr. Daugherty substitute employee compensation for 2008 in the event that the IRS were to take that away, we think presents a live claim that Mr. Daugherty has sought to preserve through this proceeding.

He's not seeking a cash payment, ultimately.  All he's looking for is some agreement by Highland to assume this liability or to put the money in escrow in the event of a clawback.  But for voting purposes, we're asking that the full potential of $2.6 million for this claim be permitted.

And, you know, you asked earlier about why $9 million

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 19 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2 ment filed 99/12/25 of 99age 29 of 174   PageID 6801

19

isn't enough.  It's a matter of degree.  Mr. Daugherty is a creditor and he is entitled to a say in the plan, and that's what we're trying to establish today.  And we think it's important that Mr. Daugherty have a voice, and that voice carry some weight, to enable Mr. Daugherty to have a seat at the table, have a voice in the plan.

I think the more that this Court would be willing to permit at this summary stage of the proceedings, where there's a presumption in favor of claims, even if they're disputed -- I think that will be my only reference to 3018 law today -- we submit the Court should err on the side of more rather than less.

Mr. Morris and I had discussed doing mutual openings followed by Mr. Daugherty's testimony.  I think now would be a good time to turn this over to Mr. Morris before we call Mr. Daugherty, if that works for you.

THE COURT:  All right.  That works for me.  Mr. Morris?

MR. MORRIS:  Good afternoon, Your Honor.  John Morris; Pachulski Stand Ziehl & Jones, for the Debtor.

I really do appreciate Your Honor's preliminary projections of where we are.  I had prepared a rather extensive presentation for the Court that I'm actually going to dispense with because I'd like to focus on the narrow issues that Your Honor has identified.

000655

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 20 of 90
Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 85-2    Filed 09/12/25    Page 30 of 174    PageID 6802
Main Document    Page 25 of 90

20

I want to begin by apologizing to the Court for having to engage in this process. We have tried very hard, I think as Your Honor has perceived, to fully resolve this particular motion. At the outset of the process, the Debtor readily acknowledged the validity of Mr. Daugherty's judgment in the amount of $2.6 million, plus interest, through $3.7 million. That's not an amount in dispute today. That won't be in dispute as a matter of his claim. We have admitted it, we acknowledge it, and it will be allowed in that amount.

We went one step further in the hope that it would resolve this motion by agreeing to allow the maximum amount that Mr. Daugherty's expert was prepared to testify to on the petition date for these promissory estoppel and other related claims. The expert at that time testified to a range of somewhere of four to about $4-1/2, $5-1/2 million, and that's how we arrived at the $9.1 million.

Let me make it clear, Your Honor, that if the parties are unable to resolve this, the Debtor will contest that. But for this purpose, we felt by giving it one hundred percent validity, notwithstanding the fact that we will contest it on the merits if needed, that that was a fair resolution, that that was a very simple way to get this done. Unfortunately, we were not successful.

We're here today not because we like to litigate but because we're doing our best for these estates and its

000656

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 21 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2 Filed 09/12/25 of 90 Page 31 of 174   PageID 6803

21

stakeholders, including all unsecured creditors.  Mr. Daugherty is entitled to a seat at the table.  We have given him a seat at the table.  He now sits with the third largest general unsecured claim that is going to be allowed, and that follows from the settlements with the Crusader and Redeemer Funds and with Acis.  At $3.7 million, he's already got the third largest allowed claim.  And we're prepared to give him a vote of over $9 million for this purpose.  But what we don't do and we don't think our fiduciary duty will allow us to do is give him credit for claims that, in our view, clearly have no merit.

So let me just go through them very quickly.  The first is a claim for over $20 million arising from the assertion that somehow he is now entitled to one hundred percent of the HERA assets.  Mr. Daugherty -- I don't know Mr. Daugherty.  I have no animosity against Mr. Daugherty.  One of the things that I and my colleagues and the board have dealt with throughout this case is that there's so much baggage here, Your Honor.  And it's -- this has been our burden, this has been our challenge, is to cut through this and try to get to the merits.  What's really fair and what's really reasonable?  And it's what we try to do in our settlement negotiations and it's the only reason we're here today, because we thought we made a generous offer.

And Mr. Daugherty is well within his rights to say, Not

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 22 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K      Document 85-2   Filed 09/12/25 of 90   Page 32 of 174   PageID 6804

22

good enough.  But we think, we think we've offered enough. When we think of his claim to a hundred percent of the HERA assets, he will testify, I assume, that when he left he had 19.1 percent.  He never thought he had more than 19.1 percent. Nobody ever promised him any more than 19.1 percent.  His expert in Delaware was prepared to testify on damages based on 19.1 percent.  He actually pursued these claims, Your Honor, not just in Delaware, he actually started in Texas.  He knew about this in 2013, right when it happened.  It was part of his Texas action, and it was rejected.  And you heard -- and we heard Mr. Uebler allude to it, right?  So then he goes to -- he goes to Delaware and he tries to bring them again, maybe three years later, in 2017.  These are undisputed facts, Your Honor.  And they get dismissed.

Now, the interesting thing is, if you look at our Exhibit T, it's the Delaware -- I think it's V, actually.  It's the Delaware court's order dismissing the claims.  It didn't give a reason.  But if you go back to Highland's brief, you'll see there's a multitude of reasons.

And when they use the phrase *laches*, Your Honor, it doesn't mean that Mr. Daugherty was found to have sat on his hands.  The Delaware Chancery Court is a court of equity, and so they use equitable principles.  What really happened is that the Delaware court found that the claim was barred by the statute of limitations because the cause of action arose in

000658

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 23 of 90

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2  Main Document  Filed 09/12/25  Page 23 of 90  Page 33 of 174   PageID 6805

23

2013, Mr. Daugherty knew that, and he didn't bring his action until 2017, more than, you know, more than the three-year statute of limitations.

But you'll see in the Debtors' brief, which we've cited, that Highland actually asserted a multitude of reasons why this claim should be barred.  And we don't know exactly why the Chancery Court did it, but he's going to have to deal not just with *laches* -- which is the word, the phrase that's used for statute of limitations -- he's going to have to deal with promissory estoppel.  He's going to have to -- not promissory estoppel; just estoppel generally.  Res judicata.  It's all in there.  There is no chance he's going to succeed on this claim on appeal.  And it's $21 million, and he shouldn't be given the right to vote any portion of it.  That's number one.

Number two, with respect to the tax claim, what's really interesting here, Your Honor, is that there is no claim that Highland has breached any duty today.  There's no claim that he's breached a contract -- that Highland has breached a contract.  There's no claim that Highland has committed any tort.

What happened was, back in 2008, Mr. Daugherty, according to him, was promised $1.475 million as compensation.  There was an agreement.  That compensation was delivered to him not in cash but in the form of an allocation of losses from the Highland partnership.  Mr. Daugherty was a limited partner.

000659

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07    Page 24 of 90

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2  Filed 09/12/25   Page 34 of 174     PageID 6806

24

He got over $4 million in losses. Those losses were recorded on a K-1 that's going to be admitted into evidence. And Mr. Daugherty took those losses and shielded his income and his gains in other places in his life, I don't know. But the benefit of that was $1.475 million.

Mr. Daugherty never says that Highland breached its agreement. He never says that Highland failed to perform. He never says that Highland did anything wrong. All that's happened here, Your Honor, is that the IRS is conducting an audit of Highland's 2008 taxes, including these losses. Okay? So, as we sit here today, Highland owes zero. There is no basis to give him any claim for voting purposes. There's just, there's no reason. It may be -- later that he should be getting. And what I would find to be very reasonable is that we are here on the merits and he asked the Court to establish a reserve. I think it's almost what Mr. Uebler asked for, that you establish some type of reserve for a contingent claim. You know, that would make sense. But that's not why we're here today. We're here to say whether or not he's allowed to vote this claim, a claim where Highland today admittedly owes nothing.

So, you know, I think that that dispenses with the tax issue.

The last one is this claim for attorneys' fees. I will tell you, Your Honor, I didn't have a good weekend myself this

000660

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 25 of 90

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 09/12/25    Page 35 of 174    PageID 6807

25

past weekend because I had to flip through 2,600 pages of Mr. Daugherty's appendix.  I don't have the experience here on (garbled), but I waded all through that stuff.  And Mr. Uebler and I have a very cordial relationship, which I'm grateful for, and we were talking on Friday, and he said, Why do you guys say that he resigned from Strand in 2009?  And I said, I don't know where I picked it up, but that's what I put in here.  And he said, But that's not right.  And I asked him, I said, If you have a letter of resignation, you have something, give it to me.  And he didn't give me anything.

But last night -- and this is why it came up at the last minute.  This is why it came up at the last minute.  Last night, they filed a declaration from someone named Mr. Covlin or Colvin, who I hadn't heard of but who apparently was the Highland general counsel back when Mr. Daugherty was at Highland.  And you'll see in Paragraph 5 of his declaration he says, I don't have a memory of Mr. Daugherty resigning from the Strand board before he left in 2011.  And I said to myself, I don't -- I don't understand why people can't -- there's got to be a letter of resignation, there's got to be something to prove the fact.

And so I called Highland this morning and I said, When did he resign?  Do we have anything?  I said, I want anything you can find.  And we're going to put into evidence, Your Honor, two different exhibits, one of which, ironically, is a

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07    Page 26 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2 emFiled 09/12/25 of 90age 36 of 174    PageID 6808

26

Secretary's Certificate that was signed by Mr. Colvin.  And it was signed in early 2009, where he certifies to the Strand board resolutions, which set forth the officers of the company, and Mr. Daugherty is not on it.

The second document, Your Honor, is even more significant. It is a periodic statement of the officers of Strand that are listed by individual with their title and each person signs it.  And what the evidence is going to show is that Mr. Daugherty signed his statement as either Secretary or Assistant Secretary every single time from 2006 until about March of 2009.  And then in the mid-2009 document, consistent with Mr. Colvin's certificate, Secretary's Certificate, he's no longer there, but Mr. Colvin was still signing all of his papers without Mr. Daugherty.

So I don't really know the record of Delaware.  I'm doing the best I can, Your Honor.  But I don't think that there's going to be any dispute at the end of all of this that Mr. Daugherty ceased to be a director or an officer of Strand sometime between March and May 2009.

Why is that significant?  Because that is what he hangs his hat on in order to establish his claim for indemnification.  We don't think there is any claim because he was no longer an officer of Strand after early 2009.

