PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Plaintiff/Counter-Defendant*
*Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff/Counter-Defendant, | § § | Adv. Proc. No. 25-03055-bwo |
| v. | § § § | **Highland Capital Management, L.P.'s Post-Trial Proposed** |
| PATRICK HAGAMAN DAUGHERTY, | § § § | **Findings of Fact and Conclusions of Law** |
| Defendant/Counter-Plaintiff. | § | |

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The service address for Highland is 6333 E. Mockingbird Ln., Ste 147 #5045, Dallas, TX, 75214.

4913-8765-7133.15 36027.00008

## TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION AND PROCEDURAL POSTURE ................................................1

II.   STIPULATED FACTS ................................................................................3

III.  FACTS ADDUCED AT TRIAL ....................................................................5

    A.   Daugherty's Employment, Partnership, and 2008 Comp Statement .................5

    B.   Daugherty's 2008 Tax Return and Receipt of Refund ....................................6

    C.   The Highland 2008 Tax Year Audit; Daugherty Resigns from
        Highland; Daugherty Sues for Breach of Employment Agreement ...................7

    D.   Daugherty's Employment Agreement and Failure to Sign Separation
        Agreement...........................................................................................10

    E.   The Claimant Trust, Claim 205, the Settlement Agreement, and the
        Objection to Reserved Claim...................................................................12

    F.   Evidence at Trial Concerning Estimation of the Reserved Claim....................13

    G.   Highland's Performance Under the Books and  Records Provision in
        the Settlement Agreement.......................................................................21

IV.   DETERMINATION OF CONTESTED ISSUES OF FACT AND LAW ........................24

    A.   The Party with the Ultimate Burden of Proof on Each Cause of Action
        and Defining Those Burdens ...................................................................24

    B.   The Compensation Statement Is Not a Binding  and Enforceable
        Contract (Mixed Question of Law and Fact) ..............................................24

    C.   If Highland Had Obligations Under the Compensation Statement, They
        Were Fulfilled .....................................................................................29

    D.   Daugherty's Reserved Claim Should Be Disallowed (Mixed Question
        of Law and Fact)..................................................................................33

    E.   If the Compensation Statement Is an Enforceable Contract, and
        Highland Has Not Fulfilled Its Obligations Thereunder, Daugherty's
        Reserved Claim Can Be Estimated in Accordance with Section 502(c)
        of the Bankruptcy Code (Mixed Question of Law and Fact)...........................33

    F.   Failure to Estimate Daugherty's Reserved Claim Before August 11,
        2026 Would Unduly Delay the Administration of Highland's
        Bankruptcy Case ..................................................................................34

    G.   If Daugherty's Reserved Claim Can Be Estimated, How Much Is the
        Reserved Claim Estimated to Be for Purposes of Allowance? ........................35

H.    Whether Daugherty's Breach of Contract Counterclaim Is Barred by the Statute of Limitations?................................................................37

I.    Highland Fulfilled Its Obligations Under the Books and Records Provision (Mixed Question of Law and Fact) ....................................37

J.    Daugherty Withdrew His Claim for Attorneys' Fees.....................................43

V.    CONCLUSION.....................................................................................................43

4913-8765-7133.15 36027.00008

ii

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S POST-TRIAL
<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Highland Capital Management, L.P. ("<u>Highland</u>" or "<u>HCMLP</u>") submits its *Post-Trial Proposed Findings of Fact and Conclusions of Law* pursuant to the Court's direction provided at the conclusion of the trial (the "<u>Trial</u>") of this adversary proceeding (the "<u>Adversary Proceeding</u>") on April 17, 2026.

## I.   <u>NATURE OF ACTION AND PROCEDURAL POSTURE</u>

1.   This action concerns Daugherty's contingent, unliquidated claim against Highland arising from the audit of Highland's 2008 tax return (the "<u>Reserved Claim</u>") and Highland's claims against Daugherty seeking to disallow and estimate his Reserved Claim.[2]  This action also concerns Daugherty's Counterclaims (defined below).  JPO ¶ 1.[3]

2.   On October 16, 2019, Highland filed its petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above-captioned bankruptcy case (the "<u>Bankruptcy Case</u>" or the "<u>Case</u>"). Thereafter, Daugherty filed several proofs of claim in the Bankruptcy Case. Those claims culminated in Daugherty's claim filed December 23, 2020 appearing as claim no. 205 on the claims register in the Highland Bankruptcy Case ("<u>Claim 205</u>"), which superseded and replaced all Daugherty's prior claims. JPO ¶ 2.

3.   In November 2021, Daugherty and Highland entered into that certain *Settlement Agreement* (the "<u>Settlement Agreement</u>"), which resolved all aspects of Daugherty's claims against Highland's estate except for the Reserved Claim. On March 8, 2022, the Court entered an order approving the Settlement Agreement [Bankr. Docket No. 3299] (the "<u>Settlement Order</u>").

---

[2] Highland has withdrawn its claim for subordination under 11 U.S.C. § 510(b).

[3] "<u>JPO</u>" refers to the Joint Pretrial Order entered on April 13, 2026 at Docket No. 101.

The Settlement Agreement provided, among other things, that Highland would transfer to Daugherty its "interests in HERA and ERA,"[4] and that such transfer will include "the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system . . . [and] be without representation or warranty of any type … and  without any liability or material cost to HCMLP or its affiliates ...." Highland Ex. 5 ¶ 8 (the "Books and Records Provision"). The Settlement Agreement further provided that Highland expressly "reserve[d] the right to assert any and all defenses" to the Reserved Claim. *Id*. ¶ 9; JPO ¶ 3.

4.      On May 2, 2025, Highland commenced the Adversary Proceeding by filing its *Complaint for (1) Disallowance of Claim No. 205 in Its Entirety, (2) Estimation of Claim No. 205 for Allowance Purposes, or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty* [Docket No. 1] (the "Complaint"). In its Complaint, Highland asserted three claims: (a) disallowance of the Reserved Claim, (b) estimation of the Reserved Claim pursuant to 11 U.S.C. 502(c), and (c) subordination of the Reserved Claim under 11 U.S.C. § 510(b), (excluding the claim for subordination which has been withdrawn with prejudice, "Highland's Claims").  JPO ¶ 4.

5.      On June 5, 2025, Daugherty filed a motion to dismiss the Complaint [Docket No. 5] (the "Motion to Dismiss"). On July 18, 2025, Highland filed *Highland Capital Management, L.P.'s (A) Objection to Patrick Daugherty's Motion to Dismiss and (B) Cross Motion for Relief from a Final Order Pursuant to Bankruptcy Rule 9024* [Docket No. 10] (the "Cross Motion"). At the hearing on Daugherty's Motion to Dismiss and Highland's Cross Motion, the Court denied the Motion to Dismiss and granted the Cross Motion. The Court's ruling struck a particular

---

[4] "HERA" refers to "Highland Employee Retention Assets LLC" and "ERA" refers to "Highland ERA Management, LLC."

provision of the Settlement Agreement that Daugherty contends prohibited Highland from filing this Adversary Proceeding.[5]  JPO ¶ 5.

6.      On October 3, 2025, Daugherty filed his *Answer* and *Original Counterclaim* [Docket No. 39] asserting three causes of action against Highland for (a) breach of contract for breach of the Books and Records Provision; (b) specific performance through which Daugherty seeks an order requiring Highland to turn over all of the HERA and ERA books and records in compliance with the Books and Records Provision; and (c) attorneys' fees arising from Highland's alleged bad faith conduct in commencing the Adversary Proceeding (collectively, the "Counterclaims"). On October 24, 2025, Highland filed its answer to the Counterclaims (which included its affirmative defenses) [Docket No. 56].  JPO ¶ 6.

7.      The Court conducted the Trial on Highland's Claims and Daugherty's Counterclaims on April 17, 2026 in which it admitted certain documents into evidence (subject to certain limitations stated on the record) [Docket No. 132] and heard testimony from James P. Seery, Jr. (Highland's Chief Executive Officer), David Klos (Highland's Chief Financial Officer), Patrick Daugherty (the Claimant and defendant in this Adversary Proceeding), and Trevor Jason Liles-Tims (an individual who proffered expert testimony on Daugherty's behalf).

## II.      STIPULATED FACTS

8.      From 1998-2011, Daugherty was employed by Highland. JPO ¶ 8.

9.      Daugherty and Highland entered into that certain Amended Employment Agreement dated as of December 31, 2004 (the "Employment Agreement").  Highland Ex. 11; JPO ¶ 9.

---

[5]  Daugherty appealed to the District Court from this Court's order granting the Cross Motion. That appeal is still pending. In the JPO, Daugherty agreed that he would not relitigate those issues during the April 17 Trial.  *See* JPO at 3 n.5.

10.     On or about February 27, 2009, Highland issued to Daugherty a Comprehensive Compensation and Benefits Statement (the "Comprehensive Statement").  Highland Ex. 13; Daugherty 14; JPO ¶ 10.

11.     In 2009, based on a draft Schedule K-1 that Highland provided to him, Daugherty filed his 2008 federal income tax return.  JPO ¶ 11.

12.     In 2009, Daugherty received refunds from the IRS of previously paid taxes in the amounts of $493,629 and $780,301 related to his 2008 Individual Income Tax Return (Form 1040) and his 2008 Application for Tentative Refund (Form 1045), respectively.  These forms incorporated Highland's losses that had been allocated to him as provided for in the draft Schedule K-1.  JPO ¶ 12.

13.     On March 3, 2010, the IRS notified Highland that it was initiating an audit of Highland's 2008 federal income tax returns.  JPO ¶ 13.

14.     On September 28, 2011, Daugherty gave voluntarily notice of resignation from all positions at Highland.  Highland Ex. 12; JPO ¶ 14.  His last day as an employee at Highland was October 31, 2011.  JPO ¶ 14.

15.     On October 16, 2019, Highland filed its petition for relief under chapter 11 of the Bankruptcy Code.  JPO ¶ 15.

16.     On February 22, 2021, the Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") with respect to the Plan.[6]  JPO ¶ 16.

---

[6] The "Plan" refers to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on the main docket at Docket No. 1808. The Confirmation Order was subsequently modified for reasons irrelevant to the Motion.  *See* Bankr. Docket No. 4378.

17.     The Plan included a form of *Claimant Trust Agreement* (the "CTA").  Bankr. Docket No. 1811, Exhibit R (preamble); JPO ¶ 17.

