

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 24, 2026**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Highland Capital Management, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| ——————————————— | § | ——————————————— |
| | § | |
| Highland Capital Management, L.P., | § | |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| v. | § | Adversary No. 25-03055-bwo |
| | § | |
| Patrick Hagaman Daugherty, | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |

## <u>MEMORANDUM OPINION</u>

The Court issues this Memorandum Opinion in the action between Plaintiff

and Counter-Defendant, Highland Capital Management, L.P. ("Highland"), and

Patrick Hagaman Daugherty ("Daugherty"), Defendant and Counter-Plaintiff.

Highland contests the validity of Daugherty's proof of claim filed in its related bankruptcy case and seeks to disallow the claim. In the alternative, Highland asks the Court to estimate Daugherty's contingent claim under 11 U.S.C. § 502(c) for purposes of making a distribution under Highland's confirmed chapter 11 plan.[1] Daugherty's counterclaims allege that Highland breached a prior settlement agreement between the parties, in which Highland agreed to turnover the Highland Employee Retention Assets LLC ("HERA") and ERA Management, LLC ("ERA") books and records. Daugherty seeks specific performance of the settlement agreement.[2] Trial was held on April 17, 2026, after which the parties submitted proposed findings of fact and conclusions of law.

The Court's findings and conclusions are based upon the record before the Court and are issued under Rule 52 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The issues here raise mixed questions of fact and law. Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

---

[1] Prior to trial, Highland withdrew its claim for subordination under 11 U.S.C. § 510(b). Unless otherwise stated, all "§" or "section" references are to Tile 11 of the United States Code (the "Bankruptcy Code").

[2] Prior to trial, Daugherty withdrew his claim for attorney's fees.

## FINDINGS OF FACT

### *Highland's Bankruptcy Case and Daugherty's Reserved Claim*

1.      On October 16, 2019, Highland filed its petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned bankruptcy case. Case No. 19-34054, Dkt. No. 1. In Highland's bankruptcy case, Daugherty filed several proofs of claim that culminated in proof of claim number 205, which is subject to the parties' dispute in this adversary proceeding. Dkt. No. 101, ¶ 2.[3]

2.      On November 24, 2020, this Court entered an Order temporarily allowing Daughtery's claim in the amount of $9,134,019.00 for voting purposes only. Case No. 19-34054, Dkt. No. 1474. Then, on February 22, 2021, this Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief.*[4] *Id.*, Dkt. No. 1943. Highland's confirmed plan became effective on August 11, 2021, at which time a claimant trust was established over which James P. Seery, Highland's Chief Executive Officer, was appointed trustee. *Id.*, Dkt. Nos. 1808, 2700.

3.      Following confirmation, on November 22, 2021, Highland and Daugherty executed a settlement agreement. Dkt. No. 101, ¶ 19. Among other things, the settlement agreement resolved Daugherty's claims against Highland's bankruptcy estate, save for one, and required Highland to turnover HERA and ERA's

---

[3] Unless otherwise stated, all "Dkt. No." references herein are to the above-captioned adversary proceeding.

[4] The Confirmation Order was subsequently modified for reasons irrelevant to this dispute. *See* Case No. 19-34054, Dkt. No. 4378.

books and records to Daugherty. Highland Ex. 5; Daugherty Ex. 3. Below are provisions from the settlement agreement relevant to this dispute:

8. HERA and ERA: The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to satisfy any liability the Debtor may have in connection with the HERA Judgment. To facilitate recovery of such potential claims – which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties -- HCMLP will transfer its interests in HERA and ERA to Daugherty. Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type; including, for the avoidance of doubt, without any representation or warranty as to the merits of the potential claims or the efficacy of the transfer of the potential claims. Such transfer will be without any liability or material cost to HCMLP or its affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a "Disposition"). In connection with the transfer, HERA and ERA have expressly released the HCMLP Released Parties from any and all claims, including any claims actions or remedies related

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9.      IRS Compensation Claim: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved

Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor

reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor

and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the

IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that

Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for

purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve

Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses

thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal

liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims;

provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS

without the written consent of the Debtor until March 31, 2022.