Even if he was, Your Honor, everything that he's seeking indemnification for now arose after he left in 2011.  He's

000662

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 27 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Filed 09/12/25   Page 37 of 174   PageID 6809
Main Document   Page 27 of 90

27

trying to use the indemnification provision in order to recover his attorneys' fees, attorneys' fees that were recovered [sic] after 2011, that were incurred solely for his own personal benefit.

It's not as if he brought a claim derivatively on behalf of Highland.  Instead, he pursued litigation where he would recover damages, where he was the plaintiff.  In fact, Highland was a defendant, is a defendant in a lot of this litigation.  I don't understand how anyone can fairly read an indemnification agreement that requires the indemnitee to act on behalf of the indemnitor, and that somehow suing an indemnitor is consistent with the concept of indemnification. It just, it doesn't make sense.  He wasn't there.  The fees accrued after the fact.  There's just, there's no basis for it.

And fees on fees, that other concept that they're building upon, is fees on top of fees to pursue indemnity.  So if the indemnity doesn't work, fees on fees don't work either, Your Honor.

And I'll just very briefly, the fee shifting thing, I heard Your Honor's point.  But, again, I bear no ill will toward Mr. Daugherty, but a fair reading of the record says that nobody comes to this, none of those parties come here with unclean hands.  Mr. Daugherty was found to have breached his fiduciary duty.  The only judgments that have been

000663

Case 25-03055-bwo Doc 105-7 Filed 04/15/26 Entered 04/15/26 15:13:54 Desc
Exhibit PD-07 Page 28 of 90
Case 19-34054-sgj11 Doc 1426 Filed 11/18/20 Entered 11/18/20 18:56:37 Desc
Case 3:25-cv-01876-K Document 35-2 Filed 09/12/25 Page 38 of 174 PageID 6810
Main Document Page 28 of 90

28

rendered by any court so far have him paying Highland 2.8 and Highland paying him 2.6. He complains that so many of Highland's causes of actions were dismissed. We could do a scorecard if you think it's necessary showing that Daugherty's claims and causes of action were dismissed.

I heard Mr. Uebler talk about, you know, the appellate court reversing the criminal issue. But you know what, Your Honor? The trial court actually agreed with Highland there.

So, again, fee shifting is an extreme remedy, the absolute extreme remedy in the United States. And, again, not to cast aspersions against Mr. Daugherty, but nobody comes here with unclean hands. There's no basis to do it in this particular case.

So we think $9.1 million was very fair, Your Honor. We think the undisputed facts are going to show that the balance of these claims are without merit at the merit hearing, but certainly for this purpose, Your Honor. He doesn't -- he doesn't come close to the -- even the low bar that's needed for voting purposes.

Thank you, Your Honor.

THE COURT: All right. Thank you. Mr. Uebler, you can call your witness.

MR. UEBLER: Thank you, Your Honor. Mr. Daugherty, are you available?

MR. DAUGHERTY: Yes. I am here.

Daugherty - Direct                      29

THE COURT:  All right.  Mr. Daugherty, I'm going to swear you in.

PATRICK DAUGHERTY, CREDITOR PATRICK DAUGHERTY'S WITNESS, SWORN

THE COURT:  Thank you.  You may proceed.

(Note:  Witness muffled throughout testimony.)

DIRECT EXAMINATION

BY MR. UEBLER:

Q   Good afternoon, Mr. Daugherty.

A   Good afternoon.

Q   I'd like to begin by asking you a few questions about what we call the fee reimbursement portion of your claim.  Would you explain to the Court what out-of-pocket payments are included as components of that claim?

A   As far as category or number?

Q   What's -- however you'd like to address it.  Maybe categories and then number.

A   Sure.  There's (inaudible) I'm pursuing for the costs incurred pursuant to executing my release under Strand.  And just to be clear, Strand reimburses not just for officers and executives, but also for representatives in any case, which is consistent with what Highland said in Delaware on multiple occasions.

Then there are fees on fees, which is, under Delaware law as I understand it, I'm entitled to the fees that I had to incur in order to gain -- in order to get Highland to make

000665

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 30 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Filed 09/12/25   Page 40 of 174   PageID 6812

Daugherty - Direct                    30

good on its promise in that original partnership agreement with Strand and Highland.

And then, let's see, indemnification, fees on fees. And then there's my claim for the fee-shifting. And I certainly understand the concept of the *American* Rule and the judge's point, and (inaudible), but what you have to remember here is there was a crime fraud finding in Delaware which caused Highland to lose its attorney-client privilege where we discovered that its in-house counsel -- Scott Ellington, Isaac Leventon, Thomas Surgent -- working with outside counsel, basically provided prima facie evidence of a fraud. So this moves far beyond just, you know, two parties going at it. This has been, again, that Highland sued based on, frankly, lying to that very same judge in Dallas County Court that Mr. Morris referred to. And not only the judge, the jury, where we have (inaudible) law from the various outside firms summarizing what these people -- you know, again, I generally refer to them as the cabal. But this just goes far beyond two parties having a good-faith battle with one another. This turns into, frankly, fraud. And I've had -- and by the way, Judge (inaudible) in Delaware Chancery Court, once he made this ruling, said that he sees evidence of fraud going all the way back to December of 2013, when Highland allegedly set up an escrow account on my behalf, and it never happened. And not only did it not happen, but again, they told Judge Hoffman

000666

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 31 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25 of 90   Page 41 of 174   PageID 6813

Daugherty - Direct                          31

down in Texas and they told the jury that it did happen.  And (inaudible) and everyone else on multiple occasions that (inaudible), only to find out in December of 2016, after all appeals -- the appeal process was exhausted, that most of that money was never put into escrow.  Again, they never (inaudible) Dondero (inaudible).  And (inaudible), his counsel.  But that what any of those assets were there would have been shifting -- and when I say they, I mean Scott Ellington and Isaac Leventon -- while they (inaudible) my house in Dallas, while they were claiming that I had (inaudible) and were seeking turnover in Dallas, while they were terrorizing my family and sending the cops on the house, they had all those assets shifted to themselves, kept quiet about it, and then proceeded to order me to make a $3.1 million (inaudible) for their attorneys' fees.

I don't think a fraud can get more absolute than that.  And so that is, you know, that's my quick summary on the nature of those fees.  And, again, I know this (inaudible), but this is just a little bit different than your, you know, run-of-the-mill situation.

Q   Mr. Daugherty, you mentioned indemnification in your answer.  Did Highland or its affiliates assert claims against you in Texas state court based on your conduct as a Highland employee?

A   They did.  I mean, I was accused of having (inaudible), of

000667

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 32 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25 of 90   Page 42 of 174     PageID 6814

Daugherty - Direct                    32

committing securities fraud violations, of not executing my duties to investors, when in fact I was doing just the opposite and (inaudible) protecting them from being defrauded. And some of those investors are on the Creditors' Committee today, as the Crusader and Redeemer Committee, is Eric Felton, (inaudible) Montgomery.  Those were the people I was trying to protect from -- and by the way, at the end of the day, I felt like I protected Highland, too, to keep them from doing something stupid that could end us in this -- all of us in the situation where we are today.

So I was executing my duties as a portfolio manager.  I was -- and by the way, that carried all the way through to January or February of 2012, after I left, because what Mr. Morris didn't tell you is in Mr. Colvin's affidavit I was enlisted by Highland to come to an exit interview after I had resigned, where they wanted to hear two categories of topics. One, the performance of the individual (inaudible) in the Crusader Fund, because Highland had lied to them (inaudible). They wanted to hear from me what I thought its true value was. One of those investments was Cornerstone, which we're all familiar with.

And then the other category of topics that they wanted to discuss with me was (inaudible) leaving Highland.  And that included the timing, (inaudible) efforts.  Money was being thrown at me, or offered to me, I should say, directly from

000668

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 33 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2 Filed 09/12/25 of 90 Page 43 of 174     PageID 6815

Daugherty - Direct                           33

Dondero, from Cornerstone, to pay me a (inaudible) in order to seek releases for Highland.

So, you add all these things up together, and I was performing my duties as their portfolio manager and as a fiduciary that basically superseded any duty that I had to Highland itself when it came to those clients, which was my fund, Crusader, that I managed and that ultimately the beneficiaries, the investors, led by, as I said, one of their UCC members, Eric Felton, (inaudible) at the time, who now leads the Crusader entity.

Q    Mr. Daugherty, with that background about the different bases for your theory (inaudible) claim, could you quantify it for us, how you reached $7.8 million?

A    Well, the total fund, for the total 7.8, the answer is yes, I could break it down into individual components if it would be helpful to the judge because I believe the -- I believe the indemnification part of that, which the judge seemed to have issues with, was around 1.5, if I remember correctly.  The rest of it was fees on fees, and defending myself against false accusations from the Debtor, and executing (inaudible) to defend those investors from -- (inaudible) that they were getting ripped off by Highland, by Dondero.

Q    Are there any other components to your -- the amount that's represented in your fee claim?

000669

Daugherty - Direct                      34

A    It's fees on fees.  I think we touched on that.  So that's related to the (inaudible).

Q    You're -- you're saying that the claim included a reference to IRA penalties and --

A    Oh, yeah.  So, you know, when you have to proceed like this, and I know I've been presented as this rich greedy person, but there's a reason why Highland was wanting to get garnishment and wanting to seize my assets with the constable, because I got (inaudible) fighting this.  And Judge Jernigan, I was in your case on another matter and you asked why there's not counsel, it's because I didn't have the money.  And so one of the things I had to do was cash in my IRA, my wife's IRA.

Q    What's --

A    I had to take a mortgage on my house.  I had -- with interest on that.  And with penalties on the IRA.  I did not (inaudible) -- I did not -- I hate this.  I hate talking about this.  Is that enough?

Q    I want to talk briefly about this tax refund claim for 2008 and the basis for it.  What -- what is this tax refund that you received in 2008?

A    (inaudible).  In 2008, and I put it in a page in my declaration, Highland was in trouble (inaudible) of the crisis, you know, the various -- and we had talked about our credit facility with our banks, led by Bank of America (inaudible), but they were unsecured.  So what that's -- the

000670

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 35 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25 of 90   Page 45 of 174   PageID 6817

Daugherty - Direct                          35

way it's drafted, and they wanted to get secured.  In the process, I was having negotiations, which (inaudible) into 2009.  They were concerned that money was being siphoned out of Highland while we were in breach of our credit facility.  Initially -- initially, they thought all the partners were taking money out, and after getting their -- after getting their forensic accountants in there from FTI, they discovered that the only people taking money out was Dondero and Okada, under a guise of quote/unquote repaying a loan to themselves.