18.     The Plan created the CTA when the Plan went effective on August 11, 2021. Bankr. Docket No. 2700; JPO ¶ 18.

19.     On November 22, 2021, Daugherty and Highland executed the Settlement Agreement.   Highland Ex. 5; JPO ¶ 19.

20.     On March 8, 2022, the Court entered the Settlement Order approving the Settlement Agreement.  JPO ¶ 20.

21.     On May 5, 2022, and October 19, 2022, Highland delivered certain documents and materials to Daugherty as reflected in Daugherty Exhibits 33 and 34, respectively.  JPO ¶ 21.

22.     The Reserved Claim remains disputed, contingent, and unliquidated.  JPO ¶ 22.

### III.     FACTS ADDUCED AT TRIAL

23.     The following facts were established by the testimony and documentary evidence admitted at the Trial of this matter.

### A.     Daugherty's Employment, Partnership, and 2008 Comp Statement

24.     Daugherty was an employee and limited partner of Highland from 1998 until his resignation, noticed by letter dated September 28, 2011. Highland Ex 12; Daugherty Ex. 15; Trial Tr. at 247:11-16.

25.     The unsigned Comprehensive Statement summarizes the compensation and benefits that Daugherty received for his work at Highland in 2008 and includes a statement of his prospective base salary effective March 1, 2009. Highland Ex. 13; Daugherty Ex. 14.

26.     In the "Earnings and Awards" section, the Comprehensive Statement includes the following: "2008 Tax Refund $1,475,816 Refund is an estimated amount. If actual refund deviates

materially from estimate, other compensation will be fairly adjusted. Refund is expected to be received in approximately 4 months." Highland Exhibit 13; Daugherty Ex. 14.

27.     Daugherty testified that the 2008 Tax Refund was provided by Highland in place of a cash bonus, as Highland did not have the funds to pay cash bonuses directly as a result of its strained financial circumstances arising from the 2008 financial crisis.  Trial Tr. at 294:24-295:20.

**B.     Daugherty's 2008 Tax Return and Receipt of Refund**

28.     In April 2009, based on a draft Schedule K-1 that Highland provided to him (the "Draft K-1"), Daugherty filed his 2008 federal income tax return with the IRS. JPO § 11; Daugherty Ex. 26.

29.     The Draft K-1 identified Daugherty's "partner's share of loss" as 0.746998% as of December 31, 2008.  *Id.*

30.     Using the Draft K-1, Daugherty filed his 2008 form 1040 U.S. Individual Tax Return with the IRS attesting "under penalties of perjury I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct and complete" (the "2008 1040").  Highland Ex. 35; Daugherty Ex. 23.

31.     Based on line 73a of the 2008 1040, Daugherty requested an IRS refund in the amount of $493,629 of 2008 tax previously paid.  Highland Ex. 35 (line 73a); Daugherty Ex. 23 (line 73a).

32.     In addition to the 2008 1040, Daugherty also filed a 2008 IRS Form 1045 Application for Tentative Refund (the "2008 1045") to recover taxes previously paid related to the 2006 tax year.  The 2008 1045 was also delivered to the IRS by Daugherty with the attestation: "under penalty of perjury, I declare that I have examined this application and the accompanying schedules and statements and to the best of my knowledge and belief, they are true accurate, and complete."  Highland Ex. 36; Daugherty Ex. 22.

33.     Based on line 27 of the 2008 1045, Daugherty requested an IRS refund in the amount of $780,301 from the IRS for 2006 tax previously paid.  Highland Ex. 36 (line 27); Daugherty Ex. 22 (line 27).

34.     In sum, in 2009, as a result of the 2008 1040 and the 2008 1045 filings, Daugherty actually received refunds from the IRS of previously paid taxes in the amounts of $493,629 and $780,301 for a total refund of $1,273,930 (the "Refund Received") based on Daugherty's allocable partner's share of losses as identified in the Draft K-1.  JPO ¶ 12.

35.     Later in 2009, Highland issued its final 2008 Schedule K-1 to Daugherty identifying Daugherty's "partner's share of loss" as 0.740262% as of December 31, 2008 (the "Final K-1"). Highland Ex. 14; Daugherty Ex. 24.

36.     The Final K-1 with Daugherty's 0.740262% partner's share of loss was delivered to the IRS, set Daugherty's partner's share of loss as 0.00674% less than the Draft K-1, and was later used by the IRS, rounded to 0.74030000%, in its calculation of Daugherty's percentage of Highland portfolio income in connection with the 2008 Tax Year Audit (below).  Highland Ex. 17; Daugherty Ex. 28.

**C.     The Highland 2008 Tax Year Audit; Daugherty Resigns
from Highland; Daugherty Sues for Breach of Employment Agreement**

37.     On March 3, 2010, the IRS notified Highland that it was initiating an audit of Highland's 2008 federal income tax return (the "2008 Tax Year Audit").  JPO ¶ 13.

38.     On September 28, 2011, Daugherty gave voluntary notice of resignation from all positions at Highland with his last day as an employee being October 31, 2011 (the "Resignation Date").  JPO ¶ 14.

39.     On May 22, 2012, Daugherty filed his original answer, counterclaim, and third-party petition (the "Texas Action") against a number of counter-defendants, including Highland,

in the 68th Judicial District Court of Dallas County.   Among the causes of action Daugherty asserted was a claim for breach of the Employment Agreement.  Highland Ex. 45.

40.    On February 6, 2014, a jury returned a verdict in the Texas Action, which found, among other things, that Highland had complied with the Employment Agreement. Highland Ex. 44 (Jury Questions and Answers: "Q: Did Highland fail to comply with the Employment Agreement?  A: No.").

41.    On December 8, 2017, the IRS examiner completed the IRS audit of the 2008 Tax Year Audit and executed IRS Form 4605-A with the Examination Changes to the Highland 2008 tax return ("Form 4605-A").  Highland Ex. 15; Daugherty Ex. 27.

42.    Pursuant to Form 4605-A, the IRS proposed to increase Highland's reported 2008 short-term portfolio income by $166,332,713 (the "2008 Adjustment").  *Id.*  The IRS proposed no adjustments to Highland's reported ordinary loss of $546,177,906.  *Id.*

43.    After Highland's previously reported 2008 portfolio income of $3,570,236 was upwardly adjusted by the 2008 Adjustment, the corrected short-term portfolio income for Highland for 2008 was determined by the IRS to be $169,902,949 ("Total 2008 Partnership Income").  *Id.*

44.    By letter dated February 3, 2018, Brian Collins of Highland advised Daugherty in writing that the IRS (a) had concluded its 2008 Tax Year Audit, (b) proposed adjustments to the Highland 2008 tax return, and (c) would hold a closing conference on March 2, 2018 ("Collins 1").  Highland Ex 16; Daugherty Ex. 16.

45.    Collins 1 also attached (a) IRS Form 886-Z (redacted) ("Form 886-Z") and (b) IRS Form 870-PT ("Form 870-PT").  Highland Exs. 17, 18; Daugherty Exs. 28, 29.

4913-8765-7133.15 36027.00008                                   8

46. The Form 886-Z entitled "TEFRA Partners' Share of Income" lists all of the 2008 Highland partners by name and address, their respective TIN (taxpayer identification number), and "Percentage of Profit, and Portfolio income (loss) net short-term gain (loss)."[7] Highland Ex. 17; Daugherty Ex. 28.

47. The Form 886-Z lists Daugherty with his address and TIN, his percentage of profit at 0.74030000% (same as the Final K-1, only rounded to four decimal places), and his total adjusted portfolio income as $1,257,792. Highland Ex. 17; Daugherty Ex. 28; Trial Tr. at 50:14-22 (Klos); 253:19-254:1 (Daugherty).

48. The Form 886-Z total adjusted portfolio income for Daugherty was calculated by multiplying Daugherty's 0.74030000% share of the partnership interest by Highland's Total 2008 Partnership Income shown on page 2 of the Form 886-Z. Highland Ex. 17; Daugherty Ex. 28.

49. Collins 1 also provided Daugherty with a copy of IRS Form 870-PT specifically made out for Daugherty's assent. Highland Exs. 16, 18; Daugherty Exs. 16, 29.

50. The Form 870-PT is an offer of agreement from the IRS to Daugherty pursuant to which the IRS and Daugherty would agree on the IRS's proposed adjustments to the Highland 2008 return resulting from the 2008 Tax Year Audit. *Id*.

51. Annexed to the Form 870-PT is the IRS's "Schedule of Adjustments" which proposes that Daugherty agree to the 2008 Adjustment and the 2008 Total Partnership Income. Highland Ex. 18.

---

[7] Highland's and Daugherty's Exhibits are redacted to exclude all of the partners' information, except for Daugherty's and the total.

52.   No evidence was offered that Daugherty accepted the 2008 IRS proposal reflected in the Form 870-PT, and based on the existence of the pending dispute, the Court infers that Daugherty effectively rejected the IRS's proposal.

53.   By email dated July 3, 2018 ("Collins 2"), Collins advised Daugherty that: (a) Daugherty may have received a 60-Day Letter from the IRS, (b) Highland's tax matters partner would appeal the 2008 Adjustment to the IRS Appeals Office, and (c) Daugherty would have the opportunity to accept any settlement by the tax matters partner as to his pro rata share or individually dispute the adjustment in judicial proceedings.  Highland Ex. 19; Daugherty Ex. 31.

54.   By email dated December 9, 2019, Collins advised Daugherty that "by letter dated December 8, 2017, Exam [*i.e.*, the IRS field examiners] indicated that they had concluded their audit," made proposed adjustments, issued an audit report, and held a closing conference ("Collins 3").  Highland Ex. 20; Daugherty Ex. 32.

55.   Collins 3 also advised Daugherty that Highland had formally disagreed with the IRS's proposed adjustments and that the 2008 Tax Year Audit had been transferred to the IRS Office of Appeals.  *Id.*

56.   The appeal of the IRS's final adjustments from the 2008 Tax Year Audit continues, and there is no known date when the appeal is expected to be completed. Trial Tr. at 61:10-23 (Klos), 173:18-174:1 (Liles-Tims)

**D.     Daugherty's Employment Agreement and Failure to Sign Separation Agreement**

57.   Daugherty and Highland entered into the Employment Agreement. JPO ¶ 9. Highland Ex. 11.[8]

---

[8] While Daugherty testified that he did not have a copy of his Employment Agreement (Trial Tr. at 248:22-24), the parties stipulated that Daugherty and Highland entered into the Employment Agreement dated as of December 31, 2004, and a copy of the Employment Agreement was admitted into evidence without objection. *See* JPO ¶ 9 ; Highland Ex. 11.