Highland Ex. 5, ¶¶ 8, 9; Daugherty Ex. 3, ¶¶ 8, 9. The Court entered an order

approving the settlement agreement on March 8, 2022, which allowed Daugherty's

proof of claim number 205 in the amounts set forth in the settlement agreement,

subject to further resolution of the Reserved Claim.[5] Case No. 19-34054, Dkt. No.

3298.

4.      On May 2, 2025, Highland commenced this adversary proceeding by

filing its Complaint seeking to disallow the Reserved Claim or, alternatively,

---

[5] "Reserved Claim" has the meaning given to it by the Parties in the Settlement Agreement. Highland
Ex. 5, ¶ 9; Daugherty Ex. 3, ¶ 9.

requesting that the Court estimate the Reserved Claim.[6] Dkt. No. 1. On June 4, 2025, Daugherty filed his *Motion to Dismiss* Highland's complaint. Dkt. No. 5.

5. On July 18, 2025, Highland filed its *(A) Objection to Patrick Daugherty's Motion to Dismiss, and (B) Cross Motion for Relief from a Final Order Pursuant to Bankruptcy Rule 9024* ("Cross Motion"). Dkt. No. 10. The Cross Motion sought to modify the order approving the settlement agreement to strike the so-called "Stay Provision." Such relief would permit Highland to proceed with its claim-disallowance proceeding against Daugherty despite there being no "final determination with respect to the IRS Audit Dispute." The Court granted the Cross Motion on September 5, 2025, and modification of the settlement order remains subject of Daugherty's appeal. Dkt. Nos. 23, 25.

6. Pursuant to the settlement agreement, Daugherty's Reserved Claim is fully reserved in an account held by the Claimant Trust with a balance equal to $2,650,353.00, the amount of the Reserved Claim asserted by Daugherty in his proof of claim. Daugherty Ex. 94, ¶ 1. At trial, Mr. Seery testified that this amount remains in a claimant trust account and is the last unresolved claim of the Highland bankruptcy estate. Trial Tr. at 241:21–242:3. Any distribution made to Daugherty on account of the Reserved Claim must occur prior to distributions to Highland's partnership interests—Classes 10 and 11. Trial Tr. at 240:23–243:11.

---

[6] *See supra* n.1 regarding Highland's claim for subordination.

*Daugherty's Employment at and Separation from Highland*

7.      Daugherty was employed by Highland from 1998 to his voluntary resignation in 2011. Dkt No. 101, ¶ 8, 14. On December 31, 2004, Highland and Daugherty entered into an Amended Employment Agreement ("Employment Agreement"), which, among other things, described Daugherty's compensation and benefits. Highland Ex. 11. As 'Salary and Bonus" the Employment Agreement states the following:

> (a)      Salary and Bonus. The annual salary (the "*Base Salary*") payable to the Executive during the term of this Agreement shall be an amount determined by the Company (in its sole discretion) and communicated in writing to the Executive, and will be subject to annual review pursuant to the Company's normal review policy for other similarly situated executives of the Company. Any increase in salary shall be based upon the Executive's performance and shall be determined by the Company in its sole discretion. In addition, the Company may from time to time award bonuses to the Executive based on such criteria as the Company may establish in its discretion. Any such bonus, unless specifically stated otherwise, will be paid in three (3) equal installments and is not earned or accrued until each payment date. The Executive must be employed on the payment date(s) in order to be eligible for the bonus. The payment of salary and bonuses shall be subject to all federal, state and withholding taxes, social security deductions and other general obligations. Furthermore, the designation of the Executive's compensation does not constitute a guarantee of employment for any specific period of time.