So, in the heat of all that, there were two things that came from that.  One, they shut down all the money going out of Highland and they closed (inaudible).  We had to reduce our headcount by 20 percent.  We also had to reduce our costs, you know, our outgoing costs, as you would expect when you're in this type of situation.

Well, the problem was there wasn't enough money to pay the cash element of bonuses that were coming due in February of 2009 for the work that we (inaudible), you know, operate for the year 2008.  The way it worked at Highland, and still does apparently, the employees work the full year, and then in February of the following year they get a compensation benefits letter that says, Here's what your bonus is.  Here's what your tax bonus is going to be.  It's going to be paid out in installments, call it February or August, February and August of the subsequent years.  And then there would be some

000671

Daugherty - Direct                    36

type of deferred compensation and then some type of listing of the value of the (inaudible).  So we got lunch generally every day, we had healthcare costs paid for, we had life insurance. And so we (inaudible) out all these things (inaudible).

And I think what you're asking in your question is, Where did the tax refund come in this?  Well, historically, we would -- we would have got a cash bonus in that particular, you know, document that I mentioned.  But (inaudible) pay cash bonuses beyond a *de minimis* amount.  Dondero and, I believe, Mark Patrick in the tax groups and Rick Swadley, and there's another one, Jennifer Blumer, I think, and Michael Collins, they called all of us into the conference room and they said, We're going to pay your cash bonuses, but we're going to have to do it by making this election with the IRS.

And, frankly, none of us really understood what it was. It was very convoluted.  But when we got our February 2009 award letter, and I think that's an exhibit in here somewhere, it says very clearly -- in my case, anyway -- (inaudible) tax refund, $1.475 million.  And then it says, You're going to get this -- and I'm paraphrasing -- but, You're going to get this amount, but to the extent that you don't get this amount, we will provide you, you know, Highland will provide you substitute compensation.

So it was very important that -- to take the place of what had (inaudible) cash bonus, but it was compensation through

000672

Daugherty - Direct                    37

and through.  And when you hear Mr. -- Mr. Morris, I'm sorry, go on about me getting $4 million in the loss, well, I did get (inaudible) that had a $4 million loss.  As the IRS interpreted it, they only netted, I guess, accepted it, the -- they had the number equivalent at roughly 1.1.

But the point in all this is that was the method that Dondero and the tax team had concocted to generate the funds for Highland, its separate obligation, this is a compensation of benefits letter that I got.

And we understood the situation that Highland was in and we were willing to live with that.  Where I think things went bad -- and by the way, this has been dragged out forever, Your Honor.  I've talked to Mr. Stewart about it.  I informed the IRS, tried to settle it.  And I know (inaudible) probably never (inaudible), I'm more than willing to work with the Debtor to get it settled.  But what I want, and I don't know how this works in bankruptcy, Your Honor, I -- I've got a claim, so I filed the claim, because if you don't file the claim, you lose it.  Right?  And then what happens is I'm (inaudible) the Debtor.  The Debtor (inaudible) as an adversary, said, We're going to equitably subordinate this because this is equity in nature.  And at one time, the method of payment that was concocted by the Debtor (inaudible) was, the compensation agreement is separate and apart from that, and that stands.  And neither I nor any of the other guys that

000673

Daugherty - Direct                    38

got this are looking for a windfall.  And I don't know how you vote it.  I mean, if the Debtor had said, We're just going to assume this like a lease contract, I wouldn't be in here asking you to put a number on it.  But what I got was an adversary saying, We're not going to pay this.  We're going to go equitably subordinate this, even if you're trying to, you know, get it reimbursed through the partnership.  So that forced me to bring it to you, Your Honor, and try to put a number on it.

Q    Mr. Daugherty, during your time with Highland Capital, did you receive cash distributions from Highland in your capacity as a limited partner of Highland?

A    That's a very important point.  These K-1's that -- there were two kinds of partners at Highland.  There were the real partners, Jim Dondero and Mark Okada, who referred to themselves as founding partners, and then there were the subclass of partners, really, we kind of -- we called ourselves profit centers partners because we had a place in the partnership but we weren't allowed to get any distributions.

So whenever you see a K-1, we didn't get any of that money.  All right?  That money stayed in the partnership or went to Mark and Jim.  What we had was what's called a (inaudible) and a buy-sell agreement that were attached to the partnership which -- that basically we didn't get any

000674

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 39 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25   Page 49 of 174     PageID 6821
Main Document   Page 25 of 90

Daugherty - Direct                    39

(inaudible) distributions or income from this, but what we got was at the end of that time we could go and terminate it and say, Pay me out now, and at that point it would be valued. And so in my case, when I left, the value that they offered me was $199,000.  For all, for all those years of service.  And so to answer your question, no, I didn't get any money from it.

Q    Thank you.  I want to ask you just a few questions about the HERA 80 or 81 Percent Claim that they were referring to. At a high level, what is HERA?

A    Well, this goes back to the same situation I was talking about before as it related to this 2008 tax refund.  As I mentioned, we were losing employees.  People were leaving.  I mean, we started the year in 2008 with 22 partners and we were down to I think 11 or 12 at the start of 2009.  The banks were just, the banks were furious and they were talking about liquidating us and getting a trustee put in place because they were furious to find out that Dondero and Okada had taken out money.  It was around $20 or $30 million.

Once we got through that hurdle, I said, Listen -- because I became, by the way, Your Honor, I became Highland's kind of advisor, restructuring person.  I did that for Highland as (inaudible) usually us on the same side of the table as the banks on, you know, I was head of distressed and private equity at Highland, so I -- distressed debt and go and

000675

Daugherty - Direct                        40

negotiate at the Debtors' beck and call.

In this position, I moved over to the other side of the table and I was negotiating on behalf of Highland with a lot of my colleagues who were in the distressed community, which I generally refer to as knuckle raps.  But they knew me, and I knew them, and we sort of -- and we had trust between each other, especially given what had just happened.  And they agreed to set aside HERA, which is an acronym for Highland Employee Retention Assets, and it was a fund where they set aside, I don't know, around $20 to $25 million of assets that would then be used to incent employees to stay.  And it had a three-year cliff vesting.  And what happened is they didn't have any money left.  Well, the employees that remained got reallocated their shares.  So, contrary again to what Mr. Morris said, there was an agreement that the ownership interest would go up as we stayed through and helped right-size the ship.

Q    Mr. Daugherty, why is it that you contend now that you're the one hundred percent owner of HERA?

A    Well, this goes back to bad faith.  And I sympathize with the judge, I did give you a ton of information, but this has just been nine years of terrorizing, you know, that I've had to contend with.  And if you look back to December of 2012, January of 2013, a gentleman named (inaudible) had sent Dondero an email saying, Here's how you can pay everybody

000676

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 41 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K      Document 35-2   Filed 09/12/25 of 90   Page 51 of 174   PageID 6823

Daugherty - Direct                    41

except for one.  And (inaudible) board member on HERA.  And on HERA's board, there's affiliates of this guy.  Ellington and John (inaudible).  It's basically Jim's buddies, Jim Dondero's buddies, not (inaudible).  So he sent me this email saying, Here's how you can pay everybody but one.  So we get into January 2013, and Highland purports to make an offer to buy out everybody at HERA except me.  Well, guess what.  In the middle of January, all of the board resigns, without having anyone change the shareholder unit to the LLC and without taking board action that would allow Highland Capital to be an assignee of these units.

There is a reason for this.  We go back to why HERA was created.  The banks were furious about Mark and Jim taking money and the banks wanted to take a secured interest in all things Highland.  So what we agreed is we would put it in a (inaudible), in an entity referred to as HERA, and Mark and Jim and Highland would not be able to participate in it.  So they are not recipients of the preferred units, and the only way it can ever become (inaudible) preferred units is for there to be action taken, specific action take to amend the documents, or by the board, if they remain.  And in my Texas trial, this issue did come up, and Thomas Surgent said that no such action was taken.  Thomas Surgent is Highland's chief compliance officer.  (inaudible).  I'm getting a little --

Q   I'm just going to ask two questions briefly before we turn

000677

Daugherty - Direct                    42

this over to Mr. Morris.  How did you calculate the value of

$21 million for this HERA 80 Percent Claim?

A    I took what -- Highland took my own expert report and made

it attorneys' eyes only in Delaware.  So my lawyers could

never sit down with me and explain it to me.  So all I could

go off of was what I saw at the trial.  And it was only the

last two or three days where Mr. Morris, he did file the

entire expert opinion of my expert where I could see all the

components.

     So, at the time, I took what my expert was saying was the

value of my expert assets, I think as of December 2016.  And

since I knew that that was based on 19.1 percent, I divided

that number by 19.1 percent, came up with a total, and then

re-multiplied by 80 -- 80.1 percent, to find out what that

delta was.

Q    Given that these claims were dismissed on procedural

grounds in Delaware, and having heard Judge Jernigan's

comments earlier about this claim and its value for voting

purpose, what do you as the Claimant believe a fair allocation

of this claim is for voting purposes?

          MR. MORRIS:  Objection to the form of the question.

          THE WITNESS:  Listen.  I've --

          THE COURT:  Overruled.

          THE WITNESS:  -- been around Judge Jernigan --

          THE COURT:  Overruled.  You can answer.

000678

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 43 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 53 of 174   PageID 6825

Daugherty - Direct                               43

THE WITNESS:  I've been around Judge Jernigan long enough to know that she means what she says and she says what she means.  And I understand her reservations on this, too. But I will say there are some mitigating factors here that Highland, in Texas and all the way through the Texas Court of Appeals, they were saying (inaudible), this is a double counting, this is a double counting.  That (inaudible) up for reconsideration in a court -- Texas Court of Appeals (inaudible), and the Court refused to see it that way.  Then when we went to Delaware, they(inaudible), they said, Oh, no, we have cures.  There's *laches*, statute of limitation is operating against them.

And so my reaction to that was, How am I supposed to be in an action based on my share ownership when you're saying I don't even own my share ownership and it's not determined until December 2016?

It is true that Judge (inaudible) said you should have basically filed a placeholder.  As I've learned a little bit about Delaware law, I don't think that is consistent with Delaware law, but it is what it is.  And if Judge Jernigan (inaudible) position.  So if she's right to say that I could bring these claims over (inaudible) you know, contains, you know, a different item.  And so you're asking me whether (inaudible) advice to the judge?  I would say that I'm more -- I'm more than agreeable to whatever she decides.  I just want

000679

Daugherty - Cross                    44

to know -- her to know why I'm here and what this is about, that this is not frivolous, but if it doesn't end with plan voting as she sees it, then I can live with that.