58.     The Employment Agreement was in effect through the Resignation Date, and Daugherty has not been employed at Highland since the Resignation Date.  Trial Tr. at 248:5-16.

59.     Daugherty claims that the 2008 Tax Refund he received and any "guarantee" thereof was part of his discretionary "non-cash" bonus for 2008.  Claim 205, Addendum to Proof of Claim filed by Patrick H. Daugherty ("Addendum") ¶ 3(ii)); *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [Bankr. Docket No. 1280], Ex. B, Addendum ¶ 3(ii); *see also Patrick Daugherty's Trial Brief* [Docket No. 102] (the "Daugherty Trial Brief") ¶ 10 ("Highland's intent to guarantee Daugherty's compensation is plain.").

60.     Section 3.1 of the Employment Agreement requires that Daugherty must be employed in order to be eligible for a bonus: "[Daugherty] must be employed on the payment date(s) in order to be eligible for the bonus."  Highland Ex. 11 § 3.1.

61.     Section 4.5 of the Employment Agreement mandates that if, at the future time his employment terminates, Daugherty does not sign the separation and release form attached as Exhibit A to the Employment Agreement, "[Daugherty] shall not be entitled to any severance, and [Highland] will have no further liability or obligation to [Daugherty] under [the Employment Agreement] or in connection with [Daugherty's] employment or termination."  Highland Ex. 11 § 4.5.

62.     Daugherty and Highland later attempted to negotiate a different set of separation and release documents that would have provided Daugherty with, among other things, a tax indemnity related to the 2008 Tax Audit.  Trial Tr. at 207:9-209:5; Highland Exs. 38, 40, 41.  The parties did not reach agreement, and Daugherty never signed and returned to Highland an executed Exhibit A to the Employment Agreement or any other separation agreement and release.  Trial Tr. at 206:2-207:3.

E.     **The Claimant Trust, Claim 205, the Settlement Agreement, and the Objection to Reserved Claim**

63.     The Plan and the CTA created the Claimant Trust when the Plan went effective on August 11, 2021 (the "Effective Date"). Bankr. Docket No. 2700; JPO ¶ 18.

64.     Section 9.1 of the CTA requires that the Claimant Trust be dissolved no later than three years from the Effective Date, subject to a maximum additional two years of extensions as approved by the Bankruptcy Court on motion.  CTA § 9.1 [Bankr. Docket No. 1811].  The Bankruptcy Court granted two one-year extensions of the life of the Claimant Trust with the final date of dissolution set at August 11, 2026.  *See* Highland's *Motion for An Order Further Extending Duration of Trusts* [Bankr. Docket No. 4213] (the "Extension Motion") and *Order Extending the Duration of the Trusts* [Bankr. Docket No. 4298] entered June 30, 2025.

65.     Daugherty filed Claim 205 on December 23, 2020, which included the Addendum. Highland Claims Register Claim 205; Bankr. Docket No. 1280, Ex. B; Trial Tr. 179:4-16; 258:19-259:3.

66.     Claim 205 is an unsecured claim against Highland; Daugherty admitted that no part of the claim is secured.  Claim 205, part 2 § 9.

67.     As set out in the Addendum to Claim 205, Daugherty claimed damages for "2008 Compensation" which was comprised of two components: "Compensation Award $1,475,816.00" and "Estimated Interest on Compensation Award $1,174,537.00."  Claim 205, Addendum ¶ 3.  Accordingly, the Reserved Claim is capped at $2,650,353.00.  Claim 205, Addendum ¶ 3; Trial Tr. 203:17-25.  *See also Patrick Daugherty's Reply in Support of Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Bankruptcy Rule 3018* [Bankr. Docket No. 1411] ¶¶ 40-42 ("Daugherty provided an amount in his claim covering the maximum amount of his contingent liability for which Highland is responsible only to preserve

4913-8765-7133.15 36027.00008                          12

the claim…. The full amount of the potential contingent liability, $2,650,353, should be included in Daugherty's claim for voting purposes.").

68.     In respect of the Reserved Claim, Daugherty asserted that: "[Highland] did not have sufficient cash available to pay bonuses on the February 29, 2009 payments date.  Instead, it opted to award non-cash bonuses …[and] provided Daugherty with [the Comprehensive Statement]."  Claim 205, Addendum ¶ 3(ii).

69.     On November 22, 2021, Daugherty and Highland executed the Settlement Agreement settling and releasing all claims Daugherty had against Highland and its related parties except the Reserved Claim.  Highland Ex. 5 ¶ 9; Daugherty Ex. 3 ¶ 9.  The Settlement Agreement was approved by the Court on March 8, 2022.  Bankr. Docket No. 3298.

70.     The Reserved Claim is fully reserved in an account held by the Claimant Trust with a balance equal to the $2,650,353.00 amount of the Reserved Claim.  Daugherty Ex. 94 ¶ 1; Trial Tr. at 203:13-204:2. It is the only unresolved claim left in the Highland estate.  Trial Tr. at 241:25-242:3.

## F.     Evidence at Trial Concerning Estimation of the Reserved Claim

71.     Two witnesses testified at trial concerning the estimation of the Reserved Claim, David Klos, Highland's CFO ("Klos"), and Trevor Jason Liles-Tims ("Liles-Tims"), an expert retained by Daugherty.

72.     Klos offered lay testimony in which he described an objective methodology to estimate the Reserved Claim.[9]  Klos' calculation was a straightforward arithmetic formula based

---

[9] Klos is a CPA in Texas with undergraduate degrees in accounting and finance and both a Masters of Science in accounting and a Masters of Business Administration from SMU.  Trial Tr. at 45:1-14.  While Klos is clearly experienced in tax matters, he was not offered as an expert witness (Trial Tr. at 45:15-23); the Court finds that Klos' testimony did not require unique expertise because it focused on applying objective, factual information to the agreed-upon methodology.  While a basic understanding of certain statutes was required, Klos' testimony was fundamentally

on a number of identified inputs.  The first of those inputs was the magnitude of the adjustment

to Highland's total 2008 short-term portfolio income, for which Klos set forth five possible

outcomes.  The lowest of the outcomes reflected a complete reversal of the IRS's proposed

adjustments resulting from the 2008 Tax Year Audit.  The other outcomes reflected specific

positions taken by the IRS and Highland's tax matters partner with respect to the IRS's proposed

adjustments resulting from the 2008 Tax Year Audit.

73.      Notably, Liles-Tims adopted the exact same methodology Klos employed. Trial

Tr. at 122:4-14; Highland Ex. 59 ¶ 44 (describing the methodology).  Yet, Liles-Tims testified

that the value of the Reserved Claim could not be estimated because there were supposedly "too

many variables," "too much uncertainty," and such an analysis required "too much speculation."

Trial Tr. at 90:7-91:13. Highland Ex. 59 ¶¶ 33, 43, 48-49.

74.      The Court rejects Liles-Tims' testimony that the Reserved Claim cannot be

estimated for purposes of Section 502 for several reasons.  First, the evidence established that the

parties *agree* on a methodology that could be used to estimate the Reserved Claim.  Second, with

the sole exception of the adjustment to Highland's total 2008 short-term portfolio income, the

divergence between Klos and Liles-Tims concerning the remaining inputs to the arithmetic

formula were insignificant.  Third, Klos' inputs were all reasonably supported by documentary

evidence.  Fourth, contrary to his expert, Daugherty *did* estimate the value of the Reserved

Claim—a valuation that the parties used to establish the claim reserve.[10]  And finally, since the

---

arithmetical and supported by specific statutes that both Klos and Liles-Tims agree apply and which can be found at
Highland Exs. 29-34.

[10] Liles-Tims admitted that he never reviewed Daugherty's Claim 205 and never asked Daugherty if he had a view as
to what his maximum liability might be.  Trial Tr. at 113:11-21.  The "Compensation Award" amount set forth on
Daugherty's Claim 205 had simply listed the amount found on the Compensation Statement.  The "Estimated Interest
on Compensation Award" amount set forth in Daugherty's Claim 205 was not accompanied by details as to how it
had been calculated or what inputs were used to calculate it.  Claim 205, Addendum ¶ 2 and ¶ 3(ii).  During his

Court finds and determines that the administration of Highland's Bankruptcy Case would be unduly delayed if the Reserved Claim were not estimated and fixed at this time, acceptance of Liles-Tims' opinion would necessarily result in the disallowance of Daugherty's Reserved Claim.[11]

75.     While Liles-Tims insisted that the Reserved Claim could not be estimated and acknowledged that he hadn't specifically analyzed the applicable statutes or calculated interest using the applicable interest rates (one of the inputs to the formula), he nevertheless offered his views on each of the individual inputs of the agreed-upon methodology.

1.     IRS Income Adjustment to HCMLP

76.     Klos' testimony on estimation was aided by a demonstrative exhibit (Highland Ex. 65; *see* Trial Tr. at 49:11-21) that set out, in tabular format, the inputs and arithmetical calculations for estimating five potential outcomes of the 2008 Tax Year Audit.[12] The only input

---

deposition, Mr. Daugherty indicated that he thought he had "googled" penalty rates and interest rates, but he couldn't recall what those rates were.  Highland Ex. 57 at 237:22-240:14.

[11] While not determinative, the Court also has considerable concerns regarding Liles-Tims' expertise and credibility. Liles-Tims appears to be an expert in business valuations, fraud examinations, and quantifying commercial damages (Trial Tr. 88:1-3), not IRS audits.  Moreover, while Liles-Tims' history of teaching seminars and providing expert testimony on those subject matters is impressive, nothing in their lengthy descriptions evinces knowledge or expertise in the area of federal income tax audits or even tax issues generally.  *See* Highland Ex. 59 (Appendix (Liles-Tims' CV at 2-7)).  Further, Liles-Tims is not a CPA, has never played more than a supporting role in an IRS audit, has never testified in tax court, is not an expert in bankruptcy law, and has no opinions concerning Bankruptcy Code Section 502, the statute at issue.  Trial Tr. at 88:5-89:13. Most concerning to the Court is Liles-Tims' opinion that he would be unable to estimate Daugherty's Reserved Claim even if Highland's tax matters partner reached an agreement with the IRS or there was a final judicial determination concerning the 2008 Tax Year Audit.  *Id*. at 91:14-92:15.  That is an extreme position that is hard to understand.