*Id.* ¶ 3.1(a). The Employment Agreement also includes a Form of Separation Agreement and Release, which an employee *may* sign at the termination of their employment. If an employee does not sign the separation agreement, then the Employment Agreement states that the employee is not entitled to severance, and Highland "will have no further liability or obligation to the [employee] under [the Employment Agreement] or in connection with [their] employment or termination." *Id.* ¶¶ 4.4–4.6.

8.      Consistent with the Employment Agreement, Daugherty was provided with a Comprehensive Compensation and Benefits Statement ("2009 Compensation

8

Statement") dated February 27, 2009. Highland Ex. 13. Therein, Daugherty's 2008

earnings and awards totaled $3,594,136, of which $1,475,816 was allocated as a 2008

tax refund.[7] *Id.* Stated with the 2008 tax refund line item is the following language:

> Refund is an estimated amount. If actual refund deviates materially from estimate, other compensation will be fairly adjusted. Refund is expected to be received in approximately 4 months.

*Id.* This language forms the basis for Daugherty's Reserved Claim against Highland's

bankruptcy estate.

9.      In an email from Scott Wilson, Highland's Principal, Internal Strategy,

dated February 26, 2009, to Brian Collins and Patrick Boyce, Mr. Wilson included an

attachment with draft questions and answers related to the 2008 tax refund.

Highland Ex. 47. Of note, the following questions included draft answers:

> **Why would you consider the tax refund as part of compensation? Isn't the refund in my name?**
>
> When you paid taxes in 2006 and 2007 that are now potentially subject to a refund, you received a distribution from Highland to pay those taxes. Now we believe that the taxes were overpaid, due to subsequent losses, and as such, Highland distributed an excessive amount to you to pay the taxes. Accordingly, any difference, now or then, ends up being extra compensation to you, and keeping the refund represents an extra compensation to you from Highland **(NOTE: this is by no means well researched legal argument. The Tax Dept. is investigating various legal and tax rationale in this matter, and we can discuss various options on this argument further in a verbal conversation)**
>
> **What would happen if my actual tax refund is different from this estimate, or if the timing is significantly delayed? Would I be "trued-up" if is it less? What if it is more?**

---

[7] With the inclusion of "Highland Paid Benefits," Daugherty's compensation package totaled $3,619,376. Highland Ex. 13.

> If the actual refund ends up being different than the estimated amount, then we would consider what action to take on a case-by-case basis, considering several factors including the difference in the refund amount and if that creates any "gap" between the target total cash compensation and your actual cash compensation would be.

*Id.* at 3–5 (emphasis in original). A slide-deck dated March 6, 2009, and titled "Tax Discussion" included "[p]rovide overview of tax refund estimate calculation" as an objective. Highland Ex. 39; *see also* Trial Tr. 296:6–11. One slide answered affirmatively the following question: "Can the IRS claw back the refund?" *Id.* at 7.

10.     In 2009, based on a draft Schedule K-1 that Highland provided to him, Daugherty filed his 2008 federal income tax return. Dkt. No. 101, ¶ 11. The Draft K-1 identified Daugherty's "partner's share of loss" as 0.746998% as of December 31, 2008. Daugherty Ex. 26. In 2009, Daugherty received refunds from the IRS of previously paid taxes in the amounts of $493,629 and $780,301 related to his 2008 Individual Income Tax Return (Form 1040) and his 2008 Application for Tentative Refund (Form 1045), respectively, for a total refund of $1,273,930. Highland Exs. 35, 36. These forms incorporated Highland's losses that were allocated to him as provided for in the draft Schedule K-1. Dkt. No. 101, ¶ 12. Later in 2009, Highland issued its final 2008 Schedule K-1 to Daugherty identifying Daugherty's "partner's share of loss" as 0.740262% as of December 31, 2008. Highland Ex. 14; Daugherty Ex. 24.

11.     On March 3, 2010, the IRS notified Highland that it was initiating an audit of Highland's 2008 federal income tax return. Dkt. No. 101, ¶ 13.