Q   Thank you, Mr. Daugherty.

THE COURT:  All right.  Thank you.  Pass the witness. Mr. Morris?

MR. MORRIS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q   Good afternoon, Mr. Daugherty.

A   Hello.

Q   My name is John Morris with Pachulski Stang and I'm here on behalf of the Debtor.  We've never spoken before, have we?

A   Yeah, we have.

Q   Yeah?  I don't --

A   Yes.

Q   I don't recall.  But it's --

A   You were in in-person court in Judge Jernigan's court in January and February and I think we spoke.

Q   Okay.  Well, forgive me for not recalling that particular detail.  I just wanted -- just a few questions, sir.  On the tax issue, according to your testimony you were promised $1.475 million approximately in connection with your 2008 compensation; do I have that right?

A   That's correct.

000680

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 45 of 90
Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 85-2    Filed 09/12/25    Page 55 of 174    PageID 6827

Daugherty - Cross                          45

Q    And I understand your testimony that it was Highland's idea, but you agreed to the method of compensation in the form of an allocation of Highland's partnership losses, right?

A    I would not say that.  There was no -- it was dictation, not an offer and acceptance.

Q    Well, you did accept -- you did accept the benefit of the allocation of the Highland losses on your 2008 tax returns, right?

A    I -- I don't know if accept is the right answer.  I sent my K-1 in with my tax return, and as I clearly admit, there's approximately $4 million of losses that are allocated to me via the K-1 that they could use in the computation of my taxes.

Q    Okay.  So it's fair to say, then, that the manner in which, or I think the word that was used in your papers, the method by which you were compensated was through the allocation of a portion of Highland's losses; is that right?

A    That is wrong.  I was compensated that said you're going to get 1.475.  If you don't get 1.475, we will provide substitute compensation.  What you're confusing is the manner in which Highland decided to try and fund the obligation, and I just don't think it's right to conflate the two.

Q    Well, Highland did fund the obligation through the allocation of losses to you; isn't that right?

A    It is not.  As I said, I got the $4 million pass-through

000681

Daugherty - Cross                46

that the IRS determined was approximately $1.1 million, as I recall.

Again, I'm not here to try to capture that missing 3.75. All I want is Highland to basically stay in the shoes if -- or stand by the promise that they made, that they made, sorry, that they made to me, which is if the IRS changes their mind or if Highland (inaudible) and wanted to start to use this (inaudible) argument, that I get sufficient compensation to make me whole.

I mean, at this point, if that -- if we aren't successful, right, on this tax refund issue, then I'm going to get -- not just me. There's about seven or eight other employees who have all also filed claims in this case. We're going to get hammered with penalties and interest that far exceed that amount, and that's not fair.

Q   Okay. As of today, Highland doesn't owe you -- that audit is not complete; is that right?

A   Well, it's -- the audit took place for two years, and you're probably familiar more than me, I got a letter from Byron Collins in December of 2019, after the Debtor filed for bankruptcy, saying, We've exhausted effectively our negotiations with the IRS. We've now turned this over to some appeals unit in the IRS, and they determined that you don't get -- I'm paraphrasing -- that you don't get to keep this amount.

000682

Daugherty - Cross                    47

Now, that basically put me on notice, right, that this is coming to somewhat of a conclusion.  (inaudible), I listed it as a claim, I listed it as unliquidated, because I really don't know how to treat it.  I guess, I mean, hopefully, the judge makes a decision, and the same kind of category, I don't know how you classify this thing.  But when you guys filed an adversary against me and said, You know what, by the way, (inaudible) to me about any of my clients.  So when you present to the Court that you engage me and (inaudible) with this guy, you guys didn't talk to me once from the time you filed until October about my claims.  You did it just recently, after you filed an adversary.  I would have been happy to work with you on this.

MR. MORRIS:  Your Honor?  Your Honor, I apologize for interrupting.  Can I have the question read back?  Because I really move to strike.  I'll be here all day if we get these answers that really have nothing to do with my question.

THE COURT:  Okay.

MR. MORRIS:  It's not proper.

THE COURT:  Well, I'm going to sustain and strike the narrative answer.  I'm going to ask you to just repeat your question at this point.

MR. MORRIS:  Okay.

BY MR. MORRIS:

Q    The audit is not completed; isn't that correct?

000683

Daugherty - Cross                    48

A    I don't know.  I've been told by you that it's not.

Q    Okay.  And nobody has told you and you have no information to contradict my assertion that the audit is incomplete today?

A    That's correct.

Q    And as you sit here today, you don't know how much, if anything, you might owe on account of the tax issue.  Is that right?

A    That is right.

Q    Okay.  You first learned about the audit in 2010; isn't that correct?

A    I don't know when I first learned about the audit.

Q    You learned about the audit before you left Highland; isn't that correct?

A    I know that when we filed this, you know, when we filed the returns, we had to file a cover letter that basically notified the IRS, hey, and I'm paraphrasing, we made these elections, you may not agree with these elections, but we're drawing your attention to it right now to put you on notice that we're making these elections.  So that's what I know.

Q    When is your first recollection of when you learned about the audit?

A    I don't recall.

Q    Okay.  Let's talk about the HERA assets for a moment.  When you left in 2011, you owned approximately 19.1 percent of the HERA preferred units; is that right?

000684

Daugherty - Cross                    49

A    That is right.

Q    Okay.  And you learned in 2013 of the events that you described earlier with respect to the amendment of the HERA partnership agreement -- limited liability -- limited liability company agreement, the assignment agreement, the expense allocation?  All of that occurred in 2013, and you knew it at that time, right?

A    Well, if I could clarify that.  I believe I was informed that the amendment -- you had a lot of questions in there, so I'll try and break it down.  The amendment -- you're talking about 1241, right?  I believe I was informed, informed of that either late February or early March 2014.

On the other stuff, we had -- we had sought discovery, and, you know, people have experiences that you don't always get discovery on an expedited basis all the time.  We started to take discovery in dribs and drabs in -- early in July, and then a lot more in October and then a lot more in December of 2013.  So the (inaudible) that you asked me a question about, we got a lot of it in that time period, and then some of it rolled into 2014.

Q    Okay.  So, you knew about Highland's purchase of the other holders of the HERA preferred units in 2013, right?

A    Yeah, I knew about the purported purchase probably in February 2013.

Q    And the purchases were by people who hold -- who held

000685

Daugherty - Cross                          50

vested interests in their preferred units in HERA; isn't that right?

A   You said it was by them.  I think it was from them.  But I think (inaudible).

Q   If I did, I misspoke, but thank you for the correction. But you'll agree, right, that -- that you knew in 2013 that Highland purchased from the vested holders of the preferred units their interests in -- in the HERA --

A   You know, I knew that ultimately that happened.  I don't remember if I knew definitively it happened until probably October of 2013.

Q   Okay.  And you don't bring these claims relating to all of this -- all of these things that happened in 2013 until the summer of 2017 in Delaware; is that right?

A   That -- that's generally about right.

Q   Okay.  And that's more than three years after you learned of them.  Is that fair?

A   I brought my claims after the Texas Court of Appeals said that I had that shares that your clients said I didn't.

Q   Okay.

        MR. MORRIS:  I'd move to strike.

BY MR. MORRIS:

Q   And I ask you to just listen carefully to --

        THE COURT:  Sustained.

BY MR. MORRIS:

000686

Daugherty - Cross                                    51

Q    -- my question.  Okay.  Listen carefully to my question. You brought the claims relating to the HERA events of 2013 for the very first time in Delaware in July 2017, right?

A    Yes.

Q    And it's more than three years after you learned of them; is that fair?

A    I'm sorry.  More than three years--?

Q    More than three years after you learned of those events. You just said that you learned about them in 2013.

A    I think that's right, yeah.

Q    Okay.  And you brought four different claims?  I think claim -- Counts 2, 3, 4, and 5 in the original Delaware action were all based on the events of early 2013; is that right?

A    I don't know.  I don't -- I don't -- frankly, I don't recall my claims (inaudible) that you described.

Q    Okay.

MR. MORRIS:  Can we please call up Exhibit A to Mr. Daugherty's proof of claim, which I believe has been marked as Exhibit 40?

THE COURT:  Okay.  Are you going to share the screen or do you want the Court to pull it up?

MR. MORRIS:  Yes.

THE COURT:  Okay.

MR. MORRIS:  I think we'll be able to share the screen.  Thank you.  And if we could just scroll to the end.

000687

Daugherty - Cross                         52

And I apologize, I don't have the page number, but it should be --

THE WITNESS:  Could you go back up to the top, just so I know what I'm dealing with here?

BY MR. MORRIS:

Q   Yeah.  It's Paragraph 82.

A   No, I'm looking at the date this was filed.  Can you do it to the top?  All right.  So this is --

Q   This is your amended pleading.

A   Oh, this -- okay.  You mentioned 2017, so I got a little bit thrown off.  Okay.

Q   So this is the -- this is the document that was attached to your proof of claim.  That's why I'm using it.  Okay?

A   Okay.  We've amended our proof of claim.  You're talking about the first one?

Q   This is the -- this is the one that was attached to your proof of claim, right?

A   Well, as I said, we've amended the proof of claim.  So are we talking about the one that's amended or the first one?

Q   All right.  Just take a look,

MR. MORRIS:  If you can scroll down to Paragraph -- keep -- no, keep going.  Keep going.  La Asia, can we scroll down, please?  Okay.  So go to Paragraph 84 and 85.  Okay.

BY MR. MORRIS:

Q   Can you read Paragraph 85 into the record, please?

000688

Daugherty - Cross                         53

A    (inaudible) unit holder of Highland Employee Retention
Assets.  The purported purchases of units by Highland Capital
on January 30th, 2013 using the funds of Highland Employee
Retention Assets were -- were invalid transfers.

Q    Okay.  And that's exactly what you're asking the Court
here to find; isn't that right?  That you're the sole
remaining holder and that the purported purchases by Highland
in 2013 were invalid transfers, right?

A    Correct.

Q    Okay.

A    Well, we're not asking her to find that, but we're asking
her to find for voting purposes.

Q    Okay.

       MR. MORRIS:  Can you go to Paragraph 89, please?

BY MR. MORRIS:

Q    In 89, the relief that you requested is the return to HERA
of the funds transferred it and distributed to you as the sole
remaining shareholder, right?

A    That's correct.

Q    And that's specifically one of the claims that the Court
dismissed; isn't that right?

A    I thought it dismissed the claims for me making ownership
of the, you know, the (inaudible) because of the *laches* issue
that you described.