[12] The Court rejects Daugherty's counsel's suggestion that Highland unfairly presented its evidence concerning the estimate of the Reserve Claim for several reasons.  First, Daugherty never moved to compel the production of such evidence thereby indicating such evidence was not responsive to Daugherty's discovery requests.  Second, under the scheduling order in this Adversary Proceeding (Docket No. 37), Daugherty had the right to depose Klos (a fairly obvious witness given his role at Highland and the subject matter of this proceeding) during discovery but apparently chose not to do so.  Third, Klos was identified on Highland's Witness & Exhibit list filed more than two weeks before the hearing (Docket No. 97), yet Daugherty apparently made no effort to depose Klos even then.  Finally, with respect to Highland Ex. 65, the Court notes that (a) it set forth the same methodology that Daugherty's expert recited, (b) Daugherty's expert admitted that he analyzed the two-page demonstrative exhibit for 10 hours (Trial Tr. at 164:22-165:1), and (c) Daugherty's expert was able to offer his views as to the appropriateness of the inputs Klos utilized. If

that changed among the outcomes was the amount of the "IRS income adjustment to HCMLP."[13]

Klos identified the following potential outcomes based on available data:

- (I) complete reversal of the 2008 Adjustment (*i.e.*, no further tax liability to HCMLP or its former limited partners such as Daugherty);

- (II) the value of the tax matters partner's recent settlement counter-offer to the IRS ($8 million in settlement);[14]

- (III) the mid-point amount between a complete reversal (*see* I above) and the full 2008 Adjustment (*see* V below) ($83,166,357 of IRS income adjustment to HCMLP);

- (IV) the IRS's recent settlement offer ($129,528,078 of IRS income adjustment to HCMLP), and

- (V) the full IRS proposed 2008 Adjustment from the 2008 Tax Year Audit ($166,332,713 of IRS income adjustment to HCMLP).

Highland Ex. 65; Trial Tr. at 50:4-13; 58:4-59:21.

### 2.    Daugherty's Percentage Interest in the Highland Limited Partnership

77.    The next input in the methodology is Daugherty's interest in the Highland limited partnership.  Relying on the Final K-1 (Highland Ex. 14) and the IRS Form 886-Z (Highland Ex. 17), Klos used 0.7403% as Daugherty's allocable share of Highland's limited partnership interests as of December 31, 2008.  Highland Ex. 65; Trial Tr. at 50:14-51:6.

78.    While acknowledging that Klos relied on the percentage interest that Daugherty used to obtain his tax refund (Trial Tr. at 116:3-20), Liles-Tims nevertheless suggested that the

---

Daugherty believed Highland unfairly presented its evidence concerning the estimation of the Reserved Claim, it could have and should have sought an adjournment or other relief.

[13] The variance in penalty percentage rates simply reflected that certain of the settlement offers had included waiver of the penalty, so were 0% and not applicable in those instances.

[14] *See* Highland Ex. 22.  The tax matters partner's offer was for a single payment of $8 million to resolve all liability for all former limited partners.  Calculation of Daugherty's share would be $8 million times his partnership share of 0.7403%.  While it is unclear from the offer whether liability for such a payment would or could be allocated amongst the partners, including Daugherty, Highland's estimate under this scenario assumed that Daugherty would pay his ratable 0.7403% share.  Trial Tr. at 84:3-21.

percentage interest somehow remained uncertain.  Upon cross-examination, however, Liles-Tims

was forced to admit that based on the information he reviewed, there was only one other possible

alternative to the partnership percentage used in the Final K-1 and Form 886-Z: 0.783%, a

percentage taken from a prior Highland limited partnership agreement that was not used by

Daugherty in his 2008 1040 or 2008 1045 or by the IRS.  Trial Tr. at 157:18-162:4; Highland Ex.

10 at Ex. A.

79.     Based on IRS Forms 886-Z (Highland Ex. 17) and 870-PT (Highland Ex. 18), it is

clear that the IRS applied 0.7403% as Daugherty's percentage interest in the partnership both for

purposes of allocating his share of the proposed HCMLP 2008 Adjustment and for purposes of

providing Daugherty with an opportunity to settle the audit dispute as it pertains to his partnership

interest. The Court finds as a matter of fact that adopting the percentage used in the Final K-1

given to Daugherty and reported to the IRS in 2009 and used in IRS Form 886-Z (*i.e.*, 0.7403%)

in 2018 is appropriate to use for claim estimation purposes.

3.     <u>2008 Applicable Tax Rate</u>

80.     After multiplying the adjustment by Daugherty's percentage partnership interest

in Highland (Trial Tr. at 51:13-17; 116:21-117:3), the next step in the agreed-upon methodology

is to multiply that product by the personal income tax rate in effect in 2008.  Highland Ex. 65.

81.     Klos testified that the highest federal income tax rate for individuals in 2008 was

35%, and he used that rate to be conservative.  Trial Tr. at 51:18-52:3, 84:5-17.  Liles-Tims agreed

that 35% was the highest federal income tax bracket in 2008.  *Id*. at 117:4-23; 162:17-163:15;

173:2-17.

82.   Based on the foregoing, the Court finds as a matter of fact that, while a lower rate may ultimately be applicable in Daugherty's particular circumstances, applying a 35% federal income tax rate is appropriate for claims estimation purposes.

### 4.   Statutory Penalty

83.   After quantifying the tax underpayment for Daugherty under the five scenarios, the next step in the agreed-upon methodology is to determine the applicable penalty to be included in the estimated claim, if any.[15]

84.   According to Klos, under the applicable IRS statute and the IRS's proposed adjustments from the audit, Daugherty would face a one-time 20% penalty. Trial Tr. at 52:18-53:2; Highland Ex. 65 (Statutory Penalties).  But Klos testified that no penalty would be imposed under scenarios I, II, or IV because (a) there would be no penalty if the audit was reversed (scenario I), and (b) the tax matters partner's and the IRS's settlement offers did not include a penalty component.  Klos applied the 20% penalty to scenario V and a 10% penalty (the simple mid-point of 0% and the 20% statutory penalty) to scenario III.  *See* Trial Tr. at 53:3-22, 55:19-23.

85.   Liles-Tims (a) acknowledged that Klos relied on the right statute to determine any applicable penalty; (b) testified that the penalty could be either 20% or 30%; (c) suggested that the 30% penalty rate applies to corporations, not limited partnerships such as Highland; (d) suggested that the 30% penalty rate applies to "reported transactions", which the proposed adjustments by the IRS are not; (e) admitted that he had no opinion as to which penalty rate to

---

[15] This input is only relevant if the Court finds that an estimation of Daugherty's allowed claim requires the inclusion of penalties.  If the Court finds that (a) Highland was not responsible for penalties under the Compensation Statement or (b) even if it was, (i) Daugherty assumed the risk that penalties might be imposed when he elected to reject the IRS's settlement offer in early 2018, or (ii) such penalties are completely mitigated by the investment return Daugherty should have been able to reasonably achieve on the 2008 Refund, then penalties are irrelevant and should be ignored for purposes of estimating the claim.

use; and (f) otherwise deferred to the Court on this issue.  Trial Tr. at 122:15-123:24; 126:19-127:6; 128:9-10; 163:19-164:9; 169:16-23.

86.     Based on the foregoing, including that Highland was not a corporation in 2008, the Court finds as a matter of fact that using a 20% penalty rate is appropriate for claim estimation purposes (except that if the Court ultimately estimates the claim based on the IRS settlement offer or the tax matters partner's settlement offer, then a 0% penalty rate would be appropriate in those instances, since those settlement offers explicitly excluded the application of any penalty).

### 5.     Interest Rate

87.     Klos and Liles-Tims agreed that the IRS is authorized to impose interest on tax payment deficiencies.[16]

88.     According to Klos, the applicable statutory blended interest rate to be applied is 4.59%.  This rate is based on the average applicable statutory rate over the interest period (described below), updated quarterly and compounded daily.  Trial Tr. at 55:25-56:8; Highland Ex. 65 n.3.  The historical rates that were used in the blended rate calculation and referred to in the demonstrative footnote can further be found at Highland Ex. 29 at 10-12 (with applicable rates at 11).  The simple average of the historical applicable rates described above during the interest accrual period was approximately 3.8%, and the effect of the daily compounding added approximately 0.8% in the aggregate.  *See* Highland Ex. 65 n. 3.

89.     Liles-Tims admitted that (a) Klos relied on the same statutes cited in his own report and (b) he did not personally calculate the applicable interest rate.  Yet, Liles-Tims mistakenly

---

[16] This input is only relevant if the Court finds that an estimation of Daugherty's allowed claim requires the inclusion of interest.  If the Court finds that (a) Highland was not responsible for interest under the Compensation Statement or (b) even if it was, (i) Daugherty assumed the risk that interest might be imposed when he elected to reject the IRS's settlement offer in early 2018, or (ii) such interest is completely mitigated by the investment return Daugherty should have been able to reasonably achieve on the 2008 Refund, then interest is irrelevant and should be ignored for purposes of estimating the claim.

testified that Klos erred by not compounding interest daily, apparently overlooking Klos' contrary testimony. Highland Ex. 29; Highland Ex. 65 n. 3; Trial Tr. at 119:19-120:9; 128:11-21; 164:10-165:7.

90.    Because Liles-Tims agreed that Klos relied on the appropriate statute, and because Klos correctly compounded interest daily, the Court finds as a matter of fact that utilizing a statutory blended interest rate of 4.59% to be reasonable for claims estimation purposes.

### 6.    Time Outstanding (years)

91.    The last input in the agreed-upon methodology is determining the length of time interest, if any, would be imposed.[17]

92.    Liles-Tims agreed with Klos' determination that the period of time from the tax payment date (*i.e.*, April 15, 2009) through Highland's petition date (*i.e.*, October 16, 2019) equaled 10.51 years.  Trial Tr. at 56:9-18; 120:10-122:3; 154:23-155:8; 165:8-12; Highland Ex. 65.

93.    As set forth above, the Reserved Claim is a general unsecured claim; as such, the claim amount cannot and does not include unmatured, post-petition interest. 11 U.S.C. § 502(b)(2). Based on that, and to the extent that the Court finds that pre-petition interest should be included in the estimated claim amount, the Court finds as a matter of fact that there is no dispute that the period of time to be used to calculate pre-petition interest, if any, is 10.51 years.