12.     On September 28, 2011, Daugherty gave voluntary notice of resignation from all positions at Highland with his last day as an employee being October 31,

2011. *Id.* ¶ 14. Daugherty did not sign the form separation agreement attached to the Employment Agreement. Prior to his last day of employment, Daugherty and Highland attempted to negotiate different separation and release terms that included, among other things, Highland's agreement to pay a "Notice of Tax Due," or other similar demand, delivered to Daugherty because of the IRS audit of Highland's tax return. Highland Exs. 40, 41. These negotiations did not culminate in a signed agreement. Trial Tr. 207:23–209:5.

13.     At trial, Daugherty testified that James Dondero, Highland's former chief executive officer, made promises to Daugherty about the 2009 tax refund. Trial Tr. 296:18–22 ("[Dondero] said, I'll take care of you. I'll make it up to you.")

14.     On December 8, 2017, an IRS examiner executed Form 4605-A, which proposed to increase Highland's reported 2008 short-term portfolio income by $166,332,713. Highland Ex. 15, Daugherty Ex. 27. Settlement discussions with the IRS remain ongoing. *See* Highland Ex. 20, Daugherty Ex. 32. To date, Daugherty has not received notice that he is required to repay any amount refunded to him in connection with his 2009 tax refund.

***Compliance with the Settlement Agreement***

15.     The Settlement Agreement required Highland to "transfer its interests in HERA and ERA to Daugherty. Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type . . . . Such transfer will be without any liability or material cost to HCMLP or its affiliates . . . ." Highland Ex. 5 ¶ 8;

11

Daugherty Ex. 3 ¶ 8. On April 1, 2022, Highland transferred its interests in HERA and ERA to Daugherty pursuant to written agreements. Highland Ex. 52. Both HERA and ERA are Delaware limited liability companies. *Id.*

16.    HERA and ERA were non-operating entities that did not have any employees, offices, servers, or email addresses. Trial Tr. at 183:17–185:7. The phrase "books and records (spreadsheet)" is not otherwise expressly defined in the settlement agreement.

17.    On May 5, 2022, and October 19, 2022, Highland delivered certain documents and materials to Daugherty as reflected in Daugherty Exhibits 33 and 34. The May 2022 production included over 50MB of data and included all of HERA and ERA's (a) corporate governance records, (b) historical accounting records, and (c) historical tax filings. Trial Tr. at 192:6–21, 193:4–194:2. At Daugherty's request, Highland transmitted additional records in October 2022 that included legal invoices. Trial Tr. 80:16–81:11.

18.    On February 29, 2024, HERA filed a lawsuit in the Northern District of Texas against 24 defendants. Case No. 3:24-cv-00498-K, Dkt. No. 1 (N.D. Tex.); *see also* Highland Ex. 54; Trial Tr. 198:22–199:9, 277:3–8.[8] In that case, there are pending motions to dismiss, and the district court stayed the case pending resolution of those motions to dismiss. Case No. 3:24-cv-00498-K, Dkt. No. 119. Daugherty testified that if HERA prevails on the motions to dismiss, it will seek discovery from Highland. Trial Tr. 277:18–22.

---

[8] The Court takes judicial notice of the docket in Case No. 3:24-cv-00498-K pending in the Northern District of Texas. Fed. R. Evid. 201(b)(2), (c)(1).

19. Daugherty performed and satisfied all obligations that the Settlement Agreement imposed upon him. Highland does not contest Daugherty's full performance of the Settlement Agreement. Daugherty's demand for specific performance relates to the HERA and ERA "books and records (spreadsheet)" provision of the settlement agreement. In particular, Daugherty seeks all materials "*related* to HERA and ERA" that are in Highland's possession. Dkt No. 102, ¶¶ 1, 27, 36 (emphasis added). Prior to filing his counterclaims in this adversary proceeding, Daugherty did not otherwise seek relief from this Court to enforce the settlement agreement.