Q    Sir, sir, this claim was dismissed by the Chancery Court,

Daugherty - Cross                              54

right?

A   It was dismissed by Judge (inaudible) who's the Chancery Court on *laches* grounds.

Q   Okay.  How do you know it was on *laches* grounds?

A   Because he said so.

Q   Okay.  Can we just look quickly at Cause of Action No. 3? This was a claim arising out of the exact same conduct against HERA Management and Mr. Dondero; isn't that right?

A   I'm not sure I understand your question.

Q   Count III was against HERA Management and Mr. Dondero arising out of the same facts, only this claim was for breach of fiduciary duty, right?

A   I guess it was breach of fiduciary duty.  I don't see -- I guess Mr. Dondero down there in No. 2, but I can't read the whole paragraph.

        MR. MORRIS:  Can you scroll down a little bit, please?

BY MR. MORRIS:

Q   Okay.  Right there, Paragraph 93?

A   Correct.

Q   The adoption of the third amended and restated agreement you allege to be self-dealing and constituting a breach of fiduciary duty, right?

A   Correct.

Q   And in Paragraph 94, if we can scroll down, you allege

000690

Daugherty - Cross                              55

that the execution of the allocation, the expense allocation whereby your interest was reduced to zero was also self-dealing and a breach of duty, right?

A    Can you go back there?  I can't read it.

Q    But you recall making that claim generally?

A    (inaudible)  You know, give -- ask me the question again about generally what I recall.

Q    Do you recall generally making an allegation in the Delaware Chancery Court that there is a breach of fiduciary duty by executing the expense allocation agreement, right?

A    Yeah.  On behalf of Highland ERA Management.

Q    Okay.

        MR. MORRIS:  Can we go to Paragraph 95, please?

BY MR. MORRIS:

Q    You also challenge the assignment agreement, is that right, as an act of self-dealing and breach of fiduciary duty?

A    Yeah.  I obviously can't read the redacted parts.

Q    But this claim was also dismissed, right?

A    As I said, these claims were reduced on a *laches* basis, but obviously I plan to appeal.  I just (inaudible).

Q    Right.  And *laches* you understood meant that it was time-barred, right?  It was brought beyond the statute of limitations?

A    Yeah, as I understood it, yes.

Q    Okay.

000691

Daugherty - Cross                    56

MR. MORRIS:  Can we go to the next cause of action? This will be the last one, Your Honor.

BY MR. MORRIS:

Q   This is against the Debtor, Highland Capital.  Aiding and abetting breach of fiduciary duty.  If you look at Paragraphs 101 and 102 and 103, it's charging Highland with liability for the same conduct, for the execution of the third amended and restated agreement, the receipt of the HERA assets, right, as --

A   Correct.

Q   -- part of -- and this too was dismissed on statute of limitations grounds, right?

A   I believe so.

Q   Okay.  Thank you.

A   You know, I know that Highland is liable for the transfer of promissory stock and the unjust enrichment.  I don't know if (inaudible).

Q   Okay.  Well, we'll leave that alone.  Okay?  I think that -- that's what we've actually offered to allow your claim for, for all of those claims.  Let's --

THE COURT:  Mr. Morris, I want to make sure --

MR. MORRIS:  Yes, Your Honor.

THE COURT:  -- the record is clear about what Mr. Daugherty was testifying about the last five minutes.

MR. MORRIS:  Sure.

000692

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 57 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 67 of 174   PageID 6839

Daugherty - Cross                     57

THE COURT:  This is, of course, an attachment to Daugherty's original proof of claim, but it is in the record at Docket Entry #1388, which was collectively all of Daugherty's exhibits for today, and it was at --

MR. MORRIS:  Right.

THE COURT:  -- Subpart 40, or Exhibit 40 therein, Subpart A of that.

All right.  Did you want to offer that or does anyone want to offer that into evidence so that the record will make sense?

MR. MORRIS:  Sure.  I'll take it upon myself for this specific exhibit, Your Honor.

THE COURT:  Okay.

MR. MORRIS:  I offer -- I offer PHD Exhibit 40 unto evidence.

THE COURT:  Okay.  And I assume there's no objection since that was Daugherty's exhibit.  It's admitted.

MR. UEBLER:  No objection.

THE COURT:  Okay.

(Patrick Daugherty's Exhibit 40 is received into evidence.)

BY MR. MORRIS:

Q   Mr. Daugherty, let's just talk for a moment as to the timing of your departure from Strand.  You were an officer of Strand at one point; isn't that right?

000693

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 58 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document Smented Filed 09/12/25 of 90age 68 of 174   PageID 6840

Daugherty - Cross                    58

A    Yes.

Q    Do you have any letter of resignation or any other documentation that shows the date on which you were no longer an officer of Strand?

A    I don't recall.

Q    Okay.

MR. MORRIS:  Can we please call up Exhibit X2?  Your Honor, this is one of the two exhibits that I shared with counsel earlier today that are the corporate records that show the officers of Strand at various points in time.

THE COURT:  All right.  Are they on the docket?

MR. MORRIS:  This goes to -- this goes to -- they're not.  This goes to the indemnification claim.

THE COURT:  Okay.

MR. MORRIS:  All right.  So if we can get X2 up, please.

(Pause.)

MS. CANTY:  I'm sorry, John.  One second.  The computer's acting a little crazy.

MR. MORRIS:  Okay.

(Pause.)

You know, Your Honor, instead of taking the Court's time with this, I don't need to cross-examine Mr. Daugherty with this.  What I'd like to do is, because I've shared the documents with Mr. Daugherty's counsel -- oh, here it is.

000694

Daugherty - Cross                           59

Okay.

THE COURT:  Okay.

MR. MORRIS:  So let's just --

THE WITNESS:  I see it.

MR. MORRIS:  Thank you.  Let's just get through this quickly.

BY MR. MORRIS:

Q   Do you recall that, when you were an officer of Strand, that from time to time you signed a document that identified all of the officers of that entity?

A    No.

Q    Okay.

MR. MORRIS:  Can you scroll down a little bit here?

BY MR. MORRIS:

Q   Do you see that this is --

MR. MORRIS:  I'm sorry, just a -- not quite so much. I want to see the first paragraph.

BY MR. MORRIS:

Q   It says that "I am the president of Strand Advisors" and that Mr. Dondero was certifying that the people below were duly appointed and qualified to serve as officers of Strand. I'm paraphrasing a bit there.  Do you see that?

A   I can read it.

Q   Okay.  And do you see the third line down is you?

A   Correct.

000695

Daugherty - Cross                          60

Q    And that's your signature?

A    It appears to be.

Q    And did you serve in the capacity as Secretary of Strand?

A    I mean, I served in various capacities.  So I was agent, I was representative, I was an officer.  I never was limited to just being Secretary.

Q    Okay.  But that's what you signed this document as, right?

A    That's what my signature is next to.

Q    Okay.

        MR. MORRIS:  And if you scroll down a little bit, let's just see the date.

BY MR. MORRIS:

Q    And so that's August of 2006.

        MR. MORRIS:  Can we go to the next page, please?

BY MR. MORRIS:

Q    You signed the next iteration of this as Secretary.  Do you see that?

A    I do.

        MR. MORRIS:  Can we scroll down a few lines to see the date?

BY MR. MORRIS:

Q    That's February 27, 2007, okay?  And all of these folks were officers at the time, do you recall?

A    No.

Q    No, you don't recall that?

000696

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 61 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 71 of 174     PageID 6843
Main Document    Page 62 of 90

Daugherty - Cross                              61

A    Huh-uh.  I don't remember Nicky being an officer or Jim

(inaudible) or Ron Williams.

Q    Okay.  It was 13 years ago.

          MR. MORRIS:  Let's scroll to the next page, please.

BY MR. MORRIS:

Q    Do you see --

          MR. MORRIS:  Scroll down a little further.

BY MR. MORRIS:

Q    You're now -- you've now been designated Assistant

Secretary.  Do you see that?

A    Yes.

Q    And that's your signature?

A    It is.

Q    And two lines above that, do you see there's Michael

Colvin?

A    Colvin, yes.

Q    Yeah.  And did you understand that he was Secretary of

Strand at one point?

A    I didn't focus on it one way or the other.

Q    He submitted -- Mr. Colvin submitted a declaration last

night on your behalf; isn't that right?

A    He did.

Q    And he said he couldn't recall when you stepped down from

your position as an officer of Strand, right?

A    Words to that effect, yes.

000697

Daugherty - Cross                         62

MR. MORRIS:  Can we just show the date of this document?  So, this is January 2008.  Let's go to the next page.  Here, again, if we can scroll down a little further, --

BY MR. MORRIS:

Q   -- you have Mr. Colvin signing and you also signing as Assistant Secretary.  Do you see that?

A    I do.

Q   And that's your signature?

A    Yes.

MR. MORRIS:  Okay.  Can we just see the date of this document?  This is May 2008.  Let's go to the next page.

BY MR. MORRIS:

Q    Okay.  Again, Mr. Colvin as Secretary and you as Assistant Secretary; is that right?

A    Yes.

Q   And that's your signature?

A    Yes.

Q   And it's March 1st, 2009, right?

A    That's what it says, yes.

MR. MORRIS:  Okay.  Let's go to the next page.  Stop.

BY MR. MORRIS:

Q   You see Mr. Colvin is still there, but you're not, right?

A    Correct.

Q   And this is dated May 29, 2009, right?

A    Correct.

000698

Daugherty - Cross                    63

Q    So Mr. Colvin, the person who submitted a declaration on your behalf, signed a document where you're no longer listed as an officer of Strand as of May 29, 2009, fair?

A    That is correct.

Q    Okay.

        MR. MORRIS:  Let's just keep going.

BY MR. MORRIS:

Q    This one is dated January 2010.  Again, Mr. Colvin was on and you're not, right?

A    Correct.

        MR. MORRIS:  Next page.

BY MR. MORRIS:

Q    Mr. Colvin was here as Secretary and you're not listed as an officer of Strand as of July 1st, 2010, right?

A    That's correct.

Q    Okay.  Does -- does -- do these documents refresh your recollection that you stepped down as an officer of Strand sometime between March and May of 2009?

A    No.

Q    Okay.

        MR. MORRIS:  Can we call up the other exhibit, please?

BY MR. MORRIS:

Q    This is a document entitled Secretary's Certificate.  Do you see that?

000699

Daugherty - Cross                64

A    I do.

Q    And do you see Mr. Colvin signed it as Secretary?

A    I do.

Q    And do you see that it was delivered on behalf of Strand Advisors?

A    No.

Q    Up at the top line.

A    Oh, yes.