### 7.    Summary of Potential Claim Estimates

---

[17] This input is only relevant if the Court finds that an estimation of Daugherty's allowed claim requires the inclusion of interest.  If the Court finds that (a) Highland was not responsible for interest under the Compensation Statement or (b) even if it was, (i) Daugherty assumed the risk that interest might be imposed when he elected to reject the IRS's settlement offer in early 2018; or (ii) such interest is completely mitigated by the investment return Daugherty should have been able to reasonably achieve on the 2008 Refund, then interest is irrelevant and should be ignored for purposes of estimating the claim.

94.     Applying the findings of fact above to the agreed-upon methodology yields the following estimates of the Reserved Claim under the five scenarios:

| Scenario | Estimated Claim amount if Highland is either not responsible for penalties or interest, or is responsible, but mitigated by investment return | Estimated Claim amount if Highland responsible for penalties and interest and no offset for mitigating damages |
|---|---|---|
| Scenario 1 (audit reversal) | $0 | $0 |
| Scenario 2 (tax matters partner settlement counter-offer) | $59,224 | $59,224 (same because the counter-offer had no penalties or interest) |
| Scenario 3 (mid-point amount) | $215,488 | $340,897 |
| Scenario 4 (IRS settlement offer) | $335,614 | $497,371 |
| Scenario 5 (IRS adjustments) | $430,976 | $724,892 |

Highland Ex. 65; *see* Trial Tr. at 58:4-60:8.

**G.     Highland's Performance Under the Books and
Records Provision in the Settlement Agreement**

95.     The Settlement Agreement required Highland to "transfer its interests in HERA and ERA to Daugherty.  Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type …. Such transfer will be without any liability or material cost to HCMLP or its affiliates …." Highland Ex. 5 ¶ 8; Daugherty Ex. 3 ¶8.

96.     On or about April 1, 2022, Highland transferred its interests in HERA and ERA, respectively, to Daugherty pursuant to written agreements (the "Transfer Agreements"). Highland Ex. 52; Trial Tr. at 190:10-15.

97.     HERA and ERA were non-operating entities whose purpose was to passively hold certain assets after the 2008 financial crisis for the benefit of certain Highland employees. Neither HERA nor ERA had any employees, offices, operations, servers, or email addresses.  Trial Tr. at 183:4-185:25.

98.     The phrase "books and records" is not expressly defined in the Settlement Agreement.  Seery credibly testified that, when read as a whole, the Books and Records Provision was intended to require Highland to deliver a limited set of documents to Daugherty.  Trial Tr. at 186:24-189:8. He also testified that the parenthetical "(spreadsheet)" referred to the manner in which HERA and ERA's accounting records were maintained (in QuickBooks, an electronic format that generates output to users in Microsoft Excel), and how they would be provided to Daugherty.  Trial Tr. at 189:9-25.

99.     Daugherty provided no extrinsic evidence concerning the meaning of the phrase "books and records (spreadsheet)" at time the Settlement Agreement was negotiated.  Daugherty admitted that the Books and Records Provision does not require Highland to provide all documents concerning HERA and ERA in its possession.  Trial Tr. at 263:3-6.  Daugherty also acknowledged that Highland had cooperated in good faith to deliver additional documents at his request.  Trial Tr. at 271:17-272:7.

100.    Daugherty never sought relief from this Court concerning Highland's compliance with the Books and Records Provision at any time before filing his Counterclaims on October 3, 2025, including at any time before commencing his action in the District Court on HERA's behalf. Trial Tr. at 277:12-17.

101.    Seery credibly testified that in May 2022, Highland delivered over 50 mb of data to Daugherty in satisfaction of the Books and Records Provision (the "May Production").  Trial

Tr. at 193:16-194:4; Highland Ex. 2.  The May Production contained all of HERA and ERA's (a) corporate governance records, (b) historical accounting records, and (c) historical tax filings. Trial Tr. at 192:6-21, 193:4-11; Highland Ex. 2.  In the transmittal letter with the May Production, Daugherty was told: "We believe this production completes HCMLP's obligations under paragraph 8 of the settlement agreement."  Highland Ex. 2.

102.    Klos credibly testified that Highland also provided all the legal invoices it could locate, some 300.  Trial Tr. at 81:6-11.

103.    After Highland completed the May Production (which it contended satisfied its obligations under the Books and Records Provision), Daugherty requested backup documents for the materials already produced.  In response, Highland re-produced the May Production as well as "as many backup documents as [David Klos] could find."  Trial Tr. at 194:5-19.  Highland provided those documents (including the legal invoices) to Daugherty, identifying them in an email dated October 19, 2022 (the "October Production," and together with the May Production, "Highland's Books and Records Production").  Highland Ex. 3; Trial Tr. 80:16-81:11.

104.    Daugherty's Counterclaims failed to identify specific documents or categories of HERA and ERA's "books and records" that he contends Highland did not provide.  *See* Highland Ex. 1.  In fact, in his Counterclaims, Daugherty demanded "**Highland's books and records related to HERA.**" Highland Ex. 1 ¶ 14 (emphasis added).  The Daugherty Trial Brief also describes documents that plainly go beyond any reasonable interpretation of the phrase "the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system," claiming:

- Highland failed to provide "books and records . . . that **related** to HERA and ERA."  Daugherty Trial Brief ¶ 1 (emphasis added);

- Daugherty is entitled to "**all ownership rights, property, data, documents, and records relating** to HERA and ERA." *Id*. ¶ 25 (emphasis added);

- Daugherty needs "**all HERA and ERA materials** in Highland's possession." *Id.* ¶ 27 (emphasis added); and

- Daugherty "must receive **everything Highland possessed relating** to those entities." *Id*. (emphasis added).

## IV.   DETERMINATION OF CONTESTED ISSUES OF FACT AND LAW

### A.   The Party with the Ultimate Burden of Proof on Each Cause of Action and Defining Those Burdens

105.   Under 11 U.S.C. § 502(a), a "claim ..., proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). The ultimate burden of proof for a claim always lies with the claimant. *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)); *see also In re Couture Hotel Corp.*, 554 B.R.369, 380 (Bankr. N.D. Tex. 2016).  Thus, Daugherty has the ultimate burden of proof with respect to the allowance and amount of his Reserved Claim.

106.   Daugherty also has the ultimate burden of proof with respect to each of his Counterclaims. *Couture Hotel*, 554 B.R. at 380.

### B.   The Compensation Statement Is Not a Binding and Enforceable Contract (Mixed Question of Law and Fact)

107.   The Compensation Statement is unenforceable as a contract because it is vague and indefinite and is missing material terms required to form a contract. *See APS Cap. Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272-73 (5th Cir. 2009).

108.   The Compensation Statement does not constitute an offer by Highland and acceptance by Daugherty, who was an "at will" employee with an Employment Agreement; rather, it is simply a summary of what Highland had or was going to pay Daugherty for services already rendered during the prior year and a reiteration of his base salary for the next year.

109.    As relevant here, the alleged agreement is contained in three sentences that state only: "Refund is an **estimated amount**. If actual refund deviates **materially** from estimate, **other compensation** will be **fairly adjusted**. Refund is expected to be received in approximately 4 months." Highland Ex. 13 (emphases added).

110.    The Compensation Agreement provides no guidance to the parties or the Court as to (a) what "materially" means for this purpose; (b) how "other compensation" might be adjusted; (c) how the "fair[ness]" of an adjustment will be assessed; (d) who will make the determinations as to (i) whether the "actual refund deviates materially from estimate," (ii) what compensation would be adjusted, or (iii) how such compensation would be "fairly adjusted"; or (e) when all of this was supposed to happen.

111.    Under Texas law, an alleged contract that fails to address all essential and material terms with a reasonable degree of certainty and definiteness is unenforceable as a matter of law. *See APS Cap. Corp.*, 580 F.3d at 272 ("In order to be a legally enforceable contract, an agreement must be formed around the contours of sufficiently specific terms."). Material terms "are those that the parties would reasonably regard as vitally important elements of their bargain," and "a contract must define its essential terms with enough precision to enable the court to determine the obligations of the parties." *In re ACM-Tex., Inc.*, 430 B.R. 371, 408 (Bankr. W.D. Tex. 2010); *see also Wesdem, LLC v. Ill. Tool Works Inc.*, 2022 WL 18585978, at *4 (W.D. Tex. July 28, 2022), *aff'd sub nom.*, 70 F.4th 285 (5th Cir. 2023) ("Where the agreement is so indefinite that the Court must 'speculate' about its terms, the contract fails 'as a matter of law.'" (quoting *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 547 (E.D. Tex. 2007))); *Coppock v. Doug's Corner, Inc.*, No. 5:21-CV-43-RWS-JBB, 2023 U.S. Dist. LEXIS 242726, at *10 (E.D. Tex. May 17, 2023) (noting that "the agreement's terms must also be sufficiently definite to 'enable a court to understand the

parties' obligations' and to give 'an appropriate remedy' if they are breached.") (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016)).

112.   "As a general matter, Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify 'the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred.'" *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006) (quoting *Engelman Irr. Dist. v. Shields Bros.*, 960 S.W.2d 343, 352 (Tex. App. 1997)). "The question of indefiniteness—whether an agreement reaches all essential terms of a given transaction—is one of law for the court." *APS Cap. Corp.*, 580 F.3d at 271 (citing *COC Svcs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664 (Tex. App. 2004)).

113.   Here, under Texas law, the Compensation Statement either contains vague or indefinite terms, or omits material terms, that render it unenforceable as a contract.

114.   ***First***, the 2008 tax refund is explicitly stated to be an "estimated" amount. While unstated, the refund could only come from the IRS (as the taxing authority), not Highland.  But the amount is unclear; it is merely "estimated" because a tax refund to an individual can only be determined after that individual files his/her tax return and all of the individual's particularized tax attributes are taken into consideration.[18]  While Highland could estimate the amount of losses it would pass through to Daugherty as a limited partner, and could therefore estimate the potential tax refund of prior taxes paid on a previous year's partnership income, it could not definitively

---

[18] This would include things like other sources of income, unrelated capital gains and losses from investments, unrelated K-1s from other partnerships, spousal income, estimated tax payments the individual or their spouse made during the year, individual itemized deductions, and a litany of others. Each of these factors can impact an individual's refund or tax owed each year, and no evidence was adduced demonstrating that Highland had visibility into all the factors impacting Daugherty's return.

set forth the amount of the refund Daugherty would get from the IRS. Accordingly, the prospective amount of the refund was an estimate—and "estimates" are, by definition, uncertain.