## CONCLUSIONS OF LAW

20. The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This action is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

### *Burdens of Proof*

21. 11 U.S.C. § 502(a) states, "A claim . . . proof of which is filed under section 501 [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." A properly filed proof of claim is prima facie evidence of the claimant's entitlement to collect against assets of the debtor's estate. *Cal. State Bd. Of Equalization v. Off. Unsecured Creditors' Comm. (In re Fid. Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988).

22. If a claim objection is filed, then the burden shifts to the objector to "produce evidence tending to defeat the claim that is of a probative force equal to that

13

of the creditor's proof of claim." *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985). If an objector produces evidence to rebut the prima facie validity of the claim, then the claimant must prove the validity of its claim by a preponderance of the evidence. *See United States v. Canada*, 574 B.R. 620, 627 (N.D. Tex. 2017).

23. Daugherty properly filed proof of claim number 205 and attached a compensation summary dated August 18, 2011, and the 2009 Compensation Statement. Case No. 19-34054, Dkt. No. 1280-2.[9] Thus, Highland must bring forward evidence equal in probative force to defeat Daugherty's claim.

***The Employment Agreement Absolves Highland of Any Liability to Daugherty.***

24. The parties do not contest that Texas law controls this dispute over Daugherty's Reserved Claim. Likewise, neither party contests the validity of the Employment Agreement. At issue, then, is how to construe the 2009 Compensation Statement.

25. "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "Incorporation by reference" allows courts to also consider separate documents that are plainly referred to in the contract. *See Zamora v. Swift Transp. Corp.*, 547 F. Supp. 2d 699, 702 (W.D. Tex. 2008) ("An employment agreement may incorporate, by reference, the terms of a separate

---

[9] Neither party in this adversary proceeding sought to introduce as an exhibit Daugherty's proof of claim number 205. Daugherty's unredacted proof of claim is inaccessible via Highland's claims administrator, Verita, is not filed elsewhere on the Court's docket, and was attached only in a redacted format to a prior motion filed in the related bankruptcy case.

14

document where the agreement directly and expressly refers to the separate document."); *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968) ("It is uniformly held that an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the document signed by the defendant plainly refers to another writing.").

26.     Article 3.1(a) of the Employment Agreement "plainly" states, ". . . annual salary . . . payable to the Executive . . . shall be communicated in writing to the Executive . . . ." Highland Ex. 11. The 2009 Compensation Statement was such a communication in writing related to Daugherty's compensation, and its terms are, therefore, incorporated in the Employment Agreement. The inquiry now turns to whether the terms in the 2009 Compensation Statement are ambiguous.

27.     A contract is not ambiguous if its words can be given a certain or definite legal meaning. *Coker*, 650 S.W.2d at 393. On the other hand, ambiguity in a contract exists if its terms are uncertain, doubtful, or reasonably susceptible to more than one meaning. *Towers of Tex., Inc. v. J & J Sys., Inc.*, 834 S.W.2d 1, 2 (Tex. 1992). Parties to a disputed contract are likely to take conflicting interpretation views, "but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (emphasis in original).

28.     Neither Highland nor Daugherty argue that the Employment Agreement or the 2009 Compensation Statement are ambiguous. Rather, Highland argues that the 2009 Compensation Statement lacks material terms rendering it an indefinite agreement.

29. An alleged contract that fails to address all essential and material terms with a reasonable degree of certainty and definiteness is unenforceable as a matter of law. *See APS Cap. Corp. v. Mesa Air Grp. Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) ("In order to be a legally enforceable contract, an agreement must be formed around the contours of sufficiently specific terms."). Material terms "are those that the parties would reasonably regard as vitally important elements of their bargain," and "a contract must define its essential terms with enough precision to enable the court to determine the obligations of the parties." *Tex. Architectural Aggregate, Inc. v. ACM-Tex., LLC (In re ACM-Tex., Inc.)*, 430 B.R. 371, 408 (Bankr. W.D. Tex. 2010) (internal citation omitted). Essential terms are unique to the type of agreement, and, in the employment context, essential terms include compensation, duties, and responsibilities. *See City of Hou. V. Williams*, 353 S.W.3d 128, 139 (Tex. 2011).