Q    Okay.  And Mr. Colvin signed this as of August 4, 2009, right?

A    Well, it's --

Q    Above his signature?

A    Well, Highland had the practice of -- it sort of had the practice where they would put an effective date prior to the actual time that the document was created.

Q    So Mr. Colvin, the person and the attorney who submitted a declaration on your behalf, signed this document as of August 4, 2009, right?

A    Well, well, it says, The undersigned has executed, so yeah, I'm just going to have to say yes.  I'm just not sure -- I don't know, I guess, is my obvious question of when he actually signed it.

Q    Okay.  Well, he was comfortable signing it as of August 4, 2009, is that fair, based on his signature?

A    I mean, you're showing me a document with his signature on

000700

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07    Page 65 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 75 of 174    PageID 6847

Daugherty - Cross                       65

it.  That's all I see in front of me.  I don't know what he was comfortable with.

Q   Okay.  And in Paragraph 1, it says that, The resolutions attached as Exhibit A have been duly authorized by the company, by the company's sole director.  Do you see that?

A   I do.

MR. MORRIS:  Let's look at Exhibit A, please, if we can scroll down.

BY MR. MORRIS:

Q   And this is the consent of the sole director as of May 29, 2009.  Do you see that?

A   Yeah.  (inaudible) as Treasurer?

Q   No, we'll scroll down, sir.  No problem.

MR. MORRIS:  Let's keep scrolling down.  Okay.  All right.

BY MR. MORRIS:

Q   And there's your list of officers, and you don't appear there, right?

A   I don't appear there, no.

Q   And so would you agree that Mr. Colvin, the attorney who signed the declaration on your behalf last night, signed a Secretary's Certificate pursuant to which he attested to the accuracy of the resolution, that as of May 29, 2009 the officers were as listed here and it didn't include -- did not include you?

000701

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 66 of 90

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 85-2    Filed 09/12/25    Page 76 of 174    PageID 6848
Main Document    Page 66 of 90

Daugherty - Cross                    66

A    Okay.  I just want to clarify a couple things.  One, he signed it on Friday.  You know, just so you know, it didn't get created last night.  And will you ask me the rest of that question?

Q    Sure.  I apologize.  I just didn't see it until last night, and that's why I'm referring to last night, because I didn't see it until it was filed.

A    I think we included it in the exhibit list on Friday.

Q    Okay.  I know it was on the list.  In fact, that's where --

A    I pulled it off the Internet from the court site, so they had it.

Q    You're not on this list of officers?

A    I'm not on this list, no.

Q    Okay.  And just a few more questions, sir.

        THE COURT:  I'm going to make sure the record is clear once again.  Are you going to offer into evidence these pages you've described as Exhibit X2, so we --

        MR. MORRIS:  X2 and X1.

        THE COURT:  X2 and X1?

        MR. MORRIS:  Yes.

        THE COURT:  All right.

        MR. MORRIS:  And we will file -- we will file an amended list for the docket, Your Honor.  But again, this just came up a couple of hours before the hearing, because

000702

Daugherty - Cross                    67

personally I didn't see the Colvin declaration until I woke up

this morning.  I asked the question and I got these documents.

So these documents are being tendered in response to that very

specific declaration.

THE COURT:  All right.  It was filed at 6:11 p.m.

last night, in case -- Central Time.

MR. MORRIS:  Right.

THE COURT:  Any objection to X1 and X2?

MR. UEBLER:  And Your Honor, this is Tom Uebler.  For

purposes of this summary proceeding, I'm inclined not to

object to the document.  We've both put a lot of paper before

the Court.  But we would reserve our right to explore these

documents further in discovery on the merits and try to find

out why we didn't see them for the last three years in

Delaware.

THE COURT:  All right.  So X1 and X2 will be admitted

for today's hearing.  And Mr. Morris, you're going to file

them later on the docket.

MR. MORRIS:  Yes, Your Honor.

(Debtors' Exhibits X1 and X2 received into evidence.)

MR. MORRIS:  Yes, Your Honor.  Just a few more

questions.  I know we're almost out of time here.

BY MR. MORRIS:

Q    Mr. Daugherty, just quickly, in the Texas action you were

found liable for breaching your fiduciary duty to Highland;

000703

Daugherty - Cross                          68

isn't that correct?

A    Correct.

Q    And you were ordered to pay Highland's legal fees of approximately $2.8 million; is that right?

A    Correct.

Q    The litigation that you -- excuse me.  Withdrawn.  The claims that you have been pursuing against all of the Highland-related people and entities, you would be the beneficiary of any judgment that you obtained, right?

A    I don't know what you mean by that.

Q    You are the sole plaintiff in all of these cases?

A    On the actions that I brought?

Q    Yes.

A    I believe so, yeah.

Q    Okay.  And so any judgment that's rendered will be rendered in your own personal capacity; isn't that right?

A    Yes.

Q    You didn't bring --

A    Well, I'm the plaintiff, I guess is what I'm saying.

Q    Yeah.  That's fair.

A    So, I mean, yeah, the payments will go to me.

Q    Okay.  You mentioned something about a criminal case being overturned on appeal.

A    I didn't.  My lawyer did.

Q    Okay.  Can you just describe for the Court what the

000704

Daugherty - Cross                    69

original charge was?

A    I don't believe that it's relevant, but there was an injunction put in place that said that -- that prohibited me from retaining Highland's account information.  And over the course of, I don't know, from about 2014 to 2018, Highland brought eight different, you know, variations of show cause violations on that injunction against me.  Eight times I had to defend.  And one of those eight was based on Josh Terry had just been terminated from Highland and I saw him, I think, I saw him in London May of 2016.  He got terminated in June.  I sent him -- I walked up to his house and handwrote him a letter extending my condolences and --

          MR. MORRIS:  Your Honor, I'm going to --

          THE WITNESS:  You asked me a question and I'm trying to answer it.

BY MR. MORRIS:

Q    I apologize.  I apologize.  Let me ask a different question because -- because that wasn't responsive to what I was asking.  Were you found in contempt of court?

A    No.

Q    Okay.  What crime were you charged with?

A    I was charged with contempt of court violating the injunction.  And a three-member panel at the Texas Court of Appeals found unanimously in my favor that there was no evidence that I violated the injunction.

000705

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 70 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25 of 90   Page 80 of 174   PageID 6852

Daugherty - Redirect                    70

Q    But the trial court did in fact not only find that there was evidence, but the trial court is the one who imposed the judgment against you; is that fair?

A    That is correct.  And he was ordered to vacate that ruling.

Q    Okay.

MR. MORRIS:  Your Honor, I have no further questions.

THE COURT:  All right.  Redirect?

MR. UEBLER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. UEBLER:

Q    Mr. Daugherty, the fee award that Mr. Morris referred to in Highland's favor, did you pay that?

A    I did.  I wired approximately $3.1 million to Highland, I want to say, December 13th or 14th, 2016.

Q    2016?

A    Yeah.

Q    What amount have you received form Highland or any of its affiliates as a result of the judgment you obtained?

A    Zero.

Q    With respect to Strand Advisors, when did you last serve as an agent of Strand?

A    January-February 2012, when Highland enlisted me to meet with the Crusader investors, and I guess one called a Stratus (phonetic) investor, to the Stratus -- as I mentioned, there

000706

Daugherty - Redirect                      71

was two categories.  One, my view on value of various Top 40

portfolio investments, and two, to discuss my reasons for

leaving Highland.

Q    When did you last serve as a representative of Strand?

A    In that January-February 2012 time frame.

Q    Were you authorized to sign documents on behalf of Strand

Advisors?

A    Yes.

Q    When did that authority cease?

A    When my employment at Highland terminated in October 2011.

        MR. UEBLER:  Your Honor, I have no further questions.

        THE COURT:  Any recross?

        MR. MORRIS:  Mr. Daugherty?  Yes, Your Honor.

        THE COURT:  Go ahead.

                    RECROSS-EXAMINATION

BY MR. MORRIS:

Q    Mr. Daugherty, did you submit any documentation in support

of your contention that you served not as an officer but as an

agent or a representative of Strand until the time of your

departure in 2011?

A    Yes.

Q    All right.

        MR. MORRIS:  No further questions, Your Honor.

        THE COURT:  All right.  Thank you.

    Mr. Daugherty, we appreciate your testimony.  You're

Daugherty - Redirect                    72

excused.

THE WITNESS:  Thank you, Judge.

THE COURT:  All right.  Mr. Uebler, do you have any other evidence today?

MR. UEBLER:  I don't have any other evidence, Your Honor, just some very brief closing remarks, if that's permitted.  And I see we have four minutes left, so I'll defer to the Court.

THE COURT:  Well, I won't cut you off cold in four minutes.

   Mr. Morris, did the Debtor have any evidence today?

MR. MORRIS:  Yes, Your Honor.  Does Mr. Daugherty rest?

THE COURT:  Yes, they rested.  What I understood, they rest.

MR. UEBLER:  I -- that's correct.  I mean, subject to my comment earlier about submitting the exhibits and the papers as part of our case.

THE COURT:  Well, let's make sure we get all of Mr. Daugherty's evidence in before I shift over to Mr. Morris.  So what else did you want to offer?

MR. UEBLER:  Only the -- the papers we've provided, including Mr. Daugherty's declaration and the exhibits attached to our motion and our reply.

THE COURT:  All right.  So those were filed as

000708

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 73 of 90
Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K      Document 85-2 mentiled 09/12/25 of 90age 83 of 174    PageID 6855

73

separate exhibits at Docket Entry No. 1388.  I think it's all there, correct?

MR. UEBLER:  Correct.

THE COURT:  All right.  So it looks like it's Exhibits 1 through 42 that appear there.

Any objection, Mr. Morris?

MR. MORRIS:  Yes, Your Honor.  I object to the admission into evidence of Exhibits 7 through 10, No. 14, and No. 17 through 38, on grounds that they are irrelevant in light of the fact that the Debtor has conceded for purposes of voting the $9.1 million in claims, and on the separate ground under Rule of Evidence 403 that any probative value of this material is greatly outweighed by the waste of time and the irrelevance of the subject matter.

I will point out just some examples, Your Honor.  And this is why the Debtor really doesn't put this stuff in the record, because it is so irrelevant to these claims.  But he's got things in there, the Court of Appeals decision on his criminal case.  He's got a Crusader presentation.  Actually, I -- we also object to that one, which is Exhibit 5.  We've got, you know, appellate decisions, the escrow correspondence.  We've got a Court of Appeals mandate.  We've got correspondence relating to the escrow at Exhibit 30.  We've got a transcript on an argument on a motion to compel.  We've got motions for the argument.