115. ***Second***, as used in the Compensation Statement, the word "materially" is vague and ambiguous. To create an enforceable obligation, the Court would have to determine, among other things, whether the actual refund Daugherty received from the IRS "deviate[s] "materially" from [the] estimate." Here, the estimate was $1,475,816 (Highland Ex. 13) and the Received Refund was $1,273,930 (JPO ¶ 12), a $201,886 difference. But, as contemporaneous evidence shows, the Compensation Statement estimate was not an estimate of the cash refund that Daugherty could expect, but rather an estimate of the derivative pre-tax equivalent of such a refund. Highland Exs. 39 and 47. In other words, the amount reflected on the Compensation Statement was a "grossed-up" amount of his estimated cash refund of $959,280 to reflect what the refund would effectively be to Daugherty on an "apples-to-apples" basis with other pre-tax compensation amounts. Highland Ex. 47.[19] On that basis, Daugherty received an actual refund greater than the Compensation Statement estimate. Because the language is vague and ambiguous, there is simply no objective way for the Court to determine whether the Received Refund deviates materially from the grossed-up estimate on the Compensation Statement.

116. ***Third***, the phrase "other compensation" is also vague and ambiguous because it had many potential permutations at the time. The Compensation Statement proves the point as it identifies myriad forms of "Earnings and Awards" and "Highland Paid Benefits" that comprise the "Total Compensation Package" that Daugherty received for services he provided to Highland in 2008, including: (a) base salary, (b) tax refund, (c) loan forgiveness, (d) other awards (including

---

[19] *See also* Highland Ex. 62. Total 2005-2007 income (*see id.* at 3) for Daugherty equals $3,552,890. 2005-2007 income multiplied by 27% equals $959,280. $959,280 "grossed-up" by 35% (*i.e.*, divided by 0.65) equals $1,475,816 – the amount found on the Compensation Statement. This exhibit reflects the actual math behind what is described at Highland Ex. 47 and what appears on the Compensation Statement.

a 401(k) match and a "defined benefit"), and (e) deferred compensation.[20]  In all, as reflected on the Compensation Statement, Daugherty was compensated 13 different ways in 2008 alone. Daugherty introduced no evidence as to how the parties intended to revise his compensation to make any adjustment, assuming one was needed, and the Compensation Statement provides no guidance for the Court to pick.

117.   **Fourth**, the phrase "fairly adjusted" is another subjective term susceptible to differing meanings.  Indeed, based on the testimony by Daugherty about Highland's financial circumstances in early 2009, it is hard to imagine that Daugherty and Highland would have reached an agreement on what was "fair."  And even if they had, based on Daugherty's own testimony as to the constraints Highland's lenders sought to place on Highland, it's unclear what even would have been allowed. Trial Tr. 294:24-295:20.  Nevertheless, had the parties intended to reach a binding agreement, they surely would have done so.  To create an enforceable agreement, the Court would have to identify on its own what amount would have been deemed "fair" by the parties in February 2009.  Daugherty did not offer any testimony or documentary evidence concerning the meaning of "fairly adjusted."

118.   **Finally**, the Compensation Statement omits numerous material terms.[21]  For example, the Compensation Statement does not (a) mention what happens if an actual tax refund is received by Daugherty (as it was) but that refund is subject to potential recovery by the IRS (as

---

[20] Highland Ex. 13.  The Compensation Statement also ascribes value to paid benefits as part of Daugherty's "total compensation package", including benefits like life insurance, disability insurance, executive long-term disability, daily catered lunches, "Blackberry" charges, and paid parking.

[21] Daugherty's allegation that the Compensation Statement contained some sort of make-whole is aspirational at best. Daugherty testified that in 2009, Highland was in financial extremis and did not have the wherewithal to make any cash bonus payment, but instead used the 2008 Tax Refund Amount as an alternative to a cash bonus.  Trial Tr. at 294:15-295:20. If Highland lacked the resources to make payment at the time, it could not have made a reliable promise to make payment in an unknown amount at some contingent, uncertain, future time. Indeed, at trial, the most Daugherty could come up with to support his vague, ambiguous, and unspecific make-whole contention was "[Dondero] said, I'll take care of you. I'll make it up to you. Not just me, but others." Trial Tr. 296:21-22.

it always is); (b) reference or even consider the possibility of an audit of Highland or Daugherty; (c) provide for what would happen in the event of an audit adjustment affecting Highland or Daugherty; (d) include any timeframe or due date for any potential adjustment of "other compensation"; (e) state that Highland would "adjust other compensation" to account for any interest or penalties arising in connection with any unconsidered audit; (f) state that Highland would "make Daugherty whole" if any portion of the refund was clawed back after the unconsidered audit; (g) state that any obligation Highland purportedly had would continue indefinitely, even after Daugherty voluntarily resigned from Highland (as he did); or (h) contain the words "indemnify," "reimburse," "cover," "back-stop," or any word or phrase of similar import.   Contemporaneous evidence actually contradicts Daugherty's theory of endless indemnification:  Tax refunds "are not guaranteed, as the IRS still has the authority to audit our claimed losses and resulting refunds due."  Highland Ex. 47; *see also* Trial Tr. 296:15-17 (Daugherty: "I was very concerned about blow-back for the IRS, which was definitely going to get, in my opinion, their attention.").   It is undisputed that Highland did not (i) even file its 2008 partnership return until nearly seven months *after* giving Daugherty the Compensation Statement (s*ee*  JPO ¶ 40; Daugherty Ex. 57 at 159:10-15; Daugherty Ex. 24), and (ii) learn that the 2008 partnership return was selected for an IRS audit until *March 2010*. Highland Ex. 64 (IRS Notice of Beginning of Administrative Proceeding, dated March 3, 2010).

119.   In sum, the Compensation Statement is not an enforceable contract as a matter of law because essential terms to form an agreement are either vague, indefinite, or missing.  For this reason alone, the Claim should be disallowed.

**C.**    **If Highland Had Obligations Under the Compensation Statement, They Were Fulfilled**

120.   Even if the Court deemed the unsigned Compensation Statement to be an enforceable contract,  Highland satisfied any obligations it may have had because Daugherty

actually received a tax refund from the IRS based on partnership losses passed to him and reflected in the Draft K-1. JPO ¶12; Daugherty Ex. 26 (Draft K-1).  The losses passed through to Daugherty as reflected on the Draft K-1 were further validated by the Final K-1 for 2008 that was provided in September 2009 and was materially consistent with the Draft K-1.  Daugherty Ex. 26; Daugherty Ex. 24 (Final K-1).  Specifically, as reflected on his Final K-1, Daugherty was allocated ordinary business losses by Highland in excess of $4 million, along with other losses that well exceeded the Highland partnership income allocated to Daugherty from 2005-2008. Thus, Highland generated and passed through to Daugherty even more losses than what was originally estimated in the Compensation Statement, which resulted in a greater "after-tax" refund for Daugherty than estimated.  In other words, the allocation to Daugherty of over $4 million of actual losses from 2008 reflected in the Final K-1 delivered in 2009, when tax-effected at 35%, generated an even larger refund than was originally estimated and formed the basis of the amount referenced in the Compensation Statement[22].

121.    When Daugherty voluntarily terminated his employment with Highland in October 2011 without signing and returning the form of separation agreement attached as Exhibit A (or any other severance agreement), Highland was—pursuant to the express terms of his Employment Agreement—relieved of any "further liability or obligation to [Daugherty] under [the Employment Agreement] or in connection with his/her employment of termination." Highland Ex. 11 § 4.5.

122.    Highland, therefore, fully satisfied any obligations it might have had under the Compensation Statement when Daugherty got the Received Refund, and the Employment Agreement cut off any right he may have had to additional amounts.

---

[22] Highland Exs. 47 and 63

123.    Daugherty voluntarily resigned from Highland on September 28, 2011, and his employment terminated on October 31, 2011.  Daugherty Ex. 15.  Daugherty concedes that the 2008 Tax Refund that he received from Highland was part of his discretionary bonus under the Employment Agreement. Trial Tr. at 300:24-301:1  Daugherty forfeited any right he may have had to a bonus under the Compensation Statement (to the extent he had any) when he voluntarily terminated his employment at Highland.

124.    The Employment Agreement states that Daugherty must be employed at the time of payment in order to be eligible for a bonus payment.  Section 3.1 of the Employment Agreement provides:

> Salary and Bonus. The annual salary (the ***"Base Salary")*** payable to the Executive during the term of this Agreement shall be an amount determined by the Company (in its sole discretion) and communicated in writing to the Executive, and will be subject to annual review pursuant to the Company's normal review policy for other similarly situated executives of the Company. Any increase in salary shall be based upon the Executive's performance and shall be determined by the Company in its sole discretion. In addition, the Company ***may*** from time to time award bonuses to the Executive based on such criteria as the Company ***may establish in its discretion***. Any such bonus, unless specifically stated otherwise, will be paid in three (3) equal installments and is not earned or accrued until each payment date. ***The Executive must be employed on the payment date(s) in order to be eligible for the bonus.*** The payment of salary and bonuses shall be subject to all federal, state and withholding taxes, social security deductions and other general obligations. Furthermore, the designation of the Executive's compensation does not constitute a guarantee of employment for any specific period of time.

Highland Ex. 11 § 3.1(a) (emphases added).

125.    Daugherty terminated his employment at Highland and therefore was no longer eligible for any additional bonus payment under the Employment Agreement after termination. Daugherty admitted this in writing 15 years ago—literally the day before he resigned in 2011.

4913-8765-7133.15 36027.00008

31

Highland Ex. 38 ("I would have to be employed at Highland in order to get any payment of bonus

(as has always been the case).").