30. Legally, there is significant difference between ambiguity and indefiniteness. *See Marx v. FDP, LP*, 474 S.W.3d 368, 375 (Tex. App.—San Antonio 2015, pet. denied) ("Unlike the trial court's obligation to resolve any ambiguity necessary to enforce a contract, indefiniteness in a contract makes the contract unenforceable."); *Sifuentes v. Carrillo*, 982 S.W.2d 500, 504 (Tex. App.—San Antonio 1998, pet. denied). When an ambiguity is discovered, courts seek to resolve the ambiguity "by looking at the contract as a whole in light of the circumstances present when the contract was entered" to ascertain the parties' intent. *Coker*, 650 S.W.2d at 393–94. "As a general matter, Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify" essential terms. *Liberto v.*

16

*D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006). In either instance, however, determining whether the contract is ambiguous or indefinite is a question of law. *See Coker*, 650 S.W.2d at 394; *Abatement Inc. v. Williams*, 324 S.W.3d 858, 862 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

31.     The Employment Agreement incorporates by reference the 2009 Compensation Statement, such that, read together, the contract contains all material terms and is not indefinite. The following language, though, from the 2009 Compensation Statement is ambiguous:

> Refund is an estimated amount. If actual refund deviates materially from estimate, other compensation will be fairly adjusted. Refund is expected to be received in approximately 4 months.

In particular, the phrases "deviates materially," "other compensation," and "fairly adjusted" are all uncertain and reasonably susceptible to more than one meaning. There are no other provisions in the Employment Agreement or the 2009 Compensation Statement that give certain or definite legal meaning to these phrases. Thus, the Court must resolve the ambiguity to enforce the agreement.

32.     The "ultimate goal" when resolving an ambiguity "is always to determine the parties' intent as objectively expressed in the words of their agreement." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). To that end, courts may consider the facts and circumstances surrounding the contract, including "objectively determinable factors that give context to the parties' transaction." *Id.* (internal quotation and citation omitted). And while this extrinsic evidence is helpful in resolving the ambiguity, courts cannot

17

interpret "contractual language to say what it unambiguously does not say." *Id.* (citation modified).

33. There can be little doubt that Highland intended the tax refund referenced in the 2009 Compensation Statement to be Daugherty's bonus for his work performed in 2008. Daugherty seemingly admits as much in his proof of claim. The ambiguity arises from the remaining language of the 2009 Compensation Statement that provided for a fair adjustment to other compensation if the refund amount materially deviated from the estimate. Highland Ex. 13; Daugherty Ex. 14.

34. Daugherty asserts the language obligates Highland to compensate Daugherty if the IRS Audit results in him paying back to the IRS all or part of the refund he received in 2009. Dkt. No. 102, ¶¶ 10–12. Highland argues the language is too vague and indefinite to create an enforceable obligation. Dkt. No. 101, ¶¶ 29–39.

35. The Court endeavors to resolve the ambiguity by determining the parties' intent from the entirety of the Employment Agreement and 2009 Compensation Statement. In doing so, the Court gives the words used in these documents their plain and ordinary meaning because they were not specifically defined or used in a technical manner. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.,* 473 S.W.3d 296, 307 (Tex. 2015). The Court concludes that, as a component of Daugherty's compensation, Highland estimated Daugherty's refund at $1,475,816 and, if the refund amount he received materially deviated from that estimate, Highland would adjust his other compensation to make up the difference.

18

Highland Ex. 13, Daugherty Ex. 14. Certainly, it is a material deviation if Daugherty must pay back the entire amount he received as a refund on account of the IRS Audit.