000709

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 74 of 90

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 09/12/25    Page 84 of 174    PageID 6856

74

If you look at these documents, Your Honor, they really have nothing to do with the claims that are being made here. Certainly, in light of the Defendant -- in light of the Debtor's concessions that we've made, we don't think that the record should include any of the documents that I've identified.

THE COURT:  All right.  Mr. Uebler, it's 2,619 pages in all.  And what do you say to that objection?

MR. UEBLER:  I agree they are prejudicial documents, Your Honor, but that doesn't make them inadmissible.  They're prejudicial documents because they establish Mr. Daugherty's right to fee shifting under the bad-faith exception to the *American* Rule.

This is not, as Mr. Morris said earlier, a case where both sides' hands are dirty.  This is a case where the Delaware court found the crime fraud exception applied.  Based on my research, that was the second time that has happened in Delaware.  That's a big deal.

And the transcripts that we put in, the motions for re-argument, the history we have presented in those 2,000 pages supports Mr. Daugherty's claim.  It's directly relevant to an issue that I think Mr. Morris referred to as frivolous earlier, but I don't want to put words in his mouth.  It's directly relevant, and that relevance by far outweighs any prejudice to Highland, or at least prejudice that wasn't of

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 75 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Filed 09/12/25   Page 85 of 174   PageID 6857

75

its own making.

So it should all be submitted at a minimum for the purpose of considering Mr. Daugherty's request for fees.

THE COURT:  Okay.  I overrule the objection.  I'll admit Exhibits 1 through 42.

(Patrick Daugherty's Exhibits 1 through 42 are received into evidence.)

THE COURT:  All right.  So you rest at this point?

MR. UEBLER:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Morris?

MR. MORRIS:  Yeah, just one clarification there, Your Honor.  Is Mr. Daugherty attempting to offer into evidence Mr. Colvin's declaration?

THE COURT:  I did not hear him offer that.

MR. UEBLER:  I believe that's No. 42, Your Honor, so the answer is yes.  And Mr. Morris had ample opportunity to question Mr. Daugherty about the substance of the declaration.

MR. MORRIS:  Your Honor, it's --

THE COURT:  Oh, okay.  I had misunderstood.

MR. MORRIS:  Okay.

THE COURT:  It is Exhibit 42, even though it was just filed separately on the docket last night.  So did you have an objection, Mr. Morris?

MR. MORRIS:  I do.  It's hearsay, Your Honor.  It's being offered for the truth of the matter asserted by a

000711

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 76 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 86 of 174     PageID 6858
Main Document   Page 76 of 90

76

witness who is not available to be cross-examined.

THE COURT:  Okay.  I sustain --

MR. UEBLER:  Your Honor, --

THE COURT:  I sustain that objection.  42 will not be admitted.  All right.

(Admission of exhibits revised to exclude Patrick Daugherty's Exhibit 42.)

THE COURT:  Mr. Morris, you have evidence?

MR. MORRIS:  Yeah.  So the Debtor offers into evidence Exhibits A through -- Exhibits A through V.  And I guess Exhibits X1 and X2 have already been admitted.

THE COURT:  All right.  Let's be clear there.  Those appear --

MR. KATHMAN:  Your Honor?  Your Honor, this is Jason Kathman.  And I just wanted to -- on Exhibit 42, we talked with Mr. Morris, and maybe I had a misunderstanding, but my understanding is that we were going to present witnesses via declarations in that manner.  And there had been some discussion about -- and giving him the opportunity to cross-examine Mr. Daugherty.  So if I misunderstood the agreement, that's on me, but there was -- we had I believe it was in two phone calls, and I think he's had more (inaudible), about how testimony and witnesses would be presented for this hearing.  And if Mr. Colvin is outside of that, again, maybe I'm misunderstanding, but I at least wanted to raise that issue.

000712

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 77 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 87 of 174   PageID 6859
Main Document   Page 77 of 90

77

MR. MORRIS:  Your Honor, respectfully, I have great respect for Mr. Kathman, but he is misunderstanding.  I would never, ever permit a declaration to come into evidence in a matter like this without the ability to cross-examine.  I can describe for the Court what the offer was, but it was not that.

THE COURT:  Okay.  Well, I regret there was a misunderstanding, but just pulling this up, while it's only a one-and-a-half page declaration, it has 57 pages of attachments, or approximately 57 pages of just all kinds of things that I can presume the Debtor might want to cross-examine Mr. Colvin on.  So I again sustain the objection.  42 will not come in.

All right.  Mr. Morris, your evidence.  Where do Exhibits A through V appear on the docket?  I need to refresh my memory.

MR. MORRIS:  Your Honor, just to let you know what happened last night, because we were working with Mr. Daugherty's counsels on redaction, and I think Mr. Anabel, with your Court's permission, allowed us to email the documents to you, and we had emailed them to Mr. Daugherty because we weren't sure at the late moment as to where we were going to be with the redactions.  We can certainly file everything now.  But Your Honor has those documents.

THE COURT:  Okay.  I do have those.  I knew that

000713

Case 25-03055-bwo  Doc 105-7  Filed 04/15/26  Entered 04/15/26 15:13:54  Desc
Exhibit PD-07  Page 78 of 90
Case 19-34054-sgj11  Doc 1426  Filed 11/18/20  Entered 11/18/20 18:56:37  Desc
Case 3:25-cv-01876-K  Document 35-2  Filed 09/12/25  Page 88 of 174  PageID 6860

78

there were several emails that they were attached to.  I just didn't know if they were separately on the docket.  So, again, let me pull those up.  It's A through V?

MR. MORRIS:  Yes.

THE COURT:  Any objections by Daugherty's counsel?

MR. UEBLER:  Your Honor, as I said, for this summary proceeding, we're not going to object to A through V.  But with the exclusion of Daugherty 42, the Colvin declaration, it seems that X1 and X2 have no relevance anymore and should be excluded.  Mr. Morris stated earlier that those two documents were submitted expressly in response to the Colvin declaration.  With that out, Exhibits X1 and X2 should be out as well.

THE COURT:  Okay.  Your response, Mr. Morris?

MR. MORRIS:  Yeah, very briefly.  Number one, I used them to cross-examine his witness.  I offered them into evidence.  There was no objection.  They've already been admitted into court.  So I think this issue is moot.

But number two, when Mr. Daugherty said that he didn't -- I don't remember exactly what his testimony was, but suffice it to say that he wouldn't agree that he had resigned sometime between March 3rd and -- between March and May of 2009, I certainly could have used them as impeachment documents under any circumstance.

THE COURT:  All right.  I overrule the objection.  X1

000714

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 79 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 85-2   Filed 09/12/25 of 90  Page 89 of 174    PageID 6861

79

and X2 are in.

(Debtors' Exhibits X1 and X2 are again received into evidence.

THE COURT:  Again, I think not only were they admitted without objection earlier, but they do, I guess you would say, contradict some of the testimony of Mr. Daugherty. His position, as I hear it, is he was still an agent, or he was an agent at least of Strand beyond the May 2009 time period.  And these are documents that arguably impeach that testimony.

All right.  So A through V and X1 and X2 are admitted.

(Debtors' Exhibits A through V and X1 and X2 received into evidence.)

THE COURT:  If I could just ask, Mr. Morris, that you all later submit on the docket these exhibits, all of them, so we don't have to go back and print out the email attachments and do it the old-fashioned way.

MR. MORRIS:  Sure.

THE COURT:  All right.  Any other evidence?

MR. MORRIS:  No, Your Honor.  The Debtor rests.

THE COURT:  All right.  I'll hear brief closing arguments.  Mr. Uebler, you first.  (Pause.)  Mr. Uebler, you're on mute, sir.  Mr. Uebler?

CLOSING ARGUMENT ON BEHALF OF CREDITOR PATRICK DAUGHERTY

MR. UEBLER:  Thank you.  Let me try that again.  I

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 80 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 90 of 174   PageID 6862
Main Document   Page 25 of 90

80

want to start by responding to one of Mr. Morris's questions of Mr. Daugherty, which was, Did you submit any papers in this case that would establish that you were either an officer or an agent of Strand through resignation in 2011?  That's Exhibit 2.  It is, in fact, Highland's answer in the Delaware case at Paragraph 66, where Defendants admit that Daugherty served as an officer and agent of Strand from 2004 until he resigned from Highland in 2011.  So I think that should answer Mr. Morris's question.

Let me just conclude by some comments that James Seery recently made in a deposition.  He said, Equally, on the other side, you could say that the man's life was ripped out from him, that his position was taken away, that he got an arbitration award that arguably the Debtor and the Debtors' management at the time stripped away all the assets and pretty patently denuded it to try to leave him with no recovery. Then when he sought a recovery, they sought to sue him in every jurisdiction in the world and basically ruin the guy's life and put him in a position where, while to some it might seem a windfall, to him it might seem just.

Mr. Seery was talking about Josh Terry, not Mr. Daugherty. But Highland's blueprint for ruining a guy's life originated from its treatment of Mr. Daugherty.

We've given you reasons today to permit the full amount of the three remaining disputed issues for voting purposes for

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 81 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 09/12/25   Page 91 of 174   PageID 6863

81

Mr. Daugherty's claim.  Allowing that full amount will protect Mr. Daugherty as a creditor, give him his appropriate say in any plan that's presented, and would hopefully bring these parties at least one step closer to resolution.

Thank you for your time today.

THE COURT:  Thank you, Mr. Uebler.  Mr. Morris?

CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

MR. MORRIS:  Yeah.  Very briefly, I'll just borrow Mr. Uebler's phraseology and say that it would not be just to give to Mr. Daugherty anything on account of a $21 million claim that has already been dismissed and that his testimony just established will be time-barred.  We don't believe that it would be just to give him anything on account of a tax claim that is completely contingent, unliquidated, and where the Debtor admittedly owes absolutely nothing to Mr. Daugherty today.

I can't imagine what it's been like to go through this litigation, just like I couldn't imagine from Mr. Terry's perspective, from Mr. Dondero's perspective.  These people have been at this for a decade.  That's not what -- that's, you know, it's not anything I can get my arms around.  What I'm here to do is to protect the Debtors' estate and its stakeholders, including its general unsecured creditors.

Mr. Daugherty is going to have a very meaningful claim if the Court allows his claim for voting purposes at $9 million.