126. Likewise, as noted above, Section 4.5 of the Employment Agreement addresses

Highland's liability to Daugherty in the event Daugherty voluntarily terminates his employment

and does not take up work with a "competing business":

> In the event that [Daugherty] terminates his/her Continuous Status as an Executive hereunder and within one (1) year thereafter [Daugherty] is not employed by a Competing Business, [Highland] shall have no further liability or obligation to [Daugherty] under this Agreement or in connection with his/her employment hereunder, except for (i) any unpaid Base Salary accrued through the date of termination, (ii) any accrued but unused vacation time, (iii) any amounts or rights to which [Daugherty] is entitled under any other written agreement with [Highland], (iv) any unreimbursed expenses properly incurred prior to the date of termination, and (v) severance pay equal to the product of
>
> (a) two (2) weeks Base Salary … multiplied by (b) the number of [years of service]… [total severance not to exceed six weeks of Base Salary]... [Daugherty] acknowledges that [Highland's] obligation to pay severance, if any, will arise only … if [Daugherty] signs and returns a duly executed separation agreement and release substantially in the form attached hereto as Exhibit A….***In the event that [Daugherty] declines to sign the separation agreement and release, he/she shall not be entitled to any severance, and [Highland] will have no further liability or obligation to [Daugherty] under this Agreement or in connection with his/her employment or termination***.

Highland Ex. 11 at § 4.5 (emphasis added).

127. Daugherty did not sign the separation and release form and deliver it to Highland

and instead elected to counter-sue Highland under the Employment Agreement (and lost against

Highland). *See* Highland Ex. 44. Any right Daugherty may have had under the Compensation

Statement for any additional consideration terminated with his employment, including his claim

for unlimited indemnity or adjustment of other pre-termination compensation.

128.    The Court also admitted into evidence an additional document, a form of Separation Agreement, that Daugherty refused to sign following his resignation (the "<u>Draft Separation Agreement</u>").  Daugherty Ex. 44 § 3(b)(ii).    The Draft Separation Agreement contains, among other things, the very indemnity promise of payment of taxes, interest, and penalties arising from an audit of Highland's tax returns (the "<u>Rejected Indemnity</u>") that Daugherty now claims is implicitly included in the Compensation Statement.  The evidence established that in October 2011, when Daugherty was presented with the Draft Separation Agreement, the IRS was *only* auditing Highland's 2008 return.  There would have been no reason to include the Rejected Indemnity in the Draft Separation Agreement if the parties believed it was already included in the Compensation Statement and would survive Daugherty's termination. Daugherty's Reserved Claim is disallowed.

**D.      Daugherty's Reserved Claim Should Be
         <u>Disallowed (Mixed Question of Law and Fact)</u>**

129.    For the reasons set out in Section IV.C., *supra,* Daugherty's Reserved Claim is disallowed.

**E.      If the Compensation Statement Is an Enforceable Contract, and
         Highland Has Not Fulfilled Its Obligations Thereunder,
         Daugherty's Reserved Claim Can Be Estimated in Accordance with
         <u>Section 502(c) of the Bankruptcy Code (Mixed Question of Law and Fact)</u>**

130.    If Daugherty's Reserved Claim is allowed, the Court must estimate it under Section 502(c) of the Bankruptcy Code.  Under Section 502(c), the Court is required to estimate contingent and unliquidated claims for allowance purposes in the circumstances present here.[23]

---

[23] Liles-Tims opined that Daugherty's Reserved Claim cannot be estimated until all disputes concerning the 2008 Audit are finally resolved, if then. Trial Tr. at 90:13-91:8. Liles-Tims' opinion cannot be reconciled with Congress' intent as reflected in the plain and unambiguous terms of Section 502(c)—a provision he acknowledges he never considered. *See* Trial Tr. 89:3-11.  Indeed, if Daugherty's expert is right, and Daugherty's Reserved Claim cannot possibly be estimated, then the Reserved Claim should be disallowed as too speculative.  The Court is bound to implement the court-approved agreement between Highland and its stakeholders (as reflected in the court-approved Plan and Claimant Trust Agreement) concerning the deadline for the resolution of claims and the commencement of dissolution (*i.e.*, August 11, 2026).

The statute provides: "[t]here *shall be* estimated for purposes of allowance ... any contingent or unliquidated claim, the fixing or liquidation of which ... would unduly delay the administration of the case. " 11 U.S.C. § 502(c) (emphasis added)

131.    "The public policy underlying claims estimation under the Code is to facilitate the timely administration of the case by making an expeditious assessment of the value of certain claims which would otherwise unduly delay administration." *In re Perry*, 425 B.R. 323, 381 (Bankr. S.D. Tex. 2010).  Thus, where, as here, both prerequisites are met, the bankruptcy court does not merely have discretion to estimate—it has an affirmative, mandatory duty to do so.  The method by which the bankruptcy court estimates a claim under Section 502(c) is within the court's broad discretion. *See In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) ("A bankruptcy court's estimation of the value of an unliquidated claim, the liquidation of which would unduly delay the proceedings, may be disturbed on appellate review only in the event of an abuse of discretion.").

## F.    Failure to Estimate Daugherty's Reserved Claim Before August 11, 2026 Would Unduly Delay the Administration of Highland's Bankruptcy Case

132.    Daugherty's Claim, which is both contingent and unliquidated, is the type of claim that, if allowed, must be estimated under Section 502(c).  As set forth above, the Plan was confirmed in February 2021 and has been effective since August 2021.  Under the Sunset Provisions[24] in the Plan, CTA, Confirmation Order, and related extension orders, Highland must resolve all disputed claims, and the Claimant Trust must commence the Dissolution Process, by August 11, 2026.  Trial Tr. at 209:6-211:13. The Reserved Claim is the last unresolved claim against Highland's estate.  The parties agree that final resolution of the appeal of the 2008 Tax

---

[24] *See generally* Highland's *Motion for an Order Further Extending Duration of Trusts* [Bankr. Docket No. 4213] (the "Extension Motion").  This Court granted the Extension Motion and extended the life of the Claimant Trust only until August 11, 2026.  Bankr. Docket No. 4298 (the "Extension Order").

Year Audit will not be complete by the court-ordered and Plan-mandated August 11, 2026 deadline to resolve the estate's outstanding claims and commence the Dissolution Process. *See* Trial Tr. at 173:18-174:1 (Liles-Tims), 209:11-210:3 (Seery). Thus, if the Reserve Claim is not estimated by August 11, 2026, Highland will violate the Confirmation Order and the Extension Order, and the administration of the Bankruptcy Case will be unduly delayed. Accordingly, this Court is required to estimate Daugherty's Claim under Section 502(c).

**G.      If Daugherty's Reserved Claim Can Be Estimated, How Much Is
the Reserved Claim Estimated to Be for Purposes of Allowance?**

133.    *[This section is contingent on the Court's finding that the Reserved Claim should be allowed in an estimated amount.]*

134.    The Court has sufficient information to apply a reasonable methodology to estimate Daugherty's Reserved Claim. The only inputs subject to estimation are (a) the amount of adjustment to Highland's 2008 partnership return (the "HCMLP Income Adjustment") and (b) whether any penalty or interest should be included. Once the HCMLP Income Adjustment is estimated, the amount of Daugherty's Reserved Claim is determined by a simple arithmetical formula: (a) HCMLP Income Adjustment x Daugherty's 0.7403% interest in the partnership as of the December 31, 2008 x 35% (the maximum personal federal income tax rate as of December 31, 2008). The product of those amounts represents Daugherty's tax underpayment. Then, if the Court determines that a penalty and interest apply, those amounts are added to the underpayment.

135.    Highland has advanced five possible amounts for the HCMLP Income Adjustment: (i) the IRS's original determination $166,332,713 at the conclusion of the 2008 Tax Year Audit (*see* Highland Ex. 65);[25] (ii) the IRS's 2024 $129,528,079 income adjustment offer to

---

[25] *See* Highland Ex. 15 (Form 4605-A). And note further that while the Form 4605-A contains a $166 million adjustment to the Highland 2008 portfolio income, it also affirms $546 million of 2008 ordinary losses that Highland had reflected

the tax matters partner of a discounted settlement (Highland Exs. 21 and 65 n. 8); (iii) Dondero's 2025 $8 million full settlement offer to the IRS (Highland Exs. 22 and 65 n. 6); (iv) a complete reversal of the 2008 Tax Year Audit with $0.00 HCMLP Income Adjustment; or (v) a mid-point hypothetical discounted settlement based on the simple average of the two extremes:  2008 Tax Year Audit income adjustment and a reversal of the 2008 Tax Year Audit with no adjustment. The results are set forth in the demonstrative exhibit, Highland Ex. 65, which was the subject of extensive testimony at trial.

136.   In consideration of the testimony concerning the amounts at issue and the state of the tax matters partner's discussions with the IRS, the Court finds that the $83,166,357 mid-point between (a) the $166,332,713 HCMLP Income Adjustment demanded by the 2008 Tax Year Audit and (b) a reversal of the 2008 Tax Year Audit resulting in a $0.00 HCMLP Income Adjustment  constitutes a reasonable basis for estimation of the HCMLP Income Adjustment as it is both (i) the mid-point of the lowest and highest outcomes and (ii) close to the mid-point of the known IRS settlement offers and tax-matters partner counter-offer.

137.   An estimated $83,166,357 HCMLP Income Adjustment results in an income adjustment to Daugherty of $615,681 (adjustment (x) 0.7403% partnership interest) with a resulting estimated tax underpayment by Daugherty of $215,488 ((adjustment (x) 0.7403%) (x) 35% (the highest marginal federal tax rate in 2009)).  The resulting estimated Reserved Claim, without penalty or interest, is therefore **$215,488**.

138.   The Court will not hold Highland liable for any penalties or interest that Daugherty could be required to pay on account of an "underpayment" amount resulting from the HCMLP

---

on its original tax return.  The income adjustment, and the subsequent dispute over the adjustment, affect only roughly 30% of the overall losses Highland reported.

Income Adjustment because (a) the Compensation Statement makes no reference to penalties or interest whatsoever, nor does it provide for any indemnification or similar obligations with respect thereto (and in fact, contemporaneous evidence *(i.e.*, the Draft Separation Agreement, including the Rejected Indemnity (Daugherty Ex. 44 § 3(b)(ii))) contradicts such a notion), (b) Daugherty could have mitigated his damages—including avoiding penalties and interest—by accepting the IRS's proposed adjustments pursuant to Form 870-PT (Highland Ex. 18), and (c) the benefit to Daugherty of the use of the Received Refund substantially exceeds any penalties and interest that would have accrued to the Petition Date.

## H.   Whether Daugherty's Breach of Contract Counterclaim Is Barred by the Statute of Limitations?

139.    Upon review of the law cited by Daugherty, Highland respectfully withdraws its affirmative defense based on the statute of limitations.