36.     Nonetheless, whether the 2009 Compensation Statement language is ambiguous and capable of resolution is immaterial, because Daugherty's Reserved Claim faces a bigger obstacle for allowance against Highland's bankruptcy estate. While the language used in the 2009 Compensation Statement is susceptible to more than one meaning, the termination provisions in the Employment Agreement are clear and unambiguous.

37.     Sections 4.5 and 4.6 of the Employment Agreement deal with an executive's voluntary termination of their employment with Highland. Each provision contains the following language:

> In the event the Executive declines to sign the separation agreement and release, he/she shall not be entitled to any severance, **and** the Company will have no further liability or obligation to the Executive under this Agreement or in connection with his/her employment or termination.

Highland Ex. 11 at 6 (emphasis added). Attached to the Employment Agreement as Exhibit A is the form separation agreement and release.

38.     Daugherty submitted his resignation from Highland in September 2011 with an effective date of October 31, 2011. Highland Ex. 12; Daugherty Ex. 15. If Daugherty signed the separation agreement attached as Exhibit A, under the Employment Agreement, Daugherty would have been entitled to severance pay and additional earned compensation or benefits, including, potentially, a true up of the 2008 Tax Refund. Daugherty did not sign the separation agreement and release.

19

39. In fact, Daugherty attempted to negotiate a different general release and separation agreement with Highland prior to his last day with the company. *See* Highland Ex. 41. This separation agreement specifically referenced in paragraph 3.(c)(ii) Daugherty's right to payment from Highland if Daugherty were obligated to pay back the 2008 Tax Refund to the IRS. *Id.*, ¶ 3.(c)(ii). Daugherty did not sign this separation agreement either.

40. Therefore, the Court finds that the Employment Agreement controls whether Daugherty's Reserved Claim should be allowed against the Highland bankruptcy estate. Pursuant to its express terms, Highland is absolved of all liability or obligations to Daugherty because he failed to execute either of the separation agreements presented to him. The Reserved Claim is disallowed.

### *Dondero's Oral Promises did not Create an Enforceable Guaranty.*

41. To the extent Daugherty argues Dondero's promises are binding agreements to cover his contingent tax liability, this argument also fails.

42. "[I]t is so obviously just that a promisor receiving no benefits should be bound only by the exact terms of his promise." *Davis v. Patrick*, 141 U.S. 479, 488 (1891). In Texas, a promise by one person to answer for the debt of another person, must be in writing and "signed by the person to be charged with the promise or

agreement or by someone lawfully authorized to sign for him." Tex. Bus. & Com. Code

§ 26.01(a), (b)(2).[10]

43. There is, however, an exception to the general rule that a promise to pay

another's debt must be in writing—the main purpose doctrine.

> [W]herever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute [of frauds], although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another.

*Lemmon v. Box*, 20 Tex. 329, 332 (1857). Three elements must be met to satisfy the

main purpose doctrine and thereby remove the promise from the statute of frauds:

> (1) the promisor intended to create primary responsibility in itself to pay the debt; (2) there was consideration for the promise; and (3) the consideration given for the promise was primarily for the promisor's own use and benefit—that is, the benefit it received was the promisor's main purpose for making the promise.

*Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 828 (Tex. 2012). "Consideration

is a bargained-for exchange of promises or return performance and consists of benefits

and detriments to the contracting parties." *Marx*, 474 S.W.3d at 378. Without it, a

contract is unenforceable. *Id.*

---

[10] The Texas Business and Commerce Code defines "person" as "an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, any other legal or commercial entity, or a protected series or registered series of a for-profit entity." Tex. Bus. & Com. Code § 1.201(b)(27).

The evidence before the Court is that Daugherty worked in Highland's Texas office, negotiated his separation while in Texas, and the Employment Agreement identifies Texas in its "choice of law" provision. Thus, the Court will consider Texas law when construing Daugherty's testimony about Highland's promise to pay his unliquidated tax liability.