000717

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 82 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2 meFiled 09/12/25 of 9Page 92 of 174     PageID 6864

82

It's going to be the third biggest claim, at least at this point, of anybody.  So that's just.  It's just that he has a seat at the table.  We're offering him a seat at the table.  But he shouldn't get anything on account of the claims that really have little to no merit.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Well, I thank you for your thoroughness, your professional courtesy that was very visible here today.

As I started out with today, Bankruptcy Rule 3018(a) is what guides us.  That rule is a provision that states, quote, Notwithstanding an objection to a claim, the Court may temporarily allow a claim for voting purposes in such amount the Court deems proper, after notice and a hearing.

There are many cases that have attempted to kind of impose a legal framework for analysis on that rule because, as you've just heard, the rule doesn't give much detail.  The cases all sort of sing the same tune, that the rule contemplates only a summary estimation proceeding, not a full trial on the merits.  The Court has great discretion to employ whatever method is best-suited to the circumstances of the case in determining what amount should be allowed for voting purposes.  The Court should consider things like whether there's a last-minute objection to strategically prevent a creditor from voting who might vote no and the objection might be frivolous, that sort

000718

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 83 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Main Document   Filed 09/12/25   Page 22 of 90   Page 93 of 174   PageID 6865

83

of thing.  And all decisions are reviewed for abuse of discretion, should there be any appeal.

So that is the rule and the case law interpreting the rule.  Based on that, I will note that we start out here with an amended proof of claim filed by Mr. Daugherty in the amount of $40,710,819.42.  And I studied hard before coming out here today the addendum to that proof of claim filed by Mr. Daugherty.  It had a description of the claim that was done in the form of a chart.  I'm holding it up here -- I don't know if it picks up on camera -- what I'm looking at.  But it appears at Docket Entry 1280-2.  It was part of the appendix to the motion to estimate claim.

So the amount is broken down into components.  If you're looking at that chart -- again, which was most helpful -- I note that in the claim of Daugherty for HERA units, there are different line items that total approximately $26 million and some change.  So that's the issue we've talked about a lot today.  Is it correct, is it reasonable to assume that Daugherty might be entitled to a hundred percent of the value or a hundred percent of the HERA units?  So, I found that, based on the evidence and the argument, to be a problematic assumption.  Again, one day we will have a trial on the adversary, a trial on the proof of claim.  I will hear every bit of relevant evidence that the parties choose to put in on that issue.  But for our purposes today, under Rule 3018, I

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 84 of 90

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Filed 09/12/25   Page 94 of 174   PageID 6866

84

just found considerable doubt that that would be an appropriate damage calculation here.

So, again, using my discretion, I found that, at a minimum, you should reduce that $26 million-plus component of the Daugherty proof of claim by the roughly 81 percent, because it was 19.1 percent, I think, that Daugherty would have been entitled to of the HERA units. So that's a roughly $5 million amount, or a $19 million reduction that -- excuse me. I did my math wrong. That's a $21 million reduction that I think would be reasonable for estimation purposes under 3018.

Further looking at the chart that breaks down Daugherty's claim -- we discussed this today in testimony -- there is an attorney fee component that aggregates to $7,854,752.31, and that's the indemnification, it's the interest on indemnification award, it's the fee shifting fees on fee award. And once again, looking at this through the lens of 3018(a), I do not think it's appropriate to assume I'm going to get there, if you will, on this attorneys' fee award. There have been *bona fide* issues, if you will, raised on whether the indemnification provision that was cited would entitle Mr. Daugherty to these fees. Section 4.1(h) of the partnership agreement would be that indemnification provision.

Moreover, the deviation from the *American* Rule, if that indemnification provision does not apply, is a big hurdle to

000720

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07    Page 85 of 90
Case 19-34054-sgj11    Doc 1426    Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K      Document 85-2   Filed 09/12/25   Page 95 of 174    PageID 6867

85

achieve.  It's very deeply rooted in our law that if you don't have a contract provision and you don't have a statute that entitles you to attorneys' fees, it's quite a high hurdle to get there, whether it be Rule 11, the vexatious litigation statute, or some common law argument of bad faith.

So, again, looking through the lens I'm looking through today, I just cannot get there under 3018.

So, doing my math, I'll go backwards.  I've just said that I can't there on $7,854,750.31 of Mr. Daugherty's $40-plus million claim.  I've said I can't get there on $21 million of his $40.7 million proof of claim because of the HERA, the 81 percent interest in the HERA units.  So what else in that chart gives me pause?  The tax refund, the 2008 tax refund component.  We have $1,475,816 plus estimated interest on that of $1.174537 [million].  It's very clear that at this point this is, at best, contingent.  And again, down the road we may get to a point where it's not contingent, the IRS has finished doing what it's going to do, and we may get to a point where we think a result is appropriate.  I don't know.  There may be, even if we get there, a subordination argument.  The point is, there are *bona fide* arguments today that do not allow me to get to the point I feel like I need to get at an estimation hearing to allow this claim, these components of the claim.

So when you subtract $7.854 million and $1.475 million and $1.174 million and $21 million, that's about $32 million that

000721

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 86 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 85-2   Filed 09/12/25   Page 96 of 174   PageID 6868
Main Document   Page 25 of 90

86

I would -- I was thinking about, before I even heard the evidence, deducting out of the claim that I would estimate for voting purposes.

That, I will tell you, is why I came out here at the very beginning today and said, Jeez, the Debtors' suggested voting claim of $9,134,019, which the Debtor came at a different way as far as the math, that sounded darn reasonable to me.

So I am going to allow a voting claim for Mr. Daugherty at $9,134,019.

Now, let me say a couple of more words why I fall back on that number. A, it's pretty close to the direction I was leaning, but B, I want Mr. Daugherty, if he's still on the line, to understand. I hope it doesn't seem like I'm giving Highland every benefit of the doubt here today and reducing your claim by every argument they made and just going at it that way. I do feel like I am obviously giving you some benefits of the doubt here. Primarily, the benefits of the doubt I'm giving you are, number one, the HERA judgment was obviously a HERA judgment. I mean, it was a judgment awarded to Mr. Daugherty against HERA, not Highland per se, right? I didn't misunderstand that. So I am assuming you have got darn good arguments, Mr. Daugherty, to hold Highland liable for that HERA award, plus the pre-judgment and post-judgment interest, up to the bankruptcy petition date of October 16th, 2019.

000722

Case 25-03055-bwo    Doc 105-7    Filed 04/15/26    Entered 04/15/26 15:13:54    Desc
Exhibit PD-07    Page 87 of 90
Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 09/12/25    Page 97 of 174    PageID 6869

87

So I'm giving you the benefit of the doubt there, and on -- well, I do want to make one more point on the attorneys' fees.  Again, that was a huge component of your proof of claim.  And I certainly well understand the bad faith arguments and your many ways you think you will have of getting attorneys' fees at the end of the day.  But I'm sitting here today looking at the fact that the Texas state court actually awarded Highland attorneys' fees against you. Now, I understand, or I think I understand, that was somewhat of a discrete issue with regard to the breach of fiduciary duty arguments in sharing information or taking files or information.  And you might argue, well, that was very discrete, and obviously you paid it.  But all this to say there are lots of a *bona fide* disputes here, I think.  And again, the rule doesn't use that term, *bona fide* disputes, but, again, I have lots of discretion here, and I think, at the end of the day, a roughly $9 million voting claim is very reasonable.

I know the point I ended up making.  I've also given you the benefit of the doubt, Mr. Daugherty, on the roughly $5 million claim I'm giving you for the 19 percent of the HERA assets.  And I understand there were things about the Texas state court judgment that left that a little ambiguous, whether you could get that or whether that would be double-counting.  But again, I just, I want you to know that I

000723

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 88 of 90

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/12/25   Page 225 of 90   Page 98 of 174   PageID 6870

88

haven't weighed every benefit of the doubt in favor of Highland here.  I've weighed a couple of these doubts in your favor.

All right.  So, $9,134,019 is the voting claim of Mr. Daugherty.  Again, this is without prejudice or waiver of any arguments at a later trial on the claim for distribution purposes.

Are there any questions?

MR. DAUGHERTY:  Just, you asked if I was on.  I just wanted to let you know I got back on.  I took my (inaudible).  But I heard every word and I appreciate your comments.

THE COURT:  All right.  Thank you, Mr. Daugherty.

Mr. Morris, would you be the scrivener on this order?  And of course, run it by Mr. Uebler and Kathman.

MR. MORRIS:  Of course, Your Honor.

MR. KATHMAN:  Your Honor?  Your Honor, this is Jason Kathman.  We have just one housekeeping issue.  We had filed, when we filed our motion to -- this 3018 motion at Docket No. 1280, actually, we filed a motion for leave to amend our proof of claim, which is the -- actually, the chart that I think Your Honor was looking at was the chart that we attached to our amended proof of claim.  We filed that with negative notice, and that negative notice actually ran yesterday.  So we'll upload a certificate of no objection.  But just, while we're here on the record, I wanted to ask for the Court to

000724

Case 25-03055-bwo   Doc 105-7   Filed 04/15/26   Entered 04/15/26 15:13:54   Desc
Exhibit PD-07   Page 89 of 90
Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 99 of 174   PageID 6871

89

approve that motion for leave to file an amended proof of claim.

THE COURT:  Okay.  So I neglected to note that detail.  I was of the impression it wasn't contested, and in fact, the objection deadline has run.  So I will accept your order on that.  Okay?

MR. KATHMAN:  Thank you, Your Honor.

THE COURT:  All right.  Thank you all.  We stand adjourned.

MR. MORRIS:  Thank you, Your Honor.

THE CLERK:  All rise.

(Proceedings concluded at 3:59 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                    **11/18/2020**

_____        _____
Kathy Rehling, CETD-444                                    Date
Certified Electronic Court Transcriber

000725

90

INDEX

PROCEEDINGS                                                        3


WITNESSES

Creditor Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. Uebler                               29
- Cross-Examination by Mr. Morris                                44
- Redirect Examination by Mr. Uebler                             70
- Recross-Examination by Mr. Morris                              71

EXHIBITS

Patrick Daugherty's Exhibit 40                      Received 57
Patrick Daugherty's Exhibits 1 through 42           Received 75
Patrick Daugherty's Exhibit 42                      Denied   76

Debtors' Exhibits X1 and X2                         Received 67
Debtors' Exhibits X1 and X2                         Received 78
Debtors' Exhibits A through V, X1, and X2           Received 79

CLOSING ARGUMENTS

By Mr. Uebler                                                    79
By Mr. Morris                                                   81

RULINGS

Daugherty's Motion for Temporary Allowance of Claim for         82
Voting Purposes (1281)

END OF PROCEEDINGS                                              89

INDEX                                                           90

000726