## I.    Highland Fulfilled Its Obligations Under the Books and Records Provision (Mixed Question of Law and Fact)

140.    Daugherty bears the burden of proof on this claim. *In re Neria*, No. AP 16-03148, 2022 WL 17254478, at *13 (Bankr. N.D. Tex. Nov. 28, 2022) (Jernigan, J.).  The Settlement Agreement contains a Delaware choice of law clause (§ 22).  Delaware law therefore controls the Court's interpretation of the Settlement Agreement. *Mozido, Inc. v. Papermaster*, No. A-16-CA-0675-LY, 2017 WL 8161165, at *10 (W.D. Tex. Aug. 14, 2017) (federal court applies forum choice of law rules; Texas law gives effect to contractual choice of law provisions, so Delaware law as chosen law applied to substantive contract law issues and contract interpretation).

141.    While Highland offered documentary and testimonial evidence showing that it satisfied its obligations under the Books and Records Provision,  Daugherty failed to specifically identify which "books and records" Highland failed to produce or how Highland otherwise breached the Books and Records Provision—and repeatedly failed to contest Highland's

4913-8765-7133.15 36027.00008                                        37

consistent assertions that it had satisfied its obligations under the Books and Records Provision. Daugherty withdrew his claim for damages for breach of the Books and Records Provision and is seeking only specific performance.  Trial Tr. at 33:12-16.

142.   As set out above, under the Books and Records Provision, Highland agreed to "transfer its interests in HERA and ERA to Daugherty.  Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type ….  Such transfer will be without any liability or material cost to HCMLP or its affiliates …." Highland Ex. 5 ¶ 8.

143.   Daugherty negotiated the Books and Records Provision directly with Highland's Chief Executive Officer, Seery.  Daugherty has no recollection about the negotiations of this provision or why the unique phrase "books and records (spreadsheet)" was included.  Trial Tr. at 259:17-260:5 (no recollection of meaning of "spreadsheet" or "Highland system").  Seery credibly testified that phrase and accompanying text (a) refers to a specific set of documents and (b) was used to circumscribe the documents Highland would be required to turn over to Daugherty.  Trial Tr. at 187:13-189:25.

144.   The parties do not disagree that HERA and ERA (a) were shell entities established for the sole purpose of holding limited, passive assets for the benefit of certain then-Highland employees as a compensation vehicle, and (b) never had any of their own employees, offices, servers, email addresses, or operations of any kind. Trial Tr. at 183:17-185:7.

145.   On May 5, 2022, shortly after the Court approved the Settlement Agreement, Highland delivered to Daugherty "HERA and ERA books and records" available on Highland's system, together with tax documents, and asserted that, subject only to a final review, it had

fulfilled its obligations under the Books and Records Provision.  Trial Tr. at 192:6-193:15; Daugherty Ex. 33.

146.    On October 19, 2022, in response to Daugherty's further requests for "back up" information, Highland provided additional information concerning HERA and ERA (including invoices backing up virtually all of HERA's historically recorded expenses reflected in the records previously delivered to Daugherty) and reiterated its position that it had "satisfied all of its obligations under the settlement agreement, and our involvement in HERA/ERA (your entities) will be complete."  Daugherty Ex. 34; *see* Trial Tr. at 194:22-196:12.  Daugherty admitted that he did not take issue with Highland's position.  Trial Tr. at 197:18-22.

147.    Daugherty did not raise the issue of "books and records" again until January 30, 2024, when his counsel requested that Highland supplement its document production to include Word, Excel, and PowerPoint documents, email correspondence, and legal communications, among others, all with corresponding metadata, and requesting that Highland employ an outside vendor at its expense to collect and produce the documents.  Highland Ex. 53.

148.    Klos testified without challenge that Highland had produced all the HERA/ERA legal invoices it could find—over 300—constituting 90% of such invoices. Trial Tr. at 81:6-11.

149.    Before Daugherty received a substantive response from Highland, on February 29, 2024, HERA (under Daugherty's control) filed its original complaint against 24 individuals, law firms, and other entities.  *See* Trial Tr. at 198:22-199:13; Highland Ex. 54 (York March 1, 2024 email).  A few days later, on March 5, 2024, Highland's counsel responded to the January 30, 2024 letter and stood by Highland's prior statements that it had fulfilled its obligations under the Settlement Agreement.  Highland Ex. 54.

4913-8765-7133.15 36027.00008

150.   On May 10, 2024, different counsel for Daugherty again demanded a broad set of documents concerning HERA and ERA that had been demanded on January 30, 2024 and again requested Highland's hiring of an outside vendor. Highland Ex 53.  Highland responded promptly and again rejected Daugherty's newest demands, reiterating that it believed that it had fulfilled its obligations under the Books and Records Provision and inviting Daugherty to seek judicial relief to finally bring the matter to a close.  Daugherty Ex. 35.

151.   Daugherty did not seek judicial resolution at that time, notwithstanding that he had commenced an action in federal district court on behalf of HERA and ERA (the "HERA Action"), knowing that Highland would not produce any further documents concerning those entities. *See* Highland Ex. 1 ¶¶ 12-13 (Counterclaim).  It was only in October 2025, three and a half years after Highland informed him that it had fulfilled its obligations under the Books and Records Provision, that Daugherty finally sought to enforce his claimed rights—and then, only as a counterclaim.

152.   The Court finds that Highland fulfilled its obligations and did not breach the Books and Records Provision.  As a matter of Delaware law, the Books and Records Provision is not ambiguous, as the term has a defined meaning in Delaware law:

> Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.  Where a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning. When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms. If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.

*Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (footnotes, quotation mark, and alterations omitted).

153.    To that end, the Delaware Court of Chancery has stated that "the meaning of the term 'books and records' can readily be understood through § 18–305 of the LLC Act and through its corporate law and limited partnership law counterparts, 8 Del. C. § 220 and 6 Del. C. § 17–305, respectively."[26] *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 Del. Ch. LEXIS 102, at *7 n.3 (Del. Ch. Jan. 29, 2002) (finding tax returns were within the scope of a contractual "books and records" provision).

154.    The Delaware Limited Liability Company Act, 6 Del. C. § 18-305(a), generally identifies the statutory base-level books and records that a Delaware LLC must provide to its managers for inspection:

> 1) True and full information regarding the status of the business and financial condition of the limited liability company;
>
> (2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;
>
> (3) A current list of the name and last known business, residence or mailing address of each member and manager;
>
> (4) A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed;
>
> (5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and
>
> (6) Other information regarding the affairs of the limited liability company as is just and reasonable.

---

[26] 8 Del. C. § 220, the corporate books and records provision, sets out defined categories of corporate financial and governance documents and does not have a "just and reasonable" category.  The Delaware Limited Partnership Law books and records provision, 6 Del. C. § 17–305, is substantially similar to the Delaware LLC Law's provision.

155.    The Transfer Agreements do not describe any "other information" that Highland was required to provide regarding the affairs of HERA and ERA.  Daugherty introduced no evidence that might guide an understanding of "other information" potentially included within the Books and Records Provision.  He did not put any purported operating agreements, which might shed some light on the information required to be available to members or managers of the companies, into evidence.

156.    Given the established and limited meaning of "books and records" in Delaware law and the absence of evidence that the parties intended to give those words some other meaning, Daugherty's contentions in his trial brief that he is entitled to "**all** HERA and ERA materials in Highland's possession" and that he "must receive **everything** Highland possessed **relating to** those entities,"  (Daugherty Trial Brief ¶ 27 (emphasis added)), are themselves vague and are otherwise not supported by the Books and Records Provision.

157.    Instead, as required, Highland provided HERA and ERA's financial, governance and tax records—indeed, Daugherty does not complain that Highland failed to provide information of the types described in items (1) through (5) of the statute—including (as described above), among other things, HERA/ERA's QuickBooks (*i.e.*, financial) information, governance records, and tax returns.

158.    The Court also finds that, at Daugherty's request, Highland provided substantial additional business documents to Daugherty.  Daugherty has not proven that the totality of the information Highland provided was *not* "just and reasonable," particularly in light of the limiting proviso that information would be provided "without liability or material cost" to Highland.  In the absence of the parties' agreement as to the inclusion of specific categories of documents beyond the scope of the matters set out in items (1)-(5) of the Delaware LLC Law, and given

Highland's provision of extensive information beyond that scope, the Court finds that Daugherty's requests for "all" documents or documents that "related to" HERA and ERA were not "just and reasonable" and Highland was under no obligation to satisfy them. The Court thus finds that Highland did not breach the Books and Records Provision.

### J.   Daugherty Withdrew His Claim for Attorneys' Fees

159.   Daugherty has stated that he has withdrawn his claim for attorneys' fees for claimed violation of the stay provision of the Settlement Agreement "without prejudice" in light of the Court's rulings that this matter could go forward.  Trial Tr. at 33:17-34:7.

## V.   CONCLUSION

160.   For the reasons set forth above, the Court concludes as follows:

- [If Claim 205 is disallowed] Highland's First Claim for Relief is granted, and Claim 205 is disallowed;

- [If Claim 205 is not disallowed] Highland's First Claim for Relief is denied, and Claim 205 shall be allowed;

- [If Claim 205 is disallowed] Highland's Second Claim for Relief is dismissed as moot;

- [If Claim 205 is not disallowed] On Highland's Second Claim for Relief, for estimation of Claim 205, the Court estimates Claim 205 in the allowed amount of $[215,488];

- On Highland's Third Claim for Relief, for subordination of Claim 205, that Highland has withdrawn the claim and it is therefore denied;

- On Daugherty's Counterclaim Count I, for a determination that Highland has breached the Books and Records Provision of the Settlement Agreement, that Highland has not breached the Settlement Agreement;

- On Daugherty's Counterclaim Count II, that Daugherty's demand for specific performance of the Books and Records Provision of the Settlement Agreement is denied;

- On Daugherty's Counterclaim Count III, Daugherty's demand for attorneys' fees, that Daugherty has withdrawn the claim and it is therefore denied.

4913-8765-7133.15 36027.00008                                    43

Dated: June 5, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Plaintiff/Counter-Defendant Highland Capital Management, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 5, 2026, a true and correct copy of the foregoing *Post-Trial Proposed Findings of Fact and Conclusions of Law* was served electronically via the Court's CM/ECF system upon all parties receiving electronic notice in this Adversary Proceeding.

*/s/ Zachery Z. Annable*
Zachery Z. Annable