44.    Assuming without deciding that Highland intended to create primary responsibility in itself to pay Daugherty's tax liability, the promise fails because there was no consideration. Though Daugherty testified that Dondero repeatedly promised to cover his tax liability, the only evidence before the Court of consideration for such promise is an unexecuted separation agreement. Highland Ex. 41. In that unexecuted separation agreement, Daugherty would give certain releases in favor of Highland and its subsidiaries in exchange for Highland's promise to pay "a 'Notice of Tax Due' or other such letter from a governmental taxing authority demanding payment for taxes that relates to an Internal Revenue Service audit." *Id.*, ¶¶ 3(c)(ii), 4. Neither party, however, agreed to be bound by the terms of the separation agreement, and there is no evidence that Dondero's oral promise, made conceivably on behalf of Highland, is relieved from the statute of frauds. These unwritten promises are not enforceable and, likewise, prohibit Daugherty from collecting his Reserved Claim from Highland's bankruptcy estate.

45.    Based on an argument that Dondero promised to make Daugherty whole, for the reasons set forth above, Daugherty's Reserved Claim is disallowed.

### *Highland Fulfilled its Obligations under the Settlement Agreement.*

46.    Daugherty bears the burden of proving that Highland breached the settlement agreement by failing to turnover the HERA and ERA "books and records (spreadsheet)," which is remedied only by specific performance. *Movora LLC v. Gendreau*, 345 A.3d 997, 1011 (Del. 2025); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 53 (Del. Ch. 2001). To obtain specific performance under Delaware law, a plaintiff

must prove by clear and convincing evidence: (1) a valid contract exists, (2) the plaintiff is ready, willing, and able to perform, (3) a legal remedy would be inadequate, and (4) the balance of equities tips in favor of the party seeking specific performance. *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 495 (Del. Ch. 2022).

47.   "Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Courts will give effect to the plain-meaning of a contract's terms and provisions where they are clear and unambiguous. *Id.* at 1159–60.

48.   To that end, the Delaware Court of Chancery has stated that "[t]he meaning of the term 'books and records' can readily be understood through § 18–305 of the LLC Act and through its corporate law and limited partnership law counterparts, 8 Del. C. § 220 and 6 Del. C. § 17–305, respectively."[11] *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, No. CIV.A. 18928, 2002 WL 205681, at *3 n.3 (Del. Ch. Jan. 29, 2002) (finding tax returns were within the scope of a contractual "books and records" provision). The Delaware Limited Liability Company Act, 6 Del. C. § 18-305(a), generally identifies, at a minimum, the statutory books and records that a Delaware LLC must provide to its managers for inspection:

> (1) True and full information regarding the status of the business and financial condition of the limited liability company;

---

[11] 8 Del. C. § 220, the corporate books and records provision, sets out defined categories of corporate financial and governance documents and does not have a "just and reasonable" category. The Delaware Limited Partnership Law books and records provision, 6 Del. C. § 17–305, is substantially similar to the Delaware LLC Law's provision.

(2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;

(3) A current list of the name and last known business, residence or mailing address of each member and manager;

(4) A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed;

(5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and

(6) Other information regarding the affairs of the limited liability company as is just and reasonable.

49. Highland provided Daugherty with HERA and ERA's financial, governance, and tax records. And, at Daugherty's request, Highland provided additional information that supported HERA and ERA's financial records. Daugherty's requests for "all" documents or documents that "related to" HERA and ERA were not "just and reasonable," and Highland was under no obligation to satisfy them. The Court thus finds that Highland did not breach the Books and Records Provision of the settlement agreement, and Daugherty is not entitled to specific performance.

50. The Court's conclusion here is without prejudice to HERA seeking discovery from Highland in connection with its lawsuit pending in the Northern District of Texas.

24

## <u>CONCLUSION</u>

Daugherty's Reserved Claim is disallowed, and he shall collect nothing further from Highland's bankruptcy estate or the claimant trust. Daugherty's counterclaim for breach of contract and specific performance is denied. The Court will issue a judgment consistent with this Memorandum Opinion.

### End of Memorandum Opinion